NON-CONFIDENTIAL VERSION

2024-1431

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., COLAKOGLU
DIS TICARET A.S., COLAKOGLU METALURJI A.S.,

*Plaintiffs – Appellees*

v.

UNITED STATES,

*Defendant – Appellee*

v.

REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC.,
COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC.,
NUCOR CORPORATION, STEEL DYNAMICS, INC.,

*Defendants – Appellants*

Appeal from the United States Court of International Trade in
Case No. 1:21-cv-00565, Judge Gary S. Katzmann

## OPENING BRIEF OF DEFENDANTS-APPELLANTS
## REBAR TRADE ACTION COALITION AND ITS INDIVIDUAL
## MEMBERS

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action
Coalition and its individual members*

Dated: April 2, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1431 |
| **Short Case Caption** | Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States |
| **Filing Party/Entity** | Rebar Trade Action Coalition and its individual members - Defendant-Appellants |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/16/2024

Signature:  /s/ Alan H. Price

Name:  Alan H. Price

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Rebar Trade Action Coalition | | |
| Nucor Corporation | | |
| Commercial Metals Company | | |
| Gerdau Ameristeel US Inc. | | |
| Steel Dynamics, Inc. | | |
| Byer Steel Group, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)   ☑  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF RELATED CASES ........................................................1

II.   JURISDICTIONAL STATEMENT ..........................................................1

III.  STATEMENT OF THE ISSUES .............................................................1

IV.   STATEMENT OF THE CASE .................................................................2

V.    STATEMENT OF FACTS .......................................................................2

    A.    Commerce's Cross-Attribution Regulation and Analysis....................2

    B.    The 2018 Review ..............................................................................5

    C.    The Appeal and Remand Proceedings .................................................8

VI.   SUMMARY OF ARGUMENT.................................................................12

VII.  ARGUMENT...........................................................................................13

    A.    Standard of Review ..........................................................................13

    B.    Commerce's Original Cross-Attribution Determination Should Be Reinstated ............................................................................13

    C.    In the Alternative, the Remand Results Should Be Remanded for a Second Time ...............................................25

        1.    Commerce's Conclusion Regarding the Nature of Steel Scrap as an Input is Inadequately Explained and Supported ..................................................27

        2.    Commerce's Evaluation of Nur's Business Activities is in Error..................................................35

VIII. CONCLUSION .......................................................................................42

## CONFIDENTIAL MATERIALS OMITTED

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted from pages 7 and 14 describes certain transactions between affiliated parties. The material omitted from pages 30, 31, and 39 identifies the location, in the record, of certain information regarding the nature of scrap use and transactions between affiliated parties. The material omitted from page 41 describes certain transactions between affiliated parties and describes the precise locations on the cited pages where relevant data may be found.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gujarat Fluorochemicals Ltd. v. United States*,
  617 F. Supp. 3d 1328 (Ct. Int'l Trade 2023) ................................................*passim*

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
  625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009) ................................................*passim*

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
  498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ................................................*passim*

*Micron Tech., Inc. v. United States*,
  243 F.3d 1301 (Fed. Cir. 2001) ........................................................................13

*Nucor Corp. v. United States*,
  600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ................................................22, 32

*Nucor Corp. v. United States*,
  612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ................................................*passim*

*Nucor Corp. v. United States*,
  653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023) ........................................22, 29, 32

*POSCO v. United States*,
  296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ................................................14, 21

*PPG Indus., Inc. v. United States*,
  978 F.2d 1232 (Fed. Cir. 1992) ........................................................................13

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................13

19 U.S.C. § 1677(5)(A)..........................................................................................2

19 U.S.C. § 1677(5)(B)..........................................................................................2

28 U.S.C. § 1295(a)(5)...........................................................................................1

28 U.S.C. § 1581(c) ...............................................................................................1

## Regulations

19 C.F.R. § 351.525(b)(6)(i) ..............................................................2, 7

19 C.F.R. § 351.525(b)(6)(iv) ..........................................................*passim*

## Administrative Materials

*Carbon and Alloy Steel Wire Rod from the Republic of Turkey*,
    82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017) ......................16

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic
    of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) ...................22

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016)......................16

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) ..............................22, 33

*Certain Glass Containers from the People's Republic of China*,
    85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) ........................23, 24, 37

*Certain Oil Country Tubular Goods from the Republic of Turkey*,
    79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014)........................16, 17, 30

*Certain Pasta from Italy*,
    61 Fed. Reg. 30,288 (Dep't Commerce June 14, 1996) ......................................4

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure
    Pipe from the People's Republic of China*, 75 Fed. Reg. 57,444
    (Dep't Commerce Sept. 21, 2010).....................................................20

*Certain Softwood Lumber Products from Canada*,
    57 Fed. Reg. 22,570 (Dep't Commerce May 28, 1992) ...................................3, 4

*Certain Softwood Lumber Products from Canada*,
    67 Fed. Reg. 67,388 (Dep't Commerce Nov. 5, 2002)........................................5

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of
    Turkey*, 84 Fed. Reg. 21,327 (Dep't Commerce May 14, 2019).......................16

*Countervailing Duties*,
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998).............................*passim*

*Forged Steel Fluid End Blocks from the Federal Republic of Germany*,
    85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020) ..............................23, 32

*Forged Steel Fluid End Blocks from the Federal Republic of Germany*,
    85 Fed. Reg. 31,454 (Dep't Commerce May 26, 2020) ....................................32

*Large Residential Washers from the Republic of Korea*,
    77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012) ..................................4, 5

*Seamless Carbon and Alloy Steel Standard, Lined, and Pressure Pipe
    from the Russian Federation*, 85 Fed. Reg. 80,007 (Dep't
    Commerce Dec. 11, 2020) ...............................................................................16

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019).....................................15

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) ......................................15

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) ....................................15

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    87 Fed. Reg. 73,750 (Dep't Commerce Dec. 1, 2022) ......................................15

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    88 Fed. Reg. 85,234 (Dep't Commerce Dec. 7, 2023) ......................................15

*Steel Concrete Reinforcing Bar from Mexico and Turkey*,
    Inv. Nos. 701-TA-502 and 731-TA-1227, USITC Pub. 5122 (Oct.
    2020) (Review) ..........................................................................................*passim*

**Other Authorities**

Fed. Cir. R. 4 .........................................................................................................1

## I.    **STATEMENT OF RELATED CASES**

Counsel for Appellants the Rebar Trade Action Coalition and its individual members (collectively "RTAC") are aware of no other appeal in or from the same civil action that has previously been before this or any other appellate court. An appeal involving a similar cross-attribution issue arising in a subsequent administrative review of the countervailing duty ("CVD") order at bar is currently pending before the U.S. Court of International Trade ("CIT").

## II.    **JURISDICTIONAL STATEMENT**

This is an appeal from the final judgment of the CIT in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Ct. No. 21-00565. The CIT entered its final judgment on November 27, 2023. The CIT exercised jurisdiction pursuant to 28 U.S.C. § 1581(c). RTAC filed its notice of appeal on January 26, 2024, within sixty days of the CIT's final judgment, making this appeal timely under Fed. Cir. R. 4. This Court has jurisdiction under 28 U.S.C. § 1295(a)(5). This appeal is from a final judgment that disposes of all parties' claims.

## III.    **STATEMENT OF THE ISSUES**

This appeal raises the following issues:

(1)    Whether the original determination by the U.S. Department of Commerce ("Commerce") to cross-attribute subsidies received by a respondent's cross-owned affiliate was reasonable and otherwise in accordance with law; and

(2)    Whether the remand determination declining to cross-attribute subsidies was reasonable and in accordance with law.

## IV.    STATEMENT OF THE CASE

This appeal arises from the CIT's final judgment in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Ct. No. 21-00565, concerning Commerce's final determination in the 2018 annual review of a CVD order on Turkish steel concrete reinforcing bar ("rebar"). Before issuing the opinion reflecting its final judgment, the CIT remanded aspects of the original final agency determination. The CIT's opinion remanding the action was published at 633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023); its final opinion, CIT slip op. 23-167 (Jan. 26, 2024), has not yet been published in the Federal Supplement.

## V.    STATEMENT OF FACTS

### A.    Commerce's Cross-Attribution Regulation and Analysis

The U.S. trade remedy laws provide that a "subsidy" exists where a foreign governmental "authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). Subsidies are "countervailable" where they are "specific." *Id.* § 1677(5)(A). Where a company receiving a countervailable subsidy is cross-owned with other corporations, Commerce will normally attribute the subsidy to the products produced by the recipient company. 19 C.F.R. § 351.525(b)(6)(i). However:

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

*Id.* § 351.525(b)(6)(iv).

In promulgating section 351.525(b)(6)(iv), Commerce explained that it was concerned with closing "a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) (final rule) ("Preamble"). Commerce stated that in applying its new cross-attribution policy, it would seek to determine whether an input was used "almost exclusively" to produce a "higher value added product," and thus formed "a link in the overall production chain" for that downstream product. *Id.*

To illustrate its intention, Commerce provided two examples of inputs that it considered "primarily dedicated" to value-added downstream production: (1) stumpage, *i.e.*, softwood timber/logs, used to produce lumber,[1] and (2) semolina, which is used to produce products like pasta. *Id.* Both examples involve inputs with

---

[1]    Stumpage is also used to produce pulp, as well as saleable byproducts such as chips and sawdust. *Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,577-78 (Dep't Commerce May 28, 1992) (final affirmative countervailing duty determination).

a "close physical relationship" to a limited group of downstream products. *Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1337 (Ct. Int'l Trade 2023); *see also* Preamble, 63 Fed. Reg. at 65,401; *Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. at 22,577-78 (indicating that timber is used to produce lumber and pulp); *Certain Pasta from Italy*, 61 Fed. Reg. 30,288, 30,829 (Dep't Commerce June 14, 1996) (final affirmative countervailing duty determination) (noting that semolina is a "primary input" into pasta production). Indeed, the downstream products in both examples (lumber and pasta) heavily rely on the named inputs (stumpage and semolina) for their overall characteristics.

Commerce also provided the contrasting example of plastics, as used in the production of automobiles or appliances. Preamble, 63 Fed. Reg. at 65,401. Glossing this example, the CIT has noted that plastics play a "universal role" in manufacturing, rather than being inputs with a close physical relationship to a limited number of downstream goods. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337; *see also* Preamble, 63 Fed. Reg. at 65,401. Further, while plastics may be inputs into automobiles or appliances (or incorporated into components for such goods), plastics are not as likely to impart critical characteristics of these finished goods as stumpage is with respect to lumber or semolina with respect to pasta. *See* Issues and Decision Memorandum accompanying *Large Residential Washers from the Republic of Korea*, 77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012) (final

affirm. countervailing duty deter.) at 3. Reasoning from this example, the CIT has rejected cross-attribution of subsidies where the input is of "universal application" and lacks a "physical relationship" to the downstream product. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337-38 (rejecting cross-attribution of subsidies based on the provision of electricity to a downstream producer of plastic resins).

In determining whether to cross-attribute subsidies received by an affiliated input supplier, Commerce also considers whether the cross-owned affiliate sells its supply of the relevant input solely, or primarily, to the respondent producer. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 67,388 (Dep't Commerce Nov. 5, 2002) (final results and partial rescission of countervailing duty expedited revs.) at 14-15. However, Commerce does not consider the volume of the input supplied to the downstream producer, either on an absolute basis or as a percentage of the downstream producer's purchases of that input. *See, e.g.*, *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1363-64 (Ct. Int'l Trade 2021).

**B.** **The 2018 Review**

Rebar is a steel product used in the reinforcement of concrete. It is typically produced by melting steel scrap, forming the melted scrap into billet (a semi-finished

good), and then further processing the billet into rebar. *Steel Concrete Reinforcing Bar from Mexico and Turkey*, Inv. Nos. 701-TA-502 and 731-TA-1227, USITC Pub. 5122 (Oct. 2020) (Review) at I-26, *available at* https://www.usitc.gov/publications/701_731/pub5122.pdf ("USITC Pub. 5122"). Federal courts and agencies have accordingly recognized that steel scrap is a—if not *the*—primary input into rebar production, and Turkish rebar producers have argued in past cases that the relationship between scrap and rebar is akin to that of semolina and pasta *See, e.g.*, *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 625 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2009); *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1323-24 (Ct. Int'l Trade 2009); USITC Pub. 5122 at 30-31, 37, 39 n.236, and I-26.

In the 2018 administrative review, Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") reported producing rebar using the typical process. Appx1022-1023, Appx1026, Appx1064-1065.[2] Indeed, steel scrap was the only raw material identified in its production diagram, and the company described scrap as a "major input" into its production operations. Appx1064-1065; *see also* Appx165-165. Kaptan reported purchasing scrap steel that cross-owned affiliates generated as a byproduct of activities such as shipbuilding (Nur Gemicilik ve Tic. A.S. ("Nur")),

---

[2]    This process was also used in 2018 by the other mandatory respondent in the review, Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S ("Icdas"). *See* Appx183-184.

operating port facilities (Martas Marmara Ereglisi Liman Tesisleri A.S. ("Martas")), and packing/heating anthracite coal (Aset Madencilik A.S. ("Aset")). Appx148-150. These affiliates also [ description of transactions ]. Appx156-157.

Commerce preliminarily found that the scrap that Kaptan purchased from its cross-owned affiliates was "primarily dedicated to the production of the downstream product." Appx1768.[3] While Marta and Aset benefited from no countervailable subsidy programs in 2018, Commerce found that Nur received a countervailable subsidy, and cross-attributed the benefits to Nur/Kaptan's combined sales. Appx1772-1773.

In its agency brief, Kaptan challenged the cross-attribution. Kaptan argued that because Nur provided Kaptan with a *de minimis* amount of scrap, and because Nur's primary business was shipbuilding, its scrap production was not "primarily dedicated" to downstream steel goods within the meaning of 19 C.F.R. § 351.525(b)(6)(i). Appx1785-1797. Commerce continued to cross-attribute Nur's subsidy benefits for the final results. Appx1832-1834. The agency observed that it had previously treated steel scrap as an input primarily dedicated to rebar production "regardless of the amount of scrap purchased," and noted the CIT's approval of this finding in a challenge to a prior administrative review of the same CVD order.

---

[3]     It made the same finding as to the steel scrap that Icdas purchased from its own cross-owned affiliates. Appx1767.

Appx1832-1833 (citing *Icdas*, 498 F. Supp. 3d at 1364). Commerce also explained that while Nur might be a shipbuilding company, its shipbuilding activities produced steel scrap, which Nur sold exclusively to Kaptan, and which Kaptan then used in making downstream steel products including subject goods. *Id.* Accordingly, Commerce found that Nur's scrap supply was "devoted to Kaptan's downstream steel production." Appx1833.

### C.    The Appeal and Remand Proceedings

Kaptan appealed and the CIT remanded Commerce's treatment of Nur's scrap as primarily dedicated to Kaptan's downstream production. Appx1-10. The lower court found insufficient the agency's explanations that it had treated scrap as an input primarily dedicated to downstream rebar production in prior reviews of the order, and that the same substantive treatment had previously been upheld as to a different Turkish rebar producer that received small quantities of scrap from an affiliated electricity producer. Appx9. The CIT found that Commerce had not adequately explained why, based on the record of the 2018 review, Nur's scrap should be considered "primarily dedicated" to Kaptan's downstream production. *Id.* The lower court also found that Commerce had not appropriately distinguished prior cases involving in which it considered the "byproduct nature" of scrap and/or the quantity of inputs transferred between cross-owned affiliates. Appx9-10.

In its draft remand results, Commerce continued to cross-attribute Nur's subsidies. Appx2170. Commerce explained that in determining whether an input supplied by a cross-owned affiliate is "primarily dedicated" to downstream production, the agency considers a non-exhaustive group of criteria that include whether:

(1) the supplier produces or generates the input at issue;

(2) the input could be used in the production of downstream goods including subject merchandise (even if it was not actually so used);

(3) the input is "merely a link in the overall production chain" for particular value-added products, as stumpage is for lumber, and semolina is for pasta.

(4) the affiliated input supplier provided the input primarily or exclusively to the downstream producer for use in the downstream production chain; and

(5) the input supplier's business activities support cross-attribution.

Appx2179-2181. Commerce also confirmed that it does not consider the quantity of the input transferred between the affiliated parties, either absolutely or as a percentage of the downstream producer's total purchases of that input. Appx2181-2182. Rather, it considers an input that "is critical for the production" of a

downstream good to be "primarily dedicated to" production of that good, even if provided in "a miniscule amount." Appx2182.

The agency found that Nur sold its scrap exclusively to Kaptan, and that the record showed "a clear vertically integrated steel scrap supply process" in which cross-owned affiliates such as Nur supplied scrap generated from their production operations exclusively to Kaptan, which used the scrap as a critical input into its production of rebar and similar downstream steel products. Appx2182-2183. Commerce then distinguished the record here from that of other cases in which it had referred to or relied on an affiliate's overall business activities in determining not to cross-attribute subsidies, explaining that those cases involved affiliates that provided the respondent with multiple goods and/or services, including those unrelated to downstream production of subject goods or goods like them. Appx2186-2187.

Commerce reversed course in the final remand results. Appx2237. The agency continued to find that certain considerations listed above supported cross-attribution. Specifically, Commerce found that Nur's generation of scrap qualified as "production" for purposes of 19 C.F.R. § 351.525(b)(6)(iv). Appx2238, Appx2253-2254. The agency found that Nur's scrap could be used to produce "the downstream product," as Kaptan in fact used it to produce rebar and other downstream steel goods. Appx2238; *see also* Appx1833. Commerce noted that Nur sold the scrap that

it produced exclusively to Kaptan for Kaptan's use in producing rebar and similar steel products. Appx2239. Commerce also indicated that while Nur may have supplied only a small quantity of scrap to Kaptan, the amount supplied was irrelevant to its analysis. Appx2247.

Nonetheless, the agency reasoned that a fresh look at the record called into question its preliminary redetermination that a "vertically integrated supply chain" existed. Appx2237. In this regard, Commerce noted that there were "extremely limited" transactions between Nur and Kaptan during the review period. Appx2237, Appx2241, Appx2247. Further, Commerce found that Kaptan's purchases of scrap steel from cross-owned affiliates other than Nur were irrelevant to the question of whether Nur's scrap production was "vertically integrated" with Kaptan's downstream production. Appx2247-2249.

Commerce found that, in contrast with the examples of semolina/pasta and stumpage/lumber provided in the Preamble, steel scrap is not necessarily an input primarily dedicated to the production of downstream steel. Appx2237-2238. Commerce noted that Nur did not process the scrap that it provided to Kaptan, and reasoned that "unprocessed scrap is a common input among a wide variety of products and industries." Appx2239-2240. Commerce also found that Nur's status as a shipbuilder, *i.e.*, its main business of producing "a product that is much further downstream" than Kaptan's steel goods, supported a decision not to cross-attribute

11

subsidies, particularly "given the extremely limited transactions between the two companies." Appx2241.

RTAC opposed the final remand results, but the CIT affirmed them. Appx11-52. This appeal then followed.

## VI.   <u>SUMMARY OF ARGUMENT</u>

The Court should reinstate Commerce's original determination to cross-attribute subsidies received by Kaptan's scrap-supplying affiliate Nur. Commerce's original determination was consistent with agency regulations, the Preamble, and applicable precedent, and was supported by substantial record evidence. By contrast, the agency's determination on remand not to cross-attribute Nur's subsidies is unsupported by substantial evidence, inadequately explained, and otherwise not in accordance with law. Specifically, the remand results focus on irrelevancies, are inconsistent with unaddressed, relevant record evidence regarding Nur's supply of scrap to Kaptan, fail to appropriately address past cases in which Commerce has confronted similar situations, and involve arbitrarily distinct treatment of Nur and other scrap-supplying Kaptan affiliates. Accordingly, to the extent that the Court chooses not to simply reinstate the lawful original determination, the Court should remand the decision not to cross-attribute Nur's subsidies for further consideration.

## VII.  ARGUMENT

### A.  Standard of Review

The Court of Appeals for the Federal Circuit reviews decisions of the CIT *de novo*, replicating the CIT's review of the challenged agency determination. *See, e.g.*, *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed. Cir. 1992). The Court thus applies the same standard of review to agency determinations as the CIT. The Court will affirm Commerce's decisions where they are supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1307-08 (Fed. Cir. 2001).

### B.  Commerce's Original Cross-Attribution Determination Should Be Reinstated

To avoid situations in which a respondent escapes countervailing duties by separately incorporating divisions that produce critical inputs into its manufacturing operations, Commerce cross-attributes subsidies received by respondent's affiliated suppliers of inputs "primarily dedicated to production of the downstream product." 19 C.F.R. § 351.525(b)(6)(iv); Preamble, 63 Fed. Reg. at 65,401. An input used in producing a limited group of downstream goods to which the input bears a close physical relationship (*i.e.*, to which it imparts critical characteristics) is "primarily dedicated" to those downstream goods within the meaning of the regulation. *See* 19 C.F.R. § 351.525(b)(6)(iv); Preamble, 63 Fed. Reg. at 65,401; *see also Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337. By contrast, an input used across a wide

variety of manufacturing operations, and/or which does not bear a close or critical relationship to the relevant downstream product, is not "primarily dedicated" to the downstream product's production. Preamble, 63 Fed. Reg. at 65,401; *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337-38.

Commerce also considers whether the input is used "almost exclusively" to produce a "higher value added product," thus forming "a link in the overall production chain" for that downstream product. Preamble, 63 Fed. Reg. at 65,401. Commerce will consider whether a particular affiliate provides its supply of the input at issue exclusively to the respondent, but does not consider the volume supplied on either an absolute basis or as a percentage of the respondent's overall purchases. *See, e.g.*, *POSCO v. United States*, 296 F. Supp. 3d 1320,  1340 (Ct. Int'l Trade 2018); *Icdas*, 498 F. Supp. 3d at 1363-64.

In the most typical process for manufacturing rebar — which is the process that Kaptan used — steel scrap is the primary raw material. *See, e.g.*, USITC Pub. 5122 at I-26; *Habas*, 625 F. Supp. 2d at 1348; *Nucor*, 612 F. Supp. 2d at 1323-24; Appx1023, Appx1026, Appx1064-1065. Kaptan reporting purchasing steel scrap used in its 2018 production operations from a variety of sources, including its cross-owned affiliates Nur, Martas, and Aset. Appx148-150. These affiliates generated scrap in the course of activities such as shipbuilding; they also [ description of transactions ]. Appx148-150; Appx156-157; Appx1768.

14

Consistent with its approach to the relationship between scrap and downstream steel goods in prior administrative reviews of the order, as well in as certain other proceedings involving steel products made with steel scrap, Commerce concluded that the scrap that Kaptan received from its affiliates was "primarily dedicated" to Kaptan's downstream production. Appx1833; Appx1768; *see also* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019) (final results and partial rescission of countervailing duty administrative review; 2016) at 35; Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) (preliminary results of countervailing duty administrative review and intent to rescind the review in part; 2017) at 10-11 (unchanged in final);[4] Preliminary

---

[4]    Commerce also treated scrap as primarily dedicated to downstream production in the 2019 and 2020 reviews of the order at bar, as well as in the as-yet unfinalized preliminary results of the 2021 review. *See* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) (final results of countervailing duty admin. rev. and rescission, in part; 2019) at 10-11; Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 87 Fed. Reg. 73,750 (Dep't Commerce Dec. 1, 2022) (preliminary results of countervailing duty administrative review and intent to rescind in part; 2020) at 7-8 (unchanged in final); Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 88 Fed. Reg. 85,234 (Dep't Commerce Dec. 7, 2023) (preliminary results of countervailing duty administrative review and intent to rescind in part; 2021) at 11-12. Kaptan has appealed the resulting cross-attribution of subsidies in the 2019 review, and that case is pending before the CIT. Kaptan did not appeal this issue as

Decision Memorandum accompanying *Seamless Carbon and Alloy Steel Standard, Lined, and Pressure Pipe from the Russian Federation*, 85 Fed. Reg. 80,007 (Dep't Commerce Dec. 11, 2020) (prelim. affirm. countervailing duty deter. and alignment of final deter. with final antidumping duty deter.) at 10 (unchanged in final); Preliminary Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 84 Fed. Reg. 21,327 (Dep't Commerce May 14, 2019) (prelim. results of countervailing duty admin. rev. and intent to rescind the rev., in part; calendar year 2017) at 8 (unchanged in final); Preliminary Decision Memorandum accompanying *Carbon and Alloy Steel Wire Rod from the Republic of Turkey*, 82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017) (prelim. affirm. countervailing duty deter. and prelim. affirm. critical circumstances deter., in part) at 9, 20 (unchanged in final); Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) (final affirm. deter. of the countervailing duty inv.) at cmt. 5; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) (final affirm. countervailing duty deter. and final affirm. critical circumstances deter.) at 8 ("OCTG from Turkey

---

to the 2020 review, but has raised the issue in its case brief in the unfinalized 2021 review.

IDM") (rejecting argument that because steel scrap is a byproduct, rather than an intentionally manufactured good, scrap generation did not qualify as production for purposes of the cross-attribution regulation). Accordingly, Commerce attributed countervailable subsidies received by Nur to the combined sales of Nur and Kaptan, excluding intercompany sales. *See, e.g.*, Appx1768.

Kaptan did not deny that scrap was its primary raw material input, or that it purchased scrap from Nur and used it to produce downstream goods including rebar. Appx1787-1797. Rather, it challenged Commerce's preliminary cross-attribution finding on the basis that Nur's scrap could not reasonably be treated as "primarily dedicated" to Kaptan's downstream production given Nur's primary business activity as a shipbuilder and the small quantity of scrap that Nur sold to Kaptan. *Id.*

In its decision memorandum, Commerce, explained that it matters little whether a supplying affiliate's business activities focused on generating a particular input, where those activities nonetheless generate the input, and the respondent uses the input to produce the subject merchandise, as was the case here. Appx1832-1833. In other words, Commerce interpreted its regulation as focusing not on the input producer's operations writ large, but on its "production of the input product" and the relation of that input with the respondent's downstream production. *See id.*; *see also* 19 C.F.R. § 351.525(b)(6)(iv) (referring to whether "production of the input product is primarily dedicated to production of the downstream product.").

Commerce further explained that it did not read the regulation — which makes no reference to quantities or volumes – as requiring consideration of the amount of the input transferred between an affiliated supplier and respondent. Appx1832-1834; 19 C.F.R. § 351.525(b)(6)(iv). Rather, Commerce explained that so long as the input product is "primarily dedicated" to the respondent's downstream production, the quantity supplied is irrelevant. Appx1834. The agency also noted that the CIT had previously upheld Commerce's decision not to consider the quantity of scrap supplied between an affiliate and respondent in a prior review of the order; Commerce further confirmed that it had not established any *de minimis* test in prior cases. Appx1833.

While Commerce did not explicitly state that scrap steel has a close physical relationship with a limited number of downstream products, akin to stumpage's relationship with lumber or semolina's relationship with pasta, Kaptan did not deny that steel scrap was its primary production input. Appx1787-1797. Indeed, its production process was the typical one, in which rebar is produced through the remelting of scrap steel. *See, e.g.*, USITC Pub. 5122 at I-26; *Habas*, 625 F. Supp. 2d at 1348; Appx1023, Appx1026, Appx1064-1065. And although Kaptan argued that Nur was akin to the plastics company referenced in the Preamble, Kaptan did not claim that steel scrap lacks a close physical relationship to downstream steel goods such as rebar or claim that steel scrap is used as a raw material other than in

steelmaking. Appx1022-1023. Rather, it argued that Nur was like a plastics producer on the inapposite basis that Kaptan used scrap steel to produce non-subject steel bar and billet, as well as subject rebar. *Id.*; *see also* Appx1023; Appx1026.

Commerce acted reasonably in rejecting Kaptan's arguments and continuing to cross-attribute subsidies, and its decision to do so should be reinstated. While Kaptan assumed that 19 C.F.R. § 351.525(b)(6)(iv) requires an input supplier's business operations to be "primarily dedicated" to producing the input supplied to the downstream, cross-owned affiliate, this is not what the regulation says. *See* Appx1832-1833. Instead, it focuses on whether the input producer's "*production* of the input product" is "primarily dedicated" to downstream production. 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added). Likewise, while Kaptan argued that the quantity of scrap that Nur provided to Kaptan was small in terms of Kaptan's overall purchases, the regulation is indifferent to whether the input producer's "production of the input product" represents a specific percentage of the supplier's overall business operations, or the recipient's purchases. *Id.* Rather, as Commerce explained, the regulation focuses on whether the cross-owned affiliated "production of the input product," regardless of how large or small it may be in the context of the supplier's business operations or the purchaser's purchases, is "primarily dedicated to {the} production of the downstream product." *See* Appx1832-1834.

Nor does the regulation require the "downstream product" to be the subject merchandise uniquely and specifically. 19 C.F.R. § 351.525(b)(6)(iv). "By avoiding the use of the term 'subject merchandise,' the regulation leaves open the possibility that the 'products' benefitting from the subsidy may include subject and non-subject merchandise." *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) (final affirm. countervailing duty deter., final affirm. critical circumstances deter.) at 98 (quoting Issues and Decision Memorandum accompanying *Certain Lined Paper Products from Indonesia*, 71 Fed Reg. 47,174 (Dep't Commerce Aug. 16, 2006) (final affirm. countervailing duty deter. and final neg. critical circumstances deter.) at 30).

The Preamble similarly supports Commerce's original determination. In explaining the "primarily dedicated" standard, the Preamble does not state that the input supplier's main business activity, the quantity of input supplied/purchased, or the purchaser's use of the input to produce non-subject goods in addition to subject goods are relevant factors. Preamble, 63 Fed. Reg. at 65,401. Rather, the Preamble indicates that the salient issue is whether the input, by its nature, can be used directly to produce only a relatively narrow subset of goods and/or is a primary input into such goods. *Id.*

By its nature, scrap steel is used commercially only in producing steel goods through remelting; scrap steel is also the primary raw material into the typical manufacturing process for rebar, which Kaptan used. As a result, it appears difficult to avoid the conclusion that steel scrap is not just "a link in the production chain" for rebar, but one with a "close physical relationship" to the rebar in which it is used. *Id.*; *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337; *see also Habas*, 625 F. Supp. 2d at 1348; *Nucor*, 612 F. Supp. 2d at 1323-24; USITC Pub. 5122 at 30-31, 37, 39 n.236, and I-26; Appx1023, Appx1026, Appx1064-1065. Indeed, Kaptan's rebar is simply steel scrap that has been remelted and reshaped, much as lumber is simply stumpage that has been sawn to particular dimensions. Appx1023, Appx1026, Appx1064-1065; Preamble, 63 Fed. Reg. at 65,401. Rebar is also a "higher value added product" in comparison with steel scrap. Preamble, 63 Fed. Reg. at 65,401; USITC Pub. 5122 at III-35 (noting that rebar prices fluctuate with the price of scrap, the main raw material into rebar production).

Commerce's determination was also consistent with judicial precedent confirming that the 19 C.F.R. § 351.525(b)(6)(iv) does not require Commerce to base its cross-attribution decision on the quantity of the input supplied or "the impact of an input supplier's contributions" on the respondent's overall operations. *Icdas*, 498 F. Supp. 3d at 1364; *POSCO*, 296 F. Supp. 3d at 1344. Likewise, judicial precedent confirms that cross-attribution is appropriate where there is a close

physical relationship between the input supplied by an affiliate and the downstream product manufactured by the respondent. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337.

Commerce's decision was also consistent with its precedent. As noted above, Commerce has repeatedly found steel scrap to be primarily dedicated to the production of downstream steel goods such as rebar. *See* discussion *supra* at 15-17. And while Kaptan argued that Commerce found otherwise with respect to a specific Korean producer of flat-rolled steel products in a 2017 review concerning cold-rolled steel and a 2018 review of the same producer's U.S. sales of cut-to-length plate, (1) the decision in the 2017 cold-rolled review was unchallenged, while (2) the decision in the 2018 plate review has repeatedly been remanded for further explanation. *Nucor Corp. v. United States*, 653 F. Supp. 3d 1295, 1306-10 (Ct. Int'l Trade 2023); *Nucor Corp. v. United States*, 600 F. Supp. 3d 1225, 1235-38 (Ct. Int'l Trade 2022); Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) (final results and partial rescission of countervailing duty admin. rev., 2018) at 33; Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) (final results of countervailing duty admin. rev.; 2017) at 30 ("2017 Korea Cold-Rolled IDM"); Appx1791-1794.

In its most recent remand results arising from that case, Commerce abandoned its attempt to justify treatment of scrap as not primarily dedicated to the production of downstream steel goods, instead finding that the Korean producer is not cross-owned with the relevant input supplier. *See* Final Results of Redetermination, Ct. No. 21-00182 (Ct. Int'l Trade Dec. 19, 2023), ECF No. 93 at 18-22 ("Plate Second Remand Results").

Other cases that Kaptan cited in its case brief before the agency do not undermine Commerce's determination. In its investigation into German forged steel fluid end blocks, Commerce explicitly confirmed that there is no "'*de minimis*' standard or requirement" with regard to the quantity or value of the input supplied between cross-owned companies. Issues and Decision Memorandum accompanying *Forged Steel Fluid End Blocks from the Federal Republic of Germany*, 85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020) (final affirm. countervailing duty deter.) at 57-58 ("FEBs from Germany IDM"). And while Commerce considered the supplier's overall business activity in its investigation into Chinese glass containers, it did so solely in the context of determining whether to employ adverse inferences with respect to the respondent's failure to supply a questionnaire response for the supplier. Issues and Decision Memorandum accompanying *Certain Glass Containers from the People's Republic of China*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) (final affirm. countervailing duty deter.) at 68-70 ("Glass

Containers IDM"). Scrap steel was also not at issue in the case and indeed, the "input" at issue was machinery/equipment, rather than any raw material input into production. *Id.*

While the lower court remanded Commerce's original determination, the original determination was nonetheless lawful and appropriately explained and supported. The lower court evinced two primary concerns with Commerce's analysis. First, the CIT indicated that Commerce could not rely on findings in prior cases to the exclusion of analyzing the facts on a particular record. Appx9. But steel scrap's close physical relationship with rebar had been long established, and Kaptan reported that steel scrap was its primary raw material input. Appx1023, Appx1026, Appx1064-1065; *see also Nucor*, 612 F. Supp. 2d at 1323-24 (noting Turkish respondents' contention that the relationship between scrap and rebar is like that of semolina and pasta). Moreover, it used scrap purchased from its cross-owned affiliates to produce rebar and similar downstream steel goods in 2018. Appx1023, Appx1026, Appx1064-1065; Appx148-149. Further, while the lower court expressed concern that the agency's determination was at odds with prior cases that Kaptan cited in its case brief, those cases are distinguishable. Appx9-10; Appx1789-1797; *see* discussion *supra* at 22-24. Indeed, the agency's treatment of Nur's scrap was consistent with its prior treatment of the relationship between scrap/rebar, as well as with multiple prior precedents regarding the relevance of the quantity of an

input transferred, whether the phrase "downstream products" should be understood as referring uniquely to subject merchandise, and whether generation of a byproduct qualifies as "production" within the meaning of the regulation and Preamble. As such, Commerce's original determination should be reinstated.

### C.     In the Alternative, the Remand Results Should Be Remanded for a Second Time

The record confirms that scrap is a primary input into Kaptan's rebar production, just as semolina is a primary input into pasta, and stumpage is a primary input into lumber. Kaptan's production process begins with melting scrap. Appx1026, Appx1064-1065. Kaptan uses the melted scrap to produce billets, which it rolls into rebar and similar products. Appx1026, Appx1064-1065. Scrap is the only raw material identified in Kaptan's production flow diagram for rebar, and the company described scrap as a "major input" into its production operations. Appx1064-1065; *see also* Appx164-165.

Kaptan has conceded that it is cross-owned with Nur, meaning that Kaptan "can use or direct the individual assets of {Nur} in essentially the same ways it can use its own assets." Appx1867; 19 C.F.R. 351.525(b)(6)(vi). Commerce has also found that (1) Nur's generation of scrap is "production" for purposes of the cross-attribution regulation, (2) Nur's scrap was exclusively sold to Kaptan, and (3) the scrap was usable — and used — as an input into Kaptan's production. Appx2238-2239; Appx1833. The record indicates that steel scrap bears a close physical

25

relationship to Kaptan's downstream goods. Appx1026, Appx1064-1065. Indeed, based on Kaptan's information, its rebar is simply steel scrap that has been remelted and reshaped, much as lumber is simply timber that has been sawn to particular dimensions. Appx1026, Appx1064-1065; Preamble, 63 Fed. Reg. at 65,401.

Nonetheless, on remand, Commerce concluded that Nur should not be treated as Kaptan's cross-owned input supplier for subsidy attribution purposes, for two reasons. First, Commerce found that "unprocessed" steel scrap of the kind that Nur sold to Kaptan is a "common input among a variety of products and industries and used in a variety of production processes." Appx2239-2240, Appx2250. Commerce thus reasoned that the relationship between Nur's scrap and Kaptan's rebar was like that of plastics with automobiles/appliances, rather than like that of stumpage with lumber or semolina with pasta. *See* Appx2239-2240, Appx2250. Second, Commerce found that Nur's primary business activity of shipbuilding was "far removed" from Kaptan's downstream steel production activities, particularly in light of the "extremely limited transactions between the two companies." Appx2241; *see also* Appx2251-2252. As such, Nur's "business activity is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the *Preamble*." Appx2241.

Commerce's reasoning is flawed. First, the agency's conclusion that Nur's scrap has the sort of attenuated relationship with Kaptan's rebar that plastics have

with automobiles or appliances is neither supported by the record nor adequately explained. Rather, the record indicates that the relationship between steel scrap — including "unprocessed" steel scrap — and rebar is akin to that of stumpage/lumber and semolina/pasta. Second, Commerce inappropriately focused on Nur's generalized "business activity" over record evidence regarding Nur's production of steel scrap, and the relationship between steel scrap and Kaptan's downstream production. In both parts of its analysis, Commerce failed to adequately address prior cases in which it found steel scrap to be primarily dedicated to downstream production of rebar and similar steel products, while also failing to recognize relevant distinctions between the record here and that of prior agency proceedings on which it relied. Commerce also arbitrarily treated Nur differently than other scrap-supplying Kaptan affiliates. Accordingly, should this Court determine not to simply reinstate Commerce's original cross-attribution determination, it should remand the agency's redetermination on remand not to cross-attribute subsidies received by Nur.

### 1.    Commerce's Conclusion Regarding the Nature of Steel Scrap as an Input is Inadequately Explained and Supported

Commerce found that Nur provided Kaptan with "unprocessed" steel scrap, which the agency characterized as a "common input among a variety of products and industries and used in a variety of production processes." Appx2239-2240, Appx2250.  Commerce also found that the scrap that Nur sold to Kaptan was not

"generated or otherwise prepared for downstream products," indicating that it was not a link in the overall production chain for Kaptan's rebar. Appx2239. These findings are neither adequately explained nor supported.

As an initial matter, Commerce did not identify the "variety . . . of industries" utilizing unprocessed steel scrap as an input, or the "variety of products" and "production processes" that use unprocessed steel scrap as an input, or point to any record evidence (or even extrinsic evidence) supporting its statement. Appx2239-2240, Appx2250. It is also not obvious what industries beyond steelmaking would use unprocessed steel scrap as a production input. There is no indication that unprocessed steel scrap is an input of "universal application," like electricity, which is used in manufacturing a wide variety of items across many industries. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337. Similarly, it is not obvious what production processes such scrap could possibly be subject to, other than melting to form steel products such as rebar, as Kaptan used it here. For that matter, Commerce has repeatedly found that steel scrap — without any consideration of its processing level — is primarily dedicated to downstream steel production. *See* discussion *supra* at 15-17 (identifying agency precedents).

In support of its consideration of the unprocessed nature of Kaptan's scrap, Commerce cited the January 31, 2023 remand results in a separate appeal involving Korean cut-to-length steel plate. Appx2240, Appx2250 (citing Final Results of

Redetermination, Ct No. 21-00182 (Ct. Int'l Trade Jan. 31, 2023), ECF No. 61 at 60 ("Plate First Remand Results")). But those remand results were subsequently rejected by the lower court and in response, the agency ceased attempting to justify any distinction between processed and unprocessed steel scrap, instead finding the Korean producer at issue not to be cross-owned with its affiliated scrap supplier. Plate Second Remand Results at 18-22; *Nucor*, 653 F. Supp. 3d at 1306-10.

Moreover, the now-superseded first remand results in the Korean plate litigation appear to be the only instance — beyond the litigation now at bar — in which Commerce has distinguished between processed and unprocessed steel scrap supplied by cross-owned affiliates and used to produce downstream steel goods. Tellingly, Commerce in the Korean plate litigation did not identify any industries/products in which unprocessed steel scrap (or processed steel scrap, for that matter) could be used except downstream steel production. Appx2239-2240, Appx2250; *see also* Plate First Remand Results at 58, 60-62. Nor has it in either case explained why (or what degree of) processing would be required for steel scrap to meet the "primarily dedicated" standard, particularly where unprocessed steel scrap is used in the respondent's steelmaking operations. Appx2239-2240, Appx2250; *see also* Plate First Remand Results at 58, 60-62.

The record also indicates that steel scrap—again, regardless of processing level—has the sort of close physical relationship with rebar that stumpage has with

lumber, and semolina has with pasta. Appx1026, Appx1064-1065 (identifying scrap as Kaptan's only raw material input, without distinguishing between processed and unprocessed scrap); *see also* USITC Pub. 5122 at I-26; *Habas*, 625 F. Supp. 2d at 1348; *Nucor*, 612 F. Supp. 2d at 1323-24. In fact, in previously treating steel scrap as primarily dedicated to downstream steel production without any discussion of its processing level, Commerce has pointed to the fact that the affiliate-supplied steel scrap is used in the downstream producer's steel production process. *See, e.g.*, OCTG from Turkey IDM at 8. Kaptan used Nur's scrap to produce downstream steel products, including rebar. Appx1026, Appx1064-1065; [ Appendix pages ]; Appx2238-2239; Appx1833.

Commerce nonetheless reasoned that Nur's scrap was not "generated or otherwise prepared for downstream products." Appx2239. But given that steel scrap is by its nature a byproduct of manufacturing steel-containing articles, it is unclear how (or why) scrap could ever be "generated" for the specific purpose of feeding downstream production. There is also an unaddressed tension between Commerce's apparent finding that scrap does not form a link in the overall production chain unless specifically generated for the purpose of feeding downstream operations, and its concession that generation of scrap as a byproduct satisfies 19 C.F.R. § 351.525(b)(6)(iv)'s "production" requirement. *Compare* Appx2238, *with* Appx2239; *see also* OCTG from Turkey IDM at 8 (rejecting argument that

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

byproduct generation did not qualify as production for purposes of the cross-attribution regulation). At any rate, Kaptan did not indicate that it only used, or could only use, scrap generated intentionally for its operations or prepared in particular ways. Appx1026, Appx1064-1065; [          Appendix pages          ]. Instead, Nur's byproduct scrap was apparently used as-is (with Kaptan the exclusive user), indicating that Nur's scrap was appropriate by nature for use in Kaptan's downstream steel production operations. [          Appendix pages          ]; Appx2238-2239. Neither the alleged lack of processing nor the byproduct nature of scrap supports Commerce's conclusion on remand that Nur's scrap was not primarily dedicated to downstream steel production.

Commerce also failed to cite any evidence showing that Nur's scrap was qualitatively different from the scrap provided to Kaptan by other scrap-supplying affiliates that the agency treated as cross-owned input suppliers of a "primarily dedicated" input for purposes of 19 C.F.R. § 351.525(b)(6)(iv). Specifically, Commerce treated Martas and Aset, as such suppliers while observing no distinctions between the scrap that they supplied to Kaptan and the scrap that Nur supplied. *See, e.g.*, Appx1769; *see also* [          Appendix pages          ]. Nor is there any indication that Martas or Aset intentionally generated scrap for Kaptan's use; rather, Kaptan reported that both companies generated the scrap that they supplied to Kaptan as a byproduct of their operations, which were focused on

operation of a seaport and packing/heating anthracite coal. *See* Appx149-150. Commerce's failure to point to record evidence distinguishing Nur's scrap from that of other scrap-supplying Kaptan affiliates that the agency treated providing a "primarily dedicated" input demonstrates the arbitrary nature of the distinctions that the agency has attempted to draw between purposefully-generated/processed scrap and the steel scrap that Nur supplied to Kaptan. *See, e.g.*, *Nucor*, 653 F. Supp. 3d at 1306-10; *Nucor*, 600 F. Supp. 3d at 1235-38.

Finally, while Commerce pointed to prior agency precedent for the proposition that it does not universally treat steel scrap as an input primarily dedicated to downstream steel production, that precedent is readily distinguishable from the review at bar. Appx2238. In its investigation into German forged steel fluid end blocks, the agency relied on the "quantities and types of materials" that the input suppliers provided.   FEBs from Germany IDM at 57-58; *see also* Preliminary Decision Memorandum accompanying *Forged Steel Fluid End Blocks from the Federal Republic of Germany*, 85 Fed. Reg. 31,454 (Dep't Commerce May 26, 2020) (prelim. affirmative countervailing duty deter. And alignment of final deter. With final antidumping duty deter.) at 17 (noting that the suppliers provided a "miniscule" amount of scrap, but also supplied ingots that were not used in the respondent's production). Here, Commerce expressly stated that the quantity of

scrap that Nur supplied to Kaptan was irrelevant to its analysis, and Nur's scrap was used in Kaptan's production. Appx2235-2236, Appx2247.

And as explained above, the agency's analysis of the "type{}" of material that Nur provided is flawed. The record shows that not only is scrap a link in the production chain for rebar, but a highly important one. *See* Appx1026, Appx1064-1065 (identifying scrap as Kaptan's only raw material input); *see also* USITC Pub. 5122 at I-26; *Habas*, 625 F. Supp. 2d at 1348; *Nucor*, 612 F. Supp. 2d at 1323-24; Preamble, 63 Fed. Reg. at 65,401. Further, Commerce adduced no plausible basis for finding steel scrap (whether or not processed) to be an input used in a wide variety of industries/products, or subject to a wide variety of production processes. Rather, such scrap is used only in the steelmaking industry, for melting and formation into products like rebar. *See* discussion *supra* at 5-6, 18, 20.[5]

In sum, Commerce failed to adequately explain or support its conclusion that the physical nature of Nur's scrap and the circumstances of its generation were such that the scrap did not form a "link in the overall production chain" for Kaptan's

---

[5]    Commerce also cited its 2018 administrative review of the CVD order on Korean plate, Appx2238, but the agency has abandoned its treatment of scrap in that case, after it was repeatedly rejected by the lower court. *See* discussion *supra* at 22-23. As for the agency's treatment of scrap in the 2017 review of the order on Korean cold-rolled steel, it reflects the same reasoning that lower court rejected and that Commerce has abandoned in the 2018 plate review. *See* 2017 Korea Cold-Rolled IDM at 30-32. These agency precedents, accordingly, do not serve to support or explain Commerce's analysis of Nur's scrap here.

downstream rebar. While Commerce determined that unprocessed, byproduct steel scrap is a "common input among a variety of products and industries and used in a variety of production processes," Appx2239-2240, Appx2250, it provided no support for this assertion. It did not identify products/industries using such scrap beyond downstream steel products. It did not adequately explain its reasons for finding the relationship between such scrap and rebar more like the relationship that plastics have with automobiles and appliances than the relationship that timber has with lumber or that semolina has with pasta. It cited no record evidence demonstrating that Kaptan used or could only use scrap that had been pre-processed or purposely generated with its downstream operations in mind.

Further, it failed to identify any qualitative distinctions between the scrap that Nur provided to Kaptan and the scrap provided by other scrap-supplying Kaptan affiliates that the agency treated as cross-owned input suppliers for subsidy attribution purposes. Commerce failed to acknowledge or confront the multiple past cases in which it found steel scrap primarily dedicated to downstream steel production without any finding as to whether that scrap was processed or not, as well as its own prior rejection of the argument that the byproduct nature of scrap is relevant to the cross-attribution analysis. RTAC respectfully submits that the Court should therefore remand Commerce's analysis of the physical nature and production of Nur's steel scrap for further consideration.

### 2.    Commerce's Evaluation of Nur's Business Activities is in Error

Commerce also found that Nur's business activities failed to support cross-attribution of subsidies. Specifically, Commerce found that Nur's "business activity is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the Preamble." Appx2241; *see also* Appx2252 (noting that Nur's "production of ships" is not dedicated to a higher value-added product). Rather, Commerce found that Nur's activities as a shipbuilder are "far removed" from Kaptan's downstream steel production activities, especially given the "extremely limited transactions between the two companies." Appx2241, Appx2251-2252.

This analysis is flawed for three reasons. First, it focuses on Nur's overall operations rather than, as the regulation and Preamble require, the nature of the input and its role in Kaptan's production. Second, in support of the analysis, the agency relied on prior precedent that is distinguishable or otherwise underscores the flaws in Commerce's remand results. Third, the agency's conclusion that the transactions between Nur and Kaptan were "extremely limited," and thus indicated that Nur's scrap was not primarily dedicated to Kaptan's downstream production, is inadequately explained and supported.

### a.    *Commerce's Analysis Was Inconsistent with the Regulations and Preamble*

First, Commerce's analysis inappropriately focused on Nur's overall operations rather than on the nature of the input and its role in Kaptan's production. Appx2241, Appx2250-2251. In explaining the "primarily dedicated" standard, the Preamble does not state that the input supplier's main business activity is a relevant factor. Preamble, 63 Fed. Reg. at 65,401. Rather, the Preamble indicates that the salient issue is whether the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary input into such goods. *Id.* Consistently with this view, both the Preamble and the regulation discuss the input supplier's "production" of the input, and whether that "production is dedicated almost exclusively to the production of a higher-value added product — the type of input product that is merely a link in the overall production chain." *Id.*; *see also* 19 C.F.R. § 351.525(b)(6)(iv). While Commerce here has found that Nur's "business activity is not 'dedicated almost exclusively to the production of a higher value-added product,'" the Preamble does not use the term "business activity," but as noted above, "production," and the focus of that term is the "production" of the "input" at issue. Appx2241; Preamble, 63 Fed. Reg. at 65,401. Indeed, the term "business activity" is found in neither the Preamble nor the regulation. Preamble, 63 Fed. Reg. at 65,401; 19 C.F.R. § 351.525(b)(6)(iv).

Likewise, while Commerce noted that Nur's "production of ships" is not dedicated to a higher value-added product, Appx2252, the Preamble and regulations are focused on production of the "input," and whether the input is a link in the production chain for the respondent's downstream, value-added product. As noted previously, given that steel scrap is the primary raw material input into rebar production, it appears difficult to avoid the conclusion that steel scrap is not only "a link in the production chain" for rebar, but a highly important one. Preamble, 63 Fed. Reg. at 65,401; *see, e.g.*, *Habas*, 625 F. Supp. 2d at 1348; *Nucor*, 612 F. Supp. 2d at 1323-24; USITC Pub. 5122 at 30-31, 37, 39 n.236, and I-26; Appx1022, Appx1026, Appx1064-1065; *see also* discussion *supra* at 5-6, 18, 20.

### b.    *Commerce's Analysis is Unsupported by Agency Precedent*

Second, to the extent that the agency argues that it has previously taken a supplier's "business activity" into account in cross-attribution analyses, the cases it cites are distinguishable, or otherwise underscore the problems with the agency's analysis here. Appx2234 n.49, Appx2250-2251. RTAC has discussed the problems with the agency's reliance on its investigation into German fluid steel end blocks above at 32-33. With respect to the agency's investigation into glass containers, Commerce there considered the supplier's business activities solely in the context of determining whether to employ adverse inferences. Glass Containers IDM at 68-70. Moreover, the "input" at issue was not scrap, or any other material physically

incorporated into the respondent's goods, but machinery and equipment. *Id.* Here, of course, Nur provided Kaptan with scrap, a raw material that is crucial to rebar production and that was physically incorporated into Kaptan's goods. *See, e.g.,* Appx1833. Moreover, the record indicates that there is a close physical relationship between scrap and Kaptan's downstream steel products, including rebar. Appx1026, Appx1064-1065. As noted previously, Kaptan's own information indicates that its rebar is simply steel scrap that has been remelted and reshaped, much as lumber is simply stumpage that has been sawn to particular dimensions. Appx1026, Appx1064-1065; Preamble, 63 Fed. Reg. at 65,401.

Commerce also relied on the final results of its 2018 administrative review of the order on Korean cut-to-length plate, but those results have repeatedly been remanded and Commerce has ceased attempting to defend them based on an analysis of the business activities of the supplier there. Appx2238; Appx2246; Plate Second Remand Results at 18-22. Further, while Commerce cited the relevant supplier's diffuse business activities in the superseded first remand results arising from the Korean plate review, Nur's business activities are not nearly as diffuse, as Commerce concedes. Appx2251. Commerce also relied on certain other factors in the Korean proceeding that are not present here or that do not support the agency's remand results in this case. For example, Commerce relied on the fact that the supplier did not provide scrap directly to the downstream producer but through an

38

intermediary. Plate First Remand Results at 28, 61. There is no intermediary here; rather, Nur sold scrap to Kaptan that Kaptan then used in its rebar production. Appx1833; *see also* [          Appendix pages          ].[6]

Commerce next cited its investigation into Turkish oil country tubular goods, noting that the supplier at issue there generated scrap as a byproduct of producing steel angles and profiles, while Nur's shipbuilding operations are "further removed" from steelmaking operations. Appx2252-2253. This argument, however, fails to acknowledge that Commerce has previously treated steel scrap as primarily dedicated to downstream steel production notwithstanding the fact that the affiliate generating the scrap is not a producer of any steel product (beyond scrap). *Icdas*, 498 F. Supp. 3d 1345 (finding that scrap supplied to a downstream rebar producer by an affiliated electrical company was primarily dedicated to downstream steel production). Commerce's argument also fails to acknowledge that the agency here treated Martas and Aset as cross-owned input suppliers for subsidy attribution purposes, although Kaptan described them as a "seaport operator" and a provider of packing and heating services for anthracite coal. Appx149; Appx1768.

---

[6]     Commerce also relied in the Korean case on the supposedly "generic" (*i.e.*, unprocessed) nature of the scrap provided and the lack of evidence indicating that it was intentionally generated for the downstream producer's use. Plate First Remand Results at 61-62. Commerce has ceased to defend the results of the Korean plate review on these bases and, in any event, these bases do not support the remand results here. *See* discussion *supra* at 22-23.

  *c.*   ***Commerce's Reliance on the "Limited" Transactions Between Nur and Kaptan Does Not Withstand Scrutiny***

  Third, while Commerce found that the "extremely limited transactions" between Nur and Kaptan supported its decision not to cross-attribute subsidies, it has failed to adequately explain or support this finding. Appx2237, Appx2241, Appx2247. Rather than detail the basis upon which the agency concluded that the transactions were "extremely limited," it cited generally to Kaptan's comments on the draft remand results, while simultaneously explaining that it was not taking into consideration the volume of scrap that Nur supplied to Kaptan. Appx2237, Appx2247. Commerce's generalized citation does not elucidate the agency's thinking, given that Kaptan's arguments were that (1) neither Nur's nor Kaptan's transactions with affiliates other than each other should be taken into consideration and (2) Nur sold only a "miniscule" amount of scrap to Kaptan. Appx2199-2201. In other words, the only argument that Kaptan made about the "limited" nature of Nur's transactions with Kaptan was grounded in the volume of steel scrap that Nur sold to Kaptan — a factor that Commerce held irrelevant. Appx2237, Appx2247. This issue cannot be brushed aside, as even if Nur/Kaptan's transactions with each other might be fairly characterized as "extremely limited," their limited nature necessarily reflects the volume of scrap at issue in the transactions. In relying on the supposedly limited nature of the companies' transactions while disavowing any reliance on the

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

quantity of scrap that those transactions reflect, Commerce spoke out of both sides of its mouth.

Further, while Commerce found that Nur and Kaptan's transactions with other affiliates should not inform its analysis, an examination of those transactions underscores the arbitrary nature of Commerce's treatment of Nur. Again, Commerce treated Martas and Aset as cross-owned input suppliers for subsidy attribution purposes. Aset [                description of transactions                ] Appx164-165, and its [                description of transactions                ]. Appx1446-1468 ([                identifying location of relevant data on cited pages                ]). While Martas [description of transactions], Appx164-165, its [description of transactions]. Appx1374-1400 ([identifying location of relevant data on cited pages]). Moreover, Kaptan reported that Martas, Aset, and Nur [ description of transactions ]. Appx156-157. Regardless of whether Kaptan or Nur's transactions with other affiliates are relevant to the Kaptan/Nur cross-attribution analysis, Commerce's treatment of Nur is inconsistent with its treatment of similarly-situated affiliates that supplied Kaptan with scrap. Commerce's failure to acknowledge, much less explain, this disparate treatment additionally supports a remand here.

In conclusion, Commerce did not adequately explain or support its analysis of Nur's business activity. The Preamble and regulations indicate that the agency's

focus should be on the supplier's production of the input product, rather than its operations as a whole. In attempting to justify its analysis, the agency relied on precedent that is distinguishable or that only illustrates the flaws in its analysis. Finally, the agency has not adequately explained or supported its finding that Kaptan and Nur's "extremely limited" intercompany transactions justify its decision not to cross-attribute subsidies received by Nur. As such, to the extent that the Court does not choose to immediately reinstate Commerce's original decision to cross-attribute the subsidies that Nur received, RTAC respectfully submits that remand is required so that Commerce may reconsider its determination, on remand from the CIT, to no longer cross-attribute Nur's subsidies.

## VIII.  **<u>CONCLUSION</u>**

As explained above, Commerce's original determination to cross-attribute subsidies received by Kaptan's cross-owned input supplier Nur was lawful and reasonable. By contrast, Commerce failed to appropriately explain or support the remand results in which it ceased to cross-attribute the subsidies that Nur received. Commerce's original determination should therefore be reinstated. Failing that, the remand determination should be remanded for further consideration.

Respectfully submitted:


/s/ John R. Shane
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition and its individual members*

Dated: April 2, 2024

# ADDENDUM

than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"). Therefore, the court sustains Commerce's Final Results.

## CONCLUSION

Based on the foregoing, the court denies Plaintiffs' motion and sustains the Final Results. Judgment will be entered accordingly.



**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., Plaintiff,**

**Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji A.S., Plaintiff-Intervenors,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dynamics, Inc., Defendant-Intervenors.**

**Slip Op. 23-62**
**Court No. 21-00565**

United States Court of International Trade.

April 26, 2023

**Background:** Foreign exporter filed suit challenging final results of Department of Commerce's administrative review of countervailing duty (CVD) order covering steel concrete reinforcing bar (rebar) from Turkey. Exporter moved for judgment on agency record.

**Holdings:** The Court of International Trade, Gary S. Katzmann, J., held that

cross-owned input supplier issue and primarily dedicated analysis required further explanation.

Remanded.

**1. Customs Duties** ⬖21.5(2)

Countervailing duties (CVDs) are duties imposed on merchandise imported into the United States to countervail or offset the effect of subsidies granted by foreign governments. Tariff Act of 1930 § 701, 19 U.S.C.A. § 1671(a).

**2. Customs Duties** ⬖21.5(2, 4)

Foreign governments sometimes subsidize domestic industries to benefit the production or exportation of merchandise and thereby confer an advantage in the trading system; if the International Trade Commission (ITC) determines that the advantage causes material injury to the relevant domestic producers or domestic industry, Department of Commerce calculates the amount of benefit conferred and may issue a countervailing duty (CVD) order to offset this unfair advantage. Tariff Act of 1930 § 701, 19 U.S.C.A. § 1671(a).

**3. Customs Duties** ⬖21.5(2)

One of the core questions in countervailing duty (CVD) investigations is whether a subsidy is countervailable, or the subsidy meets the statutory and regulatory definition of an actionable subsidy. Tariff Act of 1930 § 701, 19 U.S.C.A. § 1671(a).

**4. Customs Duties** ⬖21.5(2)

The key elements of a countervailable subsidy are: (1) a foreign authority, (2) making a financial contribution or any form of income or price support, or payment, (3) to a person, and (4) a benefit conferred thereby. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(5)(B).

**5. Customs Duties ⬳84(6)**

"Substantial evidence," as required to uphold a countervailing duty (CVD) determination, refers to such evidence that a reasonable mind might accept as adequate to support a conclusion.  Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

    See publication Words and Phrases for other judicial constructions and definitions.

**6. Customs Duties ⬳21.5(2)**

Department of Commerce was required to provide further explanation for its conclusion, in final results of administrative review of countervailing duty order on steel concrete reinforcing bar (rebar) from Turkey, that rebar exporter's affiliate was cross-owned input supplier of steel scrap products primarily dedicated to production of downstream products, so any countervailable subsidies that exporter received by supplier should be included in subsidy analysis; Commerce stated that it previously found scrap was input product primarily dedicated to production of downstream steel products, which was upheld on appeal, so it was matter of routine, but Commerce's decisions in prior segments did not involve that supplier, and scrap might have been used to produce merchandise other than rebar.  Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677; 19 C.F.R. § 351.525(b)(6)(iv).

**7. Customs Duties ⬳21.5(5)**

Department of Commerce's countervailing duty (CVD) determinations are based upon the record of the relevant segment of the proceeding, not previous segments.

**8. Customs Duties ⬳21.5(5)**

A prior administrative determination by Department of Commerce is not legally binding on other countervailing duty (CVD) reviews before Court of International Trade.

**9. Customs Duties ⬳84(1)**

Department of Commerce's countervailing duty (CVD) conclusions from earlier segments do not serve as precedent controlling its conclusions in a judicial review.

**10. Customs Duties ⬳21.5(5)**

An agency's countervailing duty (CVD) action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.

**11. Customs Duties ⬳21.5(5)**

Department of Commerce cannot simply ignore the facts of a particular record in countervailing duty (CVD) proceedings on the basis that it has seen similar situations in the past, as each decision is highly record-dependent.

———————

Andrew T. Schutz, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for Plaintiff Kaptan Demir Celik Endustrisi Ve Ticaret A.S. With him on the brief were Kavita Mohan, Jordan C. Kahn.

Matthew M. Nolan, Nancy A. Noonan, Diana Dimitriuc Quaia, Jessica R. DiPietro and Leah N. Scarpelli, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenors Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji A.S.

Sosun Bae, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director. Of counsel on the briefs was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Com-

pliance, U.S. Department of Commerce, of Washington, D.C.

Maureen Thorson, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Rebar Trade Action Coalition and its individual members. With her on the briefs were Alan H. Price and John R. Shane.

### OPINION AND ORDER

Katzmann, Judge:

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), a Turkish producer and exporter of steel concrete reinforcing bar ("rebar"), in its Motion for Judgment on the Agency Record, challenges certain aspects of the final results of the U.S. Department of Commerce ("Commerce") in the 2018 administrative review of the countervailing duty order on rebar from Turkey published in Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018, 86 Fed. Reg. 53279 (Dep't Com. Sept. 27, 2021), P.R. 288 ("Final Results"), and the accompanying Issues and Decision Memorandum, Mem. from J. Maeder to C. Marsh, re: Issues and Decision Memorandum For the Final Results of the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkey; 2018 (Dep't Com. Sept. 21, 2021), P.R. 283 ("IDM"). Plaintiff-Intervenors Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. ("Colakoglu"), a foreign manufacturer and foreign exporter of rebar from Turkey, also moved for judgment on the agency record.

Defendant United States ("the Government") and domestic producers, Defendant-Intervenors Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dynamics, Inc., ("Domestics"), oppose Kap-

tan's motion. The Government and Domestics submit that Commerce's Final Results are supported by substantial evidence and in accordance with law. The Government and Domestics, however, do not object to Colakoglu's motion for a separate rate adjustment should Kaptan succeed in securing a recalculation of its overall subsidy rate as a result of this action.

For the reasons articulated below, the court finds that with respect to Commerce's attribution to Kaptan of subsidies of Nur Gemicilik ve Tic. A.S. ("Nur"), a ship building company affiliated with Kaptan, Commerce has not provided adequate explanation in the Final Results regarding its determination that Nur was a "cross-owned input supplier" of primarily dedicated inputs under 19 C.F.R. § 351.525(b)(6)(iv). The court thus remands the Final Results for further review and explanation.

### FACTUAL AND LEGAL BACKGROUND

#### I. Regulatory and Legal Framework

[1, 2] Countervailing duties ("CVDs") are duties imposed on merchandise imported into the United States to "countervail" or offset the effect of subsidies granted by foreign governments. See 19 U.S.C. § 1671(a). Foreign governments sometimes subsidize domestic industries to benefit the production or exportation of merchandise and thereby confer an advantage in the trading system. If the International Trade Commission determines that the advantage causes material injury to the relevant domestic producers or domestic industry, Commerce calculates the amount of benefit conferred and may issue a CVD order to offset this unfair advantage. See Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1203 (Fed. Cir. 2014) ("The congressional intent behind the enactment of countervailing

duty and antidumping law generally was to create a civil regulatory scheme that remedies the harm unfair trade practices cause.").

[3]   One of the core questions in CVD investigations is whether a subsidy is "countervailable," or the subsidy meets the statutory and regulatory definition of an actionable subsidy. See Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369 (Fed. Cir. 2014). The Tariff Act of 1930 ("Tariff Act") provides that before Commerce may impose a CVD on merchandise imported into the United States, it must determine that "the government of a country or any public entity within the territory is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise." 19 U.S.C. § 1671(a)(1) (emphasis added). "Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in [paragraph (5)(B)] which is specific as described in paragraph (5A)." Id. § 1677(5)(A).

[4]   Thus, the determination of CVDs ultimately rests on whether a subsidy meets the "descriptions" contained in section 771 of the Tariff Act, as codified in Chapter 19 of the United States Code, section 1677. In general, a countervailable subsidy is described as follows:

A subsidy is described in this paragraph in the case in which an authority--

**(i)** provides a financial contribution,

**(ii)** provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or

**(iii)** makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,

to a person and a benefit is thereby conferred. For purposes of this paragraph and paragraphs (5A) and (5B), the term "authority" means a government of a country or any public entity within the territory of the country.

19 U.S.C. § 1677(5)(B). In short, the key elements are (1) a foreign authority, (2) making a financial contribution (or any form of income or price support, or payment), (3) to a person, and (4) a benefit conferred thereby.

These elements, appearing deceptively simple upon first glance, pose complex challenges when applied in real practice. One such issue is the attribution of subsidies to a "person" in cases of subsidies given to a cross-owned input supplier. Considering that corporations are often cross-owned, or part of larger conglomerate groups, the economic effect of subsidies granted to one legally separate corporation (and thus a separate legal "person") may in practice benefit another corporation that did not formally receive the subsidy. Consequently, Commerce has developed practices on attributing subsidies received by one company to the total sales of a related company.

Commerce explains, in its preamble to the final rule on CVDs promulgated in 1998 that "[t]he underlying rationale for attributing subsidies between two separate corporations [with cross-ownership] is that the interests of those two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same ways it can use its own assets (or subsidy benefits)." Countervailing Duties; Final Rule, 63 Fed. Reg. 65348, 65401 (Dep't Com. Nov. 25, 1998) ("CVD Preamble"). The 1998 regulations were adopted following the enactment of the Uruguay Round Agreement Acts that necessitated system-

atic revision of the regulatory framework. See id. The interpretations given in the CVD Preamble should be given deference as an official regulatory interpretation that expresses authoritative departmental position to an interpretation of its underlying regulation. See Kisor v. Wilkie, —— U.S. ——, 139 S. Ct. 2400, 2416, 204 L.Ed.2d 841 (2019).

Commerce's regulations accordingly contain rules on attribution of subsidies for cross-owned corporations. One such provision concerns input suppliers:

> (iv) Input suppliers. If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525 (2013). Per the CVD Preamble, this regulation was adopted to address situations involving "an input producer whose production is dedicated almost exclusively to the production of a higher value added product -- the type of input product that is merely a link in the overall production chain." CVD Preamble

at 65401. Commerce explained that "in situations such as these, the purpose of the subsidy provided to the input producer is to benefit the production of both the input and downstream products." Id. The regulation does not define "primarily dedicated." See 19 C.F.R. § 351.525 (2013).

## II.  Factual and Procedural History

Kaptan is a Turkish producer and exporter of rebar that became the subject merchandise of Commerce's CVD order in 2014. Kaptan was selected as a mandatory respondent[1] in the 2018 administrative review of the CVD order.

In the 2018 administrative review, Kaptan reported purchasing steel scrap used in its manufacturing operations from a cross-owned affiliate, Nur. See Mem. from J. Maeder to C. Marsh, re: Decision Memorandum for the Preliminary Results of Countervailing Duty Administrative Review at 8 (Dep't Com. Mar. 19, 2021), P.R. 222 ("PDM"). Commerce preliminarily determined that this scrap was "primarily dedicated to the production of the downstream product,"[2] such that any countervailable subsidies that received by corporations in the "Kaptan Group," including Martas Marmara Ereglisi Liman Tesisleri A.S., Aset Madencilik A.S., and Nur,

---

**1.** In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may —
>
> (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to —
>
> (i) a sample of exporters or producers that the administering authority deter-

mines is statistically valid based on the information available to the administering authority at the time of selection, or
(ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
(B) determine a single country-wide subsidy rate to be applied to all exporters and producers.
The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

**2.** 19 U.S.C. § 1677f-1(e)(2).

should be included in the subsidy analysis. Id.

Kaptan submitted comments to Commerce, challenging the finding in the PDM. Kaptan submitted that unlike the other corporations, Nur's primary business was shipbuilding rather than scrap production and further argued that the quantity of scrap sold to Kaptan was de minimis. Letter from Kaptan to G. Raimondo, Sec'y of Com., re: Administrative Case Brief: Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey (C-489-815) (POR: 2018) (July 28, 2021), P.R. 264, C.R. 211, at 5-6, 12 ("Kaptan's Comm. Sub."). Kaptan also noted that it used Nur's scrap to manufacture non-subject merchandise in addition to rebar. Id. Kaptan argued that, given these circumstances, Commerce's precedent did not support treatment of the scrap from Nur's shipbuilding activity as "primarily dedicated" to the production of downstream products. Id. at 6-12.

Despite Kaptan's comments, Commerce continued to treat Nur as Kaptan's cross-owned supplier of an input "primarily dedicated" to downstream production in the Final Results. IDM at 25-27. Commerce explained that in previous segments of the proceeding it had considered scrap as an "input that is primarily dedicated to downstream steel production, regardless of the amount of scrap purchased," and noted the court's approval of this finding in an appeal of a prior review involving the other mandatory respondent. Id. at 25-26 (citing Icdas Celik Enedi Tersane ve Ulasim Sanayi A.S. v. United States, 43 CIT ——, ——, 498 F. Supp. 3d 1345, 1364 (2021)). Commerce also explained that Nur produced steel scrap, which Nur sold to Kaptan, and which Kaptan then used in making downstream steel products including subject goods. Id. Further, Commerce found that there was no evidence of Nur

selling its scrap product to anyone else. Id. at 26. Accordingly, Nur's scrap supply was "devoted to Kaptan's downstream steel production." Id.

Kaptan brought this action before the court on October 19, 2021. See Complaint, Oct. 19, 2021, ECF No. 6. Presently, Kaptan moves for judgment on the agency record pursuant to Rule 56.2 of the U.S. Court of International Trade. See Pl.'s Mot. for J. on Agency R., Apr. 5, 2022, ECF No. 33 ("Pl.'s Br."). Kaptan challenges two aspects of the Final Results in its Motion for Judgment on the Agency Record: (1) Commerce's finding that Nur was a "cross-owned input supplier" under 19 C.F.R. § 351.525(b)(6)(iv); and (2) Commerce's finding that Nur's land rent exemption program with the local government, allowing Nur to use land without paying rent in exchange for meeting certain investment and employment criteria, constituted a countervailable subsidy within the meaning of section 771 of the Tariff Act, 19 U.S.C. § 1677. Id. at 1-3.

Kaptan offers four reasons for its position: (1) Commerce's cross-owned input supplier finding does not meet the substantial evidence standard because Commerce did not properly conduct the "primarily dedicated" analysis in 19 C.F.R. § 351.525(b)(6)(iv); (2) Nur's rent-free land benefit was not a countervailable subsidy because it does not meet the statutory definition of "regionally specific" under 19 U.S.C. § 1677(5A)(D)(iv); (3) even if countervailable, the land rent benefit should have been calculated as "revenue forgone" under 19 U.S.C. § 1677(5)(D)(ii), rather than a good for less than adequate renumeration ("LTAR") program under 19 U.S.C. § 1677(5)(D)(iii); and (4) even if the land rent exemption program was an LTAR program, Commerce should have made adjustments to the benchmark by

removing rent attributed to buildings rather than land only. Id. at 8-42.

Plaintiff-Intervenors Colakoglu also moved for judgment on the agency record. Colakoglu's motion presents the sole issue of whether Commerce should recalculate Colakoglu's assigned subsidy rate at the all-others rate if Kaptan's rate changes pursuant to the litigation. See Pl.-Inters.' Mem. of Law in Support of Mot. for J. on Agency R., Apr. 5, 2023, ECF No. 31. Colakoglu's argument is that to the extent that Commerce recalculates Kaptan's rate as a result of this litigation, Commerce must redetermine a separate rate for Colakoglu in accordance with 19 U.S.C. § 1671d(c)(5)(A)(i). Id. at 3-4.

The Government opposes Kaptan's motion. See Def.'s Opp. to Pl.'s Mot. for J. on Agency R., Aug. 4, 2023, ECF No. 41 ("Def.'s Br."). First, the Government argues that in previous segments of the investigation, scrap has been found to be "an input primarily dedicated to the production of the downstream steel production, regardless of the amount of scrap purchased from the cross-owned company." Id. at 5, 13-17. The Government further argues that the facts on the record demonstrate that Nur produced scrap, sold that scrap to Kaptan, and Kaptan then used that scrap to produce downstream product in the form of rebar. Id. at 17. Thus, according to the Government, Nur's production of scrap as an input product is primarily dedicated to Kaptan's product of downstream product, and Commerce appropriately attributed Nur's subsidies as a cross-owned input supplier. Id. Second, the Turkish law under which Nur received the land, Law 5084, is limited to specifically designated geographic regions, and is thus regionally specific pursuant to 19 U.S.C. § 1677(5A)(D)(iv). Id. at 18-22. This provision of land for use constituted a provision of a good for LTAR, pursuant to 19 U.S.C. § 1677(5)(D)(iii), and a benefit was thereby conferred upon Nur under 19 U.S.C. § 1677(5)(E)(iv). Id. The Government, however, does not object to Plaintiff-Intervenor Colakoglu's argument that to the extent that Commerce recalculates Kaptan's overall subsidy rate as a result of this litigation, it must also recalculate Colakoglu's separate rate. Id. at 22-23.

Domestics also oppose Kaptan's motion. See Rebar Trade Action Coalition's Resp. Br., Aug. 4, 2023, ECF No. 40. Domestics submit that Commerce properly treated Nur as Kaptan's cross-owned supplier of an input primarily dedicated to Kaptan's production of downstream goods. Id. at 8-13. Domestics further argue that the court should affirm Commerce's (1) finding that Nur obtained regionally specific benefits, (2) measurement of the benefits using a LTAR methodology associated with measuring the benefit obtained through a government's provision of goods or services, and (3) selection of the benchmark for measuring the benefits. Id. at 13-24. Domestics, however, do not object to Plaintiff-Intervenor Colakoglu's contention that the net subsidy rate should be adjusted to the extent that Kaptan's margin is adjusted. Id. at 1. Nevertheless, Domestics submit that there is no reason for Kaptan's rate to be adjusted. Id.

Kaptan filed a reply brief on October 11, 2022. See Pl.'s Reply Br., Oct. 11, 2022, ECF No. 45. Kaptan reiterated its positions and argued that Commerce's approach is "an oversimplification [that] ignores both the [CVD] Preamble and Commerce precedent." Id. at 2. Kaptan also noted that it is not pursuing its claim that the land agreement was not made pursuant to Law 5084. Id. at 13 n.7.

The court held oral argument on January 24, 2023. Domestics filed a post-argument submission on January 31, 2023. Rebar Trade Action Coalition's Post-Arg. Subm., Jan. 31, 2023, ECF No. 60 ("Def.-

Inters.' Post-Arg. Br."). On the same day, Kaptan filed its post-argument submission. See Pl.'s Post-Arg. Subm., Jan. 31, 2023, ECF No. 61.

On February 2, 2023, Kaptan filed a notice of supplemental authority. See Notice of Supp. Auth., Feb. 2, 2023, ECF No. 62. The Government filed a response to the notice of supplemental authority on February 8, 2023. See Def.'s Resp. to Pl.'s Supp. Br., Feb. 8, 2023, ECF No. 63 ("Def.'s Post-Arg. Br.").

## JURISDICTION AND STANDARD OF REVIEW

[5]  The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iv) and (vi). The standard of review is set forth in the statutory language of 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination finding or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." Substantial evidence refers to "such evidence that a reasonable mind might accept as adequate to support a conclusion." SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted).

## DISCUSSION

Kaptan does not raise a facial challenge to section 351.525(b)(6)(iv). Instead, Kaptan argues that Commerce has developed a certain practice in applying the regulation, namely in determining whether an input is "primarily dedicated" to the production of the downstream product. Therefore, the focus of the analysis is on whether such practice exists, and if so, whether Commerce adequately explained its changes or reversals in policy. See Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or

provide a reasonable explanation as to why it departs therefrom." (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))); see also SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011) ("When an agency changes its practice, it is obligated to provide an adequate explanation for the change." (citing Motor Vehicle Mfrs., 463 U.S. at 42, 103 S.Ct. 2856)).

[6]  For the reasons set forth below, the court finds that Commerce has not offered a satisfactory explanation on the cross-owned input supplier issue and the primarily dedicated analysis. See Motor Vehicle Mfrs., 463 U.S. at 42, 103 S.Ct. 2856. The court thus remands the Final Results for further explanation and review.

In the three pages of the IDM devoted to the finding of Nur as a cross-owned input supplier, Commerce offered only one substantive reason for its decision. Commerce's position is that because it had previously found that "scrap" is an input product primarily dedicated to the production of downstream steel products, and because such finding was upheld by this court, it is a matter of routine. IDM at 25, 27. According to Commerce, as long as scrap has been sold exclusively, the issue requires no further inspection. Specifically, Commerce reasoned that:

> Regardless of the amount of steel scrap manufactured by Nur and regardless of the fact that it was manufactured as a byproduct rather than as Nur's primary production activity, as previously stated, steel scrap has been found, in previous segments of this proceeding to be a product that is primarily dedicated to the production of downstream steel products. Nothing Kaptan argues changes that fact.

IDM at 27 (emphasis added). Commerce further cites to a previous opinion of this

court, Icdas Celik Enedi Tersane ve Ulasim Sanayi A.S. v. United States, 43 CIT ——, 498 F. Supp. 3d 1345 (2021) ("Icdas"), in support of its position. The remainder of the IDM on the cross-owned input supplier issue focuses on distinguishing the prior Commerce determinations that Kaptan has raised, "because the nature of input and downstream products and production processes vary among cases." IDM at 26.

[7–9] Commerce's reliance on determinations in prior segments, and this court's opinion in Icdas, is misplaced. Commerce's determinations are based "upon the record of the relevant segment of the proceeding, not previous segments." Hyundai Steel Co. v. United States, 41 CIT ——, ——, 279 F. Supp. 3d 1349, 1372 (2017) (internal quotation marks omitted) (quoting Pakfood Pub. Co. v. United States, 34 C.I.T. 1122, 1134, 724 F. Supp. 2d 1327, 1342 (2010)). "[E]ven assuming Commerce's determinations at issue are factually identical [to a prior segment], as a matter of law a prior administrative determination is not legally binding on other reviews before this court." Id. (quoting Alloy Piping Prods., Inc. v. United States, 33 C.I.T. 349, 358-59, 2009 WL 983078, *5–6 (2009)). Commerce's conclusions from earlier segments "do not serve as precedent controlling its conclusions in the instant review." Pakfood, 34 C.I.T. at 1138, 724 F. Supp. 2d at 1345.

In the prior segments, the determinations were made with respect to different companies within the Kaptan group. These determinations did not involve Nur, nor the specific factual circumstances sur-rounding Nur's generation of scrap and the sale of these products to Kaptan, and the use of the inputs in Kaptan's productions. Likewise, Icdas only involved the specific factual circumstances of a different entity, Içdaş Elektrik, selling scrap to Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. Icdas, 498 F. Supp. 3d. at 1363-64. Icdas does not stand for the proposition that all cross-owned vendors of scrap, by definition, would be considered a supplier of input primarily dedicated to the production of steel products. Commerce needs to explain further why the input product in question, i.e., scrap metal generated by Nur, is in fact primarily dedicated to the production of downstream products in this case. This is especially true considering record evidence that the scrap may have been used for the production of products other than the subject merchandise.[3]

The IDM also attempts to distinguish prior Commerce decisions cited by Kaptan. IDM at 26. Commerce, however, does not adequately address or explain why in some of these prior decisions, the department considered factors such as the byproduct nature of the scrap, and why it has declined to do so in the instant case. Id. Nor does it adequately address Kaptan's contention that although there is no de minimis standard, Commerce has previously found that ingots and scrap sold in miniscule amounts are not "primarily dedicated" to the production of the downstream product. Instead, it merely repeats its position that if scrap has been generated in any form, and if that scrap has been sold by a

---

3. Also of note is the CVD Preamble's language on the "type of input product that is merely a link in the overall production chain," and its reasoning given that in such scenarios it may deem "the purpose of the subsidy provided to the input producer is to benefit the production of both the input and downstream products." CVD Preamble at 65401. Indeed, as the Government recognizes, "evidence of a verti-cally integrated supply chain" or evidence that the scrap "was used exclusively by the downstream producer in its production of downstream product" are all factors that Commerce has considered in relevant determinations. Def.'s Post-Arg. Br. at 3. Yet Commerce here has failed to offer any analysis on whether the scrap sold by Nur was a link in the overall production chain.

cross-owned entity, and subsequently used in the production of downstream products, it is primarily dedicated. Id.

**[10]** It is "well-established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Although the court recognizes that the determination in question "depends on the specific factual situations presented to Commerce," IDM at 26, the court finds that Commerce has offered insufficient explanation as to how the specific factual situations in this case support the conclusion that Nur was a cross-owned input supplier.

**[11]** Domestics raise several points on the nature of rebar and Commerce's familiarity with rebar production. Def.-Inters.' Post-Arg. Br. at 2-3. As these reasons were not given in the IDM, they may be deemed post hoc rationalizations not permissibly before the court for consideration. SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); see also Koyo Seiko Co. v. United States, 95 F.3d 1094, 1099 (Fed. Cir. 1996) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (internal quotation marks omitted) (quoting SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943))). But even if they were considered, such general trends cannot explain why Nur's generation of scrap and subsequent sale to Kaptan in the instant case is a production of input product primarily dedi-

cated to the production of a downstream product. As Commerce, the Government, and Domestics point out repeatedly, the analysis called for under the regulation "depends on the specific factual situations." IDM at 26; see also Def.'s Br. at 10, 14, 17; Def.-Inters.' Post-Arg. Br. at 1. Commerce "cannot simply ignore the facts of a particular record on the basis that it has seen similar situations in the past," Def.-Inters.' Post-Arg. Br. at 1, as "each decision is highly record-dependent," Def.'s Post-Arg. Br. at 2; see also Def.'s Br. at 10, 14, 17. Based upon the record before this court, Commerce has not provided adequate explanation addressing such fact-specific circumstances in this segment of the investigation. Therefore, Commerce's finding that Nur is a cross-owned input supplier for the purposes of subsidy attribution is remanded for further explanation and review.[4]

### CONCLUSION

In light of the above, the court remands Commerce's Final Results for further explanation and review on Commerce's finding that Nur was a cross-owned input supplier of input products primarily dedicated to the production of downstream products. It is hereby

**ORDERED** that Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; and it is further

**ORDERED** that the deadlines provided by USCIT Rule 56.2(h) shall govern thereafter.

**SO ORDERED.**



---

**4.** The court does not reach the other arguments raised by the parties as the arguments are contingent on the court upholding Com-

merce's finding that Nur was a cross-owned input supplier. See Pl.'s Br. at 24.

Slip Op. 23-167

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **KAPTAN DEMIR ÇELIK ENDUSTRISI VE TICARET A.Ş.,** | |
| **Plaintiff,** | |
| **and** | |
| **ÇOLAKOĞLU DIŞ TICARET A.Ş. and ÇOLAKOĞLU METALURJI A.Ş.,** | |
| **Plaintiff-Intervenors,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 21-00565** |
| **Defendant,** | |
| **and** | |
| **REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, and STEEL DYNAMICS, INC.,** | |
| **Defendant-Intervenors.** | |

**OPINION**

[ The court sustains the Department of Commerce's remand redetermination. ]

Dated:  November 27, 2023

Andrew T. Schutz, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.

Matthew M. Nolan, Jessica R. DiPietro and Leah N. Scarpelli, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenors Çolakoğlu Diş Ticaret A.Ş. and Çolakoğlu Metalurji A.Ş.

Sosun Bae, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director.  Of counsel on the briefs was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

John R. Shane, Alan H. Price, and Maureen E. Thorson, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenors Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dynamics, Inc.

      Katzmann, Judge: The court returns to litigation arising from a challenge to the Department of Commerce's ("Commerce") 2018 administrative review of the countervailing duty order on rebar[1] from Turkey.  See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018, 86 Fed. Reg. 53279 (Dep't Com. Sept. 27, 2021), P.R. 288 ("AR Results").  Now before the court is a challenge to Commerce's Final Results of Redetermination Pursuant to Court Remand (Dep't Com. July 24, 2023), ECF No. 66 ("Remand Results").  Resolving this challenge implicates the trade law applications of the proverbial wisdom that one man's trash is another's treasure: on remand, Commerce determined that a shipbuilder's sale of steel scrap to an affiliated rebar manufacturer did not warrant the attribution of Turkish government subsidies from seller to buyer.  The court concludes that this redetermination is both adequately explained and supported by substantial evidence on the record, and accordingly sustains the Remand Results in their entirety.

---

[1] "Rebar," which is a portmanteau of "reinforcing" and "bar," refers to rods of steel that are embedded into concrete as a means of strengthening the resulting structure.  See Rebar, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/rebar (last updated Nov. 4, 2023); Reinforced Concrete, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reinforced%20concrete (last visited Nov. 9, 2023).

## BACKGROUND

### I.      *Legal Background*

Commerce is directed by statute to assess countervailing duties on the basis of the countervailable subsidies provided "directly or indirectly" with respect to "the manufacture, production, or export of a class or kind of merchandise imported . . . into the United States."  19 U.S.C. § 1671(a)(1).  As this provision is silent on the question of how Commerce is to attribute countervailable subsidies to products, see id., Commerce in 1998 promulgated a series of gap-filling regulations on the subject.  Relevant here is Commerce's regulation with respect to "Input suppliers," which reads as follows:

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is <u>primarily dedicated</u> to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

This provision leaves open the question of when the production of an input product is "primarily dedicated" to the production of a downstream product.  Commerce provided the following illustrations in the preamble to the <u>Federal Register</u> notice in which it promulgated § 351.525:

> The main concern we have tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain.  This was the case with stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production.  We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products.

<u>Countervailing Duties</u>, 63 Fed. Reg. 65348, 65401 (Dep't Com. Nov. 25, 1998) ("<u>Preamble</u>") (citations omitted).

Commerce also laid out the following contrasting scenario:

Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles.

Id.

As Commerce's reference to illustrative examples in its explanation suggests, Commerce's "primarily dedicated" analyses are highly fact-specific and defy attempts to trace universally applied decisional principles. See Nucor Corp. v. United States ("Nucor I"), 46 CIT __, __, 600 F. Supp. 3d 1225, 1238 (2022). In some cases Commerce has focused on the nature of the business entity producing the input product, finding production of that product not to be "primarily dedicated" to the downstream product where the entity's business is largely dedicated to matters other than production of the product. See, e.g., Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 31141 (Dep't Com. May 22, 2020) and accompanying Issues and Decisions Mem. cmt. 12 (declining to attribute subsidies for glass machinery where an input supplier's business license listed "several kinds of business activities beyond merely glass equipment manufacturing, such as rubber machinery and winery equipment"). In other cases Commerce has analyzed the nature of the input product itself, finding production of the input not to be "primarily dedicated" to the downstream product where the input product has many other potential applications besides incorporation into the downstream product.[2] See Final Affirmative Countervailing Duty Determination and Final

---

[2] Commerce's differing focus from analysis to analysis can be (at least partially) explained by the appearance in § 351.525(b)(6)(iv) of the phrase "production of the input product." This phrase could conceivably refer to two distinct things. First, it could refer to the general act of producing the input product, as in the sentence "production of textiles involves fibers and dye." This reading invites a focus on inherent attributes of the input product, whereby any production of that product

Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia, 71

Fed. Reg. 47174 (Dep't Com. Aug. 16, 2006) and accompanying Issues and Decisions Mem. cmt.

3 (finding that production of pulp logs was primarily dedicated to production of downstream paper

products because "pulp logs are used to make pulp which, in turn, is used to make paper").  This

court will uphold such differing modes of "primarily dedicated" analysis—and indeed differing

conclusions with respect to the same input product in different cases, see Nucor I, 46 CIT at __,

600 F. Supp. 3d at 1238—so long as Commerce's conclusion in each case rests on substantial

evidence and Commerce reasonably explains the basis for its decision.  See NMB Sing. Ltd. v.

United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009)); see also Save Domestic Oil, Inc. v. United

States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) (citing Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983)); see also SKF USA Inc. v. United States, 630 F.3d

---

would necessarily be primarily dedicated to a downstream product.  But "production of the input product" could also conceivably refer to a specific supplier's actual process of producing an input product, as in the sentence, "my neighbor's backyard production of chemical solvents causes a nuisance."  This reading invites a focus on attributes of the supplier's specific act of producing the input product when determining whether input production is primarily dedicated to downstream production.

Commerce's examples in the Preamble appear to resolve this ambiguity in favor of the first reading, as Commerce singles out a "type of input product" and seems to suggest (for example) that semolina production necessarily implies primary dedication to the downstream production of pasta.  See Preamble; see also Gujarat Fluorochemicals Ltd. v. United States, 47 CIT __, __, 617 F.Supp.3d 1328, 1336–37 (2023).  On the other hand, the Preamble also states that Commerce's "main concern" is with subsidies provided to "an input producer whose production is dedicated almost exclusively to the production of a higher value added production."  Preamble.  This grammatically definite focus on the actions of the input's producer appears to support the second reading.

These readings are not necessarily mutually exclusive, and the question of which is more compelling is not squarely before the court.  See infra Part II.A.  The court simply notes the conundrum as a means of sketching out the background against which Commerce relies on multiple factors in its "primarily dedicated" determinations.  Remand Results at 8, 17–18.

1365, 1373 (Fed. Cir. 2011) ("When an agency changes its practice, it is obligated to provide an

adequate explanation for the change." (citing Motor Vehicle Mfrs., 463 U.S. at 42)).

## II.    Procedural Background

The court presumes familiarity with the background of this case as discussed in the court's

review of challenges to the AR Results. See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v.

United States ("Kaptan I"), 47 CIT __, 633 F. Supp. 3d 1276 (2023). In that proceeding, Plaintiff

Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), a Turkish producer and exporter of

rebar, brought a motion for judgment on the agency record on the basis of two challenges to

Commerce's determinations in the AR Results. Id. at 1281. Kaptan specifically challenged

Commerce's determination that subsidies received by Nur Gemicilik ve Ticaret A.S. ("Nur"), a

shipbuilding company affiliated with Kaptan, were properly attributed to Kaptan on the basis of a

cross-owned input supplier relationship as defined by 19 C.F.R. § 351.525(b)(6)(iv).[3] Defendant

the United States ("the Government") and domestic producers, Defendant-Intervenors Rebar Trade

Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S.

Inc., Nucor Corporation, and Steel Dynamics, Inc., ("Domestics"), opposed Kaptan's motion. The

court concluded that Commerce had failed to properly explain how Nur's production of steel scrap,

which Kaptan bought and melted down to produce rebar, constituted "production of the input

product [that] is primarily dedicated to production of the downstream product." Id. at 1280, 1285

---

[3] Kaptan also challenged Commerce's finding that Nur's participation in a land rent exemption
program with the Turkish government was a countervailable subsidy within the meaning of section
771 of the Tariff Act, 19 U.S.C. § 1677. See Kaptan I, 633 F. Supp. 3d at 1281–82. Because the
court remanded for further explanation on the threshold question of whether to attribute Nur's
subsidies to Kaptan, the court did not address this challenge. See id. at 1285 n.4. Nor is that
challenge at issue on remand.

(quoting 19 C.F.R. § 351.525(b)(6)(iv)).  The court remanded Commerce's finding for "further explanation and review."  <u>Kaptan I</u>, 633 F. Supp. 3d at 1285.

On remand, Commerce initially indicated that it would reaffirm its determination that Nur is Kaptan's cross-owned input supplier.  <u>Draft Results of Redetermination Pursuant to Court Remand</u> (Dep't. Com. June 26, 2023), P.R.R. 1 ("<u>Draft Remand Results</u>").[4]  But following the submission of comments from interested parties on the <u>Draft Remand Results</u>, <u>see</u> Letter from Kaptan to G. Raimondo, Sec'y of Com., re: Kaptan Comments on Draft Remand (July 7, 2023), P.R.R. 6 ("Kaptan's Cmts. on <u>Draft Remand Results</u>"); Letter from Domestics to G. Raimondo, Sec'y of Com., re: Comments on Draft Results of Redetermination (July 7, 2023), P.R.R. 5 ("Domestics' Cmts. on <u>Draft Remand Results</u>"), Commerce changed course and determined that Nur is not Kaptan's cross-owned input supplier with respect to steel scrap.  <u>See</u> <u>Remand Results</u>. Commerce explained that it "reexamined the facts on the record of this proceeding" and changed its subsidy attribution determination "upon further consideration of those facts in conjunction with Commerce's regulations."  <u>Id.</u> at 1.

Domestics now challenge these <u>Remand Results</u>.  Def.-Inters.' Cmts. on Remand Redetermination, Aug. 23, 2023, ECF No. 68 ("Domestics' Br.").  Kaptan and the Government oppose this challenge, <u>see</u> Pl.'s Reply Cmts. in Support of Remand Redetermination, Sept. 22, 2023, ECF No. 70 ("Kaptan's Br."); Def.'s Resp. to Cmts. on Remand Redetermination, Sept. 22, 2023, ECF No. 72 ("Gov't Br.").

---

[4] "P.R.R." and "C.R.R." respectively refer to the Public Remand Record and Confidential Remand Record in this case.  <u>See</u> Pub. Remand Joint App'x., October 6, 2023, ECF No. 74; Confidential Remand Joint App'x., October 6, 2023, ECF No. 73.

### III.    Factual Background

Commerce adopted a multifactor approach in preparing the <u>Remand Results</u> at issue in this case.  Drawing on these past determinations (among others), Commerce provided the following set of factors as a "general outline of our considerations in our examination of the record in determining whether to attribute Nur's subsidies to Kaptan":

1.  Whether an input supplier produced the input;

2.  Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

3.  Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the <u>Preamble</u>, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

4.  Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

5.  Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the <u>Preamble</u> such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

<u>Remand Results</u> at 12–13 (bullets in original presented here as ordinals).[5]

Commerce determined on the basis of these factors that Nur's production of steel scrap was not primarily dedicated to Kaptan's production of rebar.  <u>Remand Results</u> at 16–19.  On Factors 1 and 2, which Commerce described as "threshold factor[s]," Commerce acknowledged that Nur supplied Kaptan with all of its steel scrap and that steel scrap generally can be used in the

---

[5] These factors are identical to those on which Commerce based its analysis in the <u>Draft Remand Results</u>.  <u>Draft Remand Results</u> at 12.

production of rebar.[6]  Id. at 16.  But on Factor 3, Commerce noted that unprocessed steel scrap is "a common input among a variety of products and industries and used in a variety of production processes."  Id. at 17.  Commerce explained that Nur's steel scrap could be distinguished on this basis from the examples of semolina and stumpage—which are limited in their downstream applications to pasta and lumber, respectively.  Id.

On Factor 5, Commerce noted that Nur's primary business activity is shipbuilding, not steel scrap production.  Id. at 19.  Commerce explained that it would accordingly be inappropriate to consider Nur's production of ships as "primarily dedicated" to Kaptan's production of rebar, as ships are "much further downstream" than rebar.  Id.  "Nur's business activity," Commerce concluded, "is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the Preamble."  Id.

Commerce's ultimate conclusion can be summarized as resting on two grounds: first, that unprocessed steel scrap can be used for many purposes and is thus not the type of input product that is inherently "primarily dedicated" to a single downstream product.  Second, that the steel scrap that Nur provided to Kaptan was merely a byproduct of Nur's main business activity of shipbuilding—in other words, that Nur's production of steel scrap was "primarily dedicated" to producing ships and not rebar.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (a)(2)(B)(ii).  Under § 1516a(b)(l)(B)(i), "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on

---

[6] As Commerce noted in the Draft Remand Results, there is "no debate among the parties" as to these points.  Draft Remand Results at 13.

the record, or otherwise not in accordance with law," see also Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(l)(B)(i)), "which includes compliance with the court's remand order," see SMA Surfaces, Inc. v. United States, 47 CIT __, __, Slip Op. 23-137, at 5 (Sept. 20, 2023); see also Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014). Substantial evidence refers to "such evidence that a reasonable mind might accept as adequate to support a conclusion." SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted).

## DISCUSSION

Domestics assert that the Remand Results "raise the same concerns" that led the court to remand the AR Results. They argue that Commerce's reconsidered conclusion—that Nur's production of steel scrap is not "primarily dedicated" to Kaptan's production of rebar under § 351.525(b)(6)(iv) and its accompanying Preamble in the Federal Register—is insufficiently explained and unsupported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(l)(B)(i); Domestics' Br. at 7, 12.

Referencing the examples that Commerce offered in the Preamble, Domestics argue that Commerce erred in finding the relationship of Nur's scrap to Kaptan's rebar to be more similar to that of plastic to appliances and automobiles than the relationship of timber to lumber, or of semolina to pasta. Domestics' Br. at 12. Domestics further argue that Commerce "inappropriately focused" on the fact that Nur is a shipbuilding company, and should have instead focused on "record evidence regarding Nur's production of scrap, and the relationship between scrap and Kaptan's downstream production." Id.

The court finds these arguments unavailing for the reasons set forth below.

**I.     Commerce's Characterization of Nur's Steel Scrap as Not Necessarily Primarily Dedicated to Kaptan's Rebar Production Is Lawful**

As an initial matter, Commerce's determination of whether steep scrap is primarily dedicated to downstream steel production is a fact-specific inquiry unique to each case. Domestics cite several prior administrative decisions that purportedly show that "Commerce has repeatedly found that steel scrap—without any consideration of its processing level—is primarily dedicated to downstream steel production." Domestics' Br. at 12–14. Domestics appear to suggest that against this background, Commerce's findings that steel scrap is a "common input among a variety of products and industries and used in a variety of production processes" and that "the scrap that Nur sold to Kaptan was not 'generated or otherwise prepared for downstream products'" are anomalous and thus require additional explanation. Domestics' Br. at 12 (quoting Remand Results at 12–18, 28). The existence of an agency practice would saddle Commerce with the burden of explaining its departure from that practice. See Save Domestic Oil, 357 F.3d at 1283–84. But Domestics' cited examples do not establish a practice whereby Commerce has reflexively treated steel scrap as a primarily dedicated input of rebar. In none of the cited determinations did Commerce expressly commit itself to such a categorical rule. Domestics' Br. at 12. Commerce has in fact stated elsewhere that it does not adhere to such a rule. See, e.g., Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Final Results of Redetermination Pursuant to Court Remand at 58 (Dep't Com. Jan. 30, 2023), remanded on other grounds, Nucor Corp. v. United States ("Nucor II"), 47 CIT __, __, Slip Op. 23-119 (Aug. 21, 2023). What Domestics' examples show, at most, is that Commerce has in the past reached positive primary dedication conclusions on different facts. See Nucor I, 600 F. Supp. 3d at 1238 ("[D]ecisions regarding [subsidy] attribution are fact specific and Commerce may reach different conclusions in different cases in relation to the same input.").

Even if past agency practice did saddle Commerce with the burden of explaining its departure from that practice, Domestics' challenges to Commerce's explanation of its reasoning are unpersuasive.[7]  These challenges, to the extent they are not conclusory, address only peripheral aspects of Commerce's detailed explanation of the considerations underlying its characterization of the relationship of Nur's steel scrap to Kaptan's rebar.  See Remand Results at 8–18.

First is Domestics' contention that Commerce "did not identify products/industries using [steel] scrap beyond downstream steel products" and thus "did not adequately explain its reasons for finding the relationship between such scrap and rebar more like the relationship that plastics have with automobiles and appliances than the relationship that timber has with lumber or that

---

[7] Domestics summarize their challenges as follows:

> In sum, Commerce failed to adequately explain or support its conclusion that the physical nature of Nur's scrap and the circumstances of its generation were such that the scrap did not form a "link in the overall production chain" for Kaptan's downstream rebar. While Commerce determined that unprocessed, byproduct steel scrap is a "common input among a variety of products and industries and used in a variety of production processes," Remand Results at 17-18, 28, it provided no support for this assertion. It did not identify products/industries using such scrap beyond downstream steel products. It did not adequately explain its reasons for finding the relationship between such scrap and rebar more like the relationship that plastics have with automobiles and appliances than the relationship that timber has with lumber or that semolina has with pasta. It cited no record evidence demonstrating that Kaptan used or could only use scrap that had been pre-processed or purposely generated with its downstream operations in mind. It failed to identify any qualitative distinctions between the scrap that Nur provided to Kaptan and the scrap provided by other scrap-supplying Kaptan affiliates that the agency treated as cross-owned input suppliers for subsidy attribution purposes. Commerce failed to acknowledge or confront the multiple past cases in which it found steel scrap primarily dedicated to downstream steel production without any finding as to whether that scrap was processed or not, as well as its own prior rejection of the argument that the byproduct nature of scrap is relevant to the cross-attribution analysis.

Domestics' Br. at 17–18.

semolina has with pasta." Domestics' Br. at 18.[8] This argument merely fulfills a self-fulfilling prophecy: after first constructing a category of "downstream steel products" that by its terms sweeps in all conceivable downstream applications of steel scrap, Domestics then insist that Commerce failed in its Remand Results to enumerate examples of downstream applications of steel scrap that fall outside this maximally broad definition.

By this reasoning, it would appear that even in the archetypical case of plastics, automobiles, and appliances, Commerce would be required to offer examples of downstream uses for plastics other than "downstream plastic products" in order to show that plastics production is not primarily dedicated to automobile production. And because every product that incorporates plastics as an input is arguably a "downstream plastics product," as Domestics suggest is the case with "downstream steel products," Domestics' Br. at 18, Domestics' proposed standard would seemingly compel a primary dedication finding in the very hypothetical case that Commerce invoked to demonstrate a lack of primary dedication—and, indeed, in every case. This standard wants for a limiting principle, and the court declines to adopt it.

Contrary to Domestics' suggestion, Commerce's task in establishing steel scrap's closer similarity to plastics than to semolina was not to "identify products/industries using [steel] scrap beyond downstream steel products."[9] Domestics' Br. at 18. Commerce's task was instead to assess the range of downstream steel products that steel scrap can be used to produce. Kaptan I,

---

[8] Earlier in their brief, Domestics argue along similar lines that Commerce erroneously classified steel scrap as a "common input" because "there is no obvious use for steel scrap, regardless of its processing level, except in the production of more steel through remelting." Domestics' Br. at 14.
[9] As the court noted in Gujarat Fluorochemicals, "the reference in [§ 351.525(b)(6)(iv)] to 'the downstream product' is not only singular, it is also a reference to a specific product." 617 F. Supp. 3d at 1340. Thus, even if Domestics' suggested category of "downstream steel products" were not so broad as to be meaningless, it would at the very least extend impermissibly beyond the singular "downstream product" at issue in this case: rebar.

633 F. Supp. 3d at 1284 ("Commerce needs to explain further why the input product in question . . . is in fact primarily dedicated to the production of downstream products in this case.  This is especially true considering record evidence that the scrap may have been used for the production of products other than the subject merchandise.").

That is precisely what Commerce did on remand.  Explaining that "unprocessed scrap is a common input among a wide variety of products and industries," Remand Results at 18, Commerce (elsewhere in its redetermination) listed "non-subject rebar, other types of bars, and angle profiles" as examples of products besides the subject rebar that Kaptan uses steel scrap to produce.  Id. at 26–27.  The remand record on which Commerce based these assertions contains Kaptan's representations that "Kaptan Demir manufactures steel billets, reinforcing bars, angles, square bars, flat bars, and round bars in its meltshop and two rolling mills" and that at one of these mills, "hot billets are . . . rolled into various products, including deformed reinforcing bars ranging from 8 mm to 40 mm and other products."  Letter from Kaptan to W. Ross, Sec'y of Com., re: Kaptan Initial Questionnaire Response at 8–9 (July 6, 2020), P.R.R. 88 ("Kaptan Questionnaire Response").  As the Government notes, Commerce cited cases in its Remand Results that involved additional downstream products for which steel scrap can be an input.[10]  Even Domestics acknowledge that "[t]he record here indicates that Kaptan used Nur's scrap to produce downstream steel products, including rebar."  Domestics' Br. at 15.

This variety of downstream outputs constitutes substantial evidence in support of Commerce's determination that rebar is one of many products that can be manufactured from steel scrap, and that the relationship of Nur's steel scrap to Kaptan's rebar is thus unlike the more direct

---

[10] Besides rebar, these products are "cut-to-length plate, cold-rolled steel, oil country tubular goods, and fluid end blocks."  Gov't. Br. at 11 (citing Remand Results at 16).

input-to-output relationship of semolina to pasta. Commerce, furthermore, has adequately explained the link between this evidence and its findings in the <u>Remand Results</u>.

Domestics next challenge Commerce's statements that "it is significant that there is no evidence that the scrap provided by Nur was processed in any way prior to selling it to Kaptan Demir" and that "[w]hether or not scrap is generated or otherwise prepared for downstream products in the production line is a factor to consider when determining whether an input is primarily dedicated to the production of a downstream product," <u>Remand Results</u> at 17, as inadequately explained and unsupported by substantial evidence, <u>see</u> Domestics' Br. at 12, 16. This argument also fails to identify a legally relevant flaw in Commerce's reasoning.

Commerce made these statements in conjunction with its analysis (discussed in greater detail above) of whether an input is "not merely a link in the overall production chain." <u>Remand Results</u> at 17. Commerce's point was simply that any processing of steel scrap by the input supplier focuses the range of likely downstream applications of that scrap, analogizing the relationship of input scrap to downstream rebar to the relationships of semolina to pasta and of stumpage to lumber.[11] <u>Id.</u> According to Commerce, the presence on the record of any evidence of such processing would support a finding that the input scrap's relationship to Kaptan's rebar was marginally closer. <u>Id.</u> Commerce did not invoke scrap processing as a determining factor[12]

---

[11] For example, if Nur had processed its steel scrap prior to sale by pressing it in a particular way, and Kaptan's production of rebar required that kind of pressed steel scrap as an input, Commerce might consider that processing as a factor militating in favor of a primary dedication finding. Analogously, the milling of wheat to create semolina might cut toward a finding of primary dedication to downstream pasta production.

[12] The court has previously questioned Commerce's reliance on a distinction between processed and unprocessed steel scrap as the sole basis for a primary dedication determination. <u>See</u> <u>Nucor II</u>, Slip Op. 23-119, at 25–26. The distinction that Commerce referenced here, however, is only

in its "primarily dedicated" analysis; it merely raised the possibility that processing could limit an input's downstream uses and noted that that was not the case here.  Id.

Domestics contest the relevance of Commerce's distinction between processed and unprocessed steel.  Domestics' Br. at 18.  They fail, however, to explain how this purported irrelevance—which Commerce cites as one factor among many—would affect the completeness of Commerce's explanation for its negative primary dedication finding, or the question of whether that finding is supported by substantial evidence.  Domestics also fail to meaningfully contest Commerce's premise that an input supplier's processing of steel scrap might lend support to a finding that that scrap is "merely a link" in downstream production.  Remand Results at 31; see also Gov't Br. at 5.  The court will not remand for Commerce to provide additional explanation where the party seeking remand has failed to engage with the explanation already on the record.

## II.    Commerce's Analysis of Nur's Business Activity Is Lawful

Domestics' second main challenge is to Commerce's consideration of the nature of Nur's business activities as a factor in its "primarily dedicated" inquiry.  Domestics' Br. at 18–19.  Domestics argue that Commerce erred[13] in even considering this factor, and also challenge specific

---

one of several bases for Commerce's determination that Nur's steel scrap is not primarily dedicated to Kaptan's rebar.

[13] Domestics do not clearly identify a legal basis for their request for remand on the issue of whether it was proper under § 351.525(b)(6)(iv) for Commerce to consider Nur's business activity as a factor.  Domestics state only that "the agency has inappropriately focused on the nature of Nur's 'business activity' over the record evidence regarding Nur's production of scrap," and that "Commerce has not adequately explained or supported its analysis of Nur's business activity." Domestics' Br. at 12, 23.  This second statement presumably refers to the substantial evidence standard under 19 U.S.C. § 1516a(b)(l)(B)(i) and to Commerce's duty to explain its actions under 19 U.S.C. § 1677f(i)(3)(A).  See NMB Sing., 557 F.3d at 1319.  However, Domestics do not clarify whether these statutory requirements pertain to Commerce's threshold decision to analyze Nur's business activity or to the substance of the analysis that Commerce conducted.  The court thus construes Domestics' regulatory interpretation argument as a request for remand on the basis that

aspects of Commerce's analysis thereunder.  <u>Id.</u>  The court finds neither of these arguments
persuasive.

### A.      *Commerce's Consideration of Nur's Business Activity as a Factor Is Lawful*

Domestics first propose an interpretation of 19 C.F.R. § 351.525(b)(6)(iv) and the
<u>Preamble</u> that would preclude Commerce's analysis of any factor besides the question of "whether
the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary
input into such goods."  Domestics' Br. at 19–20.  They then argue that Commerce supported its
conflicting interpretation of the regulation, outlined in the <u>Remand Results</u> at 8–13, with citations
to past determinations that are "distinguishable."  Domestics' Br. at 20.

The Government and Kaptan urge this court to uphold Commerce's consideration of Nur's
business activity in its "primarily dedicated" analysis on the basis that Commerce's reading of
§ 351.525(b)(6)(iv) and the <u>Preamble</u> as allowing for such a multifactor analysis is owed judicial
deference.  Gov't Br. at 7; Pl.'s Br. at 8 (citing <u>Chevron U.S.A., Inc. v. Nat. Res. Def. Council,
Inc.</u>, 467 U.S. 837, 843 (1984)); <u>see also</u> <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2414–18 (2019)
(discussing the applicability of judicial deference to agency interpretations of agency regulations).
The court need not weigh in on the applicability of <u>Chevron</u> or <u>Kisor</u> to Commerce's interpretation
of § 351.525(b)(6)(iv) and the <u>Preamble</u>,[14] however, as Domestics' proposed alternative
interpretation fails to pass muster in its own right.

---

Commerce's multifactor analysis was "not in accordance with law" under 19 U.S.C. §
1516a(b)(l)(B)(i).

[14] Commerce explained the regulatory underpinning of its business activity analysis as follows:

> Examining a company's business activities helps us assess whether an input
> supplier's production is "dedicated almost exclusively to the production of a higher
> value-added product" in the manner suggested by the <u>Preamble</u> such that the

Domestics offer no support for their suggestion that § 351.525(b)(6)(iv) and the <u>Preamble</u> preclude Commerce's analysis of an input supplier's business activity.  They flatly assert, for example, that "the <u>Preamble</u> does not state that the input supplier's main business activity is a relevant factor" and that the <u>Preamble</u> instead "indicates that the salient issue is whether the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary input into such goods."  Domestics' Br. at 19.  But Domestics fail to explain why the <u>Preamble</u> should be treated as an exhaustive compendium of all relevant factors, or how the text of the <u>Preamble</u> "indicates" what the "salient issue" is.

Domestics go on to assert that "the <u>Preamble</u> does not use the term 'business activity,' but . . . 'production,' with the focus of that term being the 'production' of the "input" at issue." <u>Id.</u> at 19.  "[T]he <u>Preamble</u> and regulations," they claim, "are focused on production of the 'input,' and whether the input feeds a higher value-added product, not on the supplier's production of other goods." <u>Id.</u> at 20.

These statements, too, lack support. Domestics again do not explain why the considerations that Commerce outlined in the <u>Preamble</u> cannot be applied using terms that Commerce did not employ verbatim in the <u>Preamble</u>.  Nor do Domestics explain their position on the issue of where the focus of the word "production" in § 351.525(b)(6)(iv) and the <u>Preamble</u> lies.  It is further unclear why an analysis of Nur's shipbuilding activities is irrelevant to "production of the 'input,' and whether the input feeds a higher value-added product." <u>Id.</u> at 20.  Nur produces steel scrap, after all, by building ships.  <u>Remand Results</u> at 5.

---

purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

<u>Remand Results</u> at 19 (citing <u>Preamble</u>, 63 Fed. Reg. at 65401).

Instead of challenging Commerce's position that "[e]xamining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble," id. at 19, Domestics rest their contrary position on a series of bare, conclusory assertions. Insufficiently briefed arguments may not form the basis for disturbing Commerce's interpretation, whether or not the court affords deference to that interpretation. See United States v. Great Am. Ins. Co. of N.Y., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); see also SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) (concluding that "mere statements of disagreement" do not "amount to a developed argument").

More developed, but similarly unavailing, is Domestics' argument that Commerce's references to prior determinations that considered upstream business activity as a factor are "distinguishable, or otherwise underscore the problems with the agency's analysis here." Domestics' Br. at 20. Domestics take issue with the applicability of three such determinations: Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination, 85 Fed. Reg. 31454 (Dep't Com. May 26, 2020) ("Fluid End Blocks"), Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 31141 (Dep't Com. May 22, 2020) ("Glass Containers"), and Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018, 86 Fed. Reg. 15184 (Dep't Com. Mar. 22, 2021) ("CTL Plate").

With respect to Fluid End Blocks, Domestics argue that "while the agency stated that it considered the suppliers' 'business activities,' its analysis ultimately came down to the 'quantities and types of materials' that the input suppliers provided." Domestics' Br. at 20 (quoting Mem. from J. Maeder to J. Kessler, re: Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Forged Steel Fluid End Blocks from the Federal Republic of Germany § VI(B) (Dep't Com. May 26, 2020)). In that determination, however, Commerce did not indicate any one factor that its analysis "ultimately came down to." Instead, like the Remand Results at issue here, Commerce analyzed the supplier's business activities as one among several factors. Id.

Domestics next argue that Glass Containers is distinguishable because in that case, unlike here, Commerce "considered the supplier's business activities solely in the context of determining whether to employ adverse inferences." Domestics' Br. at 20. That is true, see Mem. from J. Maeder to J. Kessler, re: Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Glass Containers from the People's Republic of China cmt. 12 (Dep't Com. May 11, 2020), but the relevance of the different framing that Domestics identify is unclear. In Glass Containers, Commerce considered whether to apply an adverse inference against a respondent that failed to submit a questionnaire response for an entity that a petitioner claimed was a cross-owned input supplier. Id. The entire inquiry into whether an adverse inference was appropriate hinged on Commerce's determination of whether that entity's production of the input in question was "primarily dedicated" to the respondent's downstream production, and Commerce engaged in substantially the same type of analysis as it did here in the Remand Results. Id.

On CTL Plate, Domestics first note that Commerce's analysis of the supplier's business activities can be discounted because the court initially remanded Commerce's determination for further explanation, and the subsequent remand results were again remanded. Domestics' Br. at 21 (citing Nucor I, 600 F. Supp. 3d at 1234–38; Nucor II, Slip Op. 23-119). Domestics suggest that these back-to-back remands lessen the support that CTL Plate lends to the Remand Results in this case on the issue of Commerce's consideration of business activity. This insinuation is unfounded: in the court's second remand order in Nucor, the court ordered Commerce to reconsider other issues but upheld Commerce's "reasoned analysis" in its remand results as to its "consideration of primary business activities." Nucor II, Slip Op. 23-119, at 25.

Domestics also note that in the CTL Plate determination, "Commerce also relied on certain other factors [other than business activity] that are not present here." Domestics' Br. at 21. As with Fluid End Blocks, however, Commerce merely invoked CTL Plate in the Remand Results as an example of a determination where Commerce considered a respondent's business activities as one factor—not, as Domestics appear to suggest, as the only factor. Commerce stated in the Remand Results that:

> In [CTL Plate], we considered a range of case-specific factors, including an analysis of the by-product nature of the steel scrap as it relates to an input supplier's overall production process, the fact it was sold through an intermediary, the scope of business of the steel scrap input supplier, and the nature of other services provided by the input supplier in determining whether the materials and inputs provided were primarily dedicated to downstream production.

Remand Results at 31. CTL Plate and Fluid End Blocks are thus indistinguishable from these Remand Results in that they exemplify Commerce's consideration of an input supplier's business activity alongside other factors in its "primarily dedicated" analysis. Together with Glass Containers, they constitute analogous precedents that do not identifiably "underscore the problems" with Commerce's analytical approach in this case. Domestics' Br. at 20.

### B.   Commerce's Evaluation of Nur's Business Activities Is Supported by Substantial Evidence and Otherwise in Accordance with Law

Turning to the substance of Commerce's analysis of Nur's business activities in the Remand Results, Domestics argue that Commerce failed to adequately explain its finding that "the production processes involved in [Nur's] shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies." Remand Results at 19, 25; see also Domestics' Br. at 22.[15]  Domestics argue as follows:

> Rather than detail the basis upon which the agency concluded that the transactions were "extremely limited," [Commerce] cited generally to Kaptan's comments on the draft remand results, while simultaneously explaining that it was not the volume of scrap supplied by Nur that it found relevant.  Commerce's generalized citation does not elucidate the agency's thinking, given that Kaptan's argument[] [was] that

---

[15] Commerce's explanation is set forth below at greater length:

> Finally, we find that Kaptan Demir's arguments regarding Nur's primary business activity lead us to reconsider our evaluation of Nur's primary business activity as a shipbuilder.  Examining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products." As discussed in the Draft Remand, Nur's primary business is shipbuilding, which involves the production of a product that is much further downstream than the downstream products produced by Kaptan Demir, most notably rebar.  Upon a review of Nur's business activities, which consist largely of shipbuilding, we find that the production processes involved in shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies.   Therefore, we find that Nur's business activity is not "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble.   Simply put, the facts on the record do not support the premise that subsidies given to a shipbuilder would be given to "benefit the production of both the input and downstream products."

Remand Results at 19 (footnotes omitted).  Commerce also noted that "the significance of the limited nature of these transactions is not based upon volume, as Kaptan Demir argues, but instead, an analysis of the totality of the facts contained within the transactions between Nur and Kaptan Demir." Id. at 25.

> . . . Nur sold only a "miniscule" amount of scrap to Kaptan.  In other words, the
> only argument that Kaptan made about the "limited" nature of Nur's transactions
> with Kaptan was grounded in the volume of steel scrap that Nur sold to Kaptan—
> the very thing that Commerce says is irrelevant.

Id. at 22–23 (citations omitted). Domestics, in other words, argue that Commerce failed to explain

the apparent contradiction between Commerce's reliance on Kaptan's representation that its

purchases of steel scrap from Nur were "miniscule" in volume, see Kaptan's Cmts. on Draft

Remand Results at 3, and Commerce's disavowal of a volume-based standard for assessing an

input supplier's business activity as a factor in determining whether to cross-attribute subsidies,

see Remand Results at 25.

The Government and Kaptan both respond that Domestics' argument on this point elides

context which clarifies Commerce's meaning in the Remand Results.  Gov't Br. at 15; Kaptan's

Br. at 9–11.  The Government points out that Commerce did in fact cite to record evidence

supporting a conclusion that Nur's transactions with its corporate affiliates were "limited" in a

non-volume-related sense.  Gov't Br. at 15.  Commerce, the Government argues, cited this

evidence in its summary of Kaptan's comments on the Draft Remand Results: "Nur's tax returns

show most of its affiliated transactions are service and financial related, with no purchase of goods

. . . ."  Gov't Br. at 15 (quoting Remand Results at 21).  Kaptan argues that its comments on the

Draft Remand Results—to which Commerce's statement in the Remand Results that the

"significance of the limited nature of these transactions is not based upon volume" was a

response—clarify that Commerce's statement "is not based upon volume," Remand Results at 25,

is properly interpreted as "is not entirely based on volume," see Kaptan's Br. at 10–11.[16]  This,

---

[16] These comments included a statement that one of Nur's financial statements "shows an
extremely limited amount of commercial good transactions between the affiliates, all of which are
accounted for by this minuscule amount of scrap sold to Kaptan."  Kaptan's Cmts. on Draft
Remand Results at 10.  Commerce, Kaptan argues, meant only to correct Kaptan's notion that

Kaptan argues, resolves any apparent contradiction with Commerce's consideration of Nur's "miniscule" sales of steel scrap. Kaptan's Br. at 11.

The question here is whether Commerce sufficiently "elucidate[d] [its] thinking," Domestics' Br. at 23, such that "the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974); see also Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) ("An explicit explanation is not necessary . . . where the agency's decisional path is reasonably discernible.").

Commerce has met this standard through its explanations in the Remand Results, although not exactly by the means that Kaptan and the Government suggest. By stating that "the production processes involved in [Nur's] shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies," Remand Results at 19, Commerce clearly indicated that the limited nature of transactions between Nur and Kaptan supported a finding that Nur's shipbuilding was its own self-contained enterprise with little connection to Kaptan's production of steel—except, that is, to Kaptan's purchase of Nur's byproduct scrap as an input. Commerce's subsequent statement that "the significance of the limited nature of these transactions is not based upon volume . . . but instead, an analysis of the totality of the facts contained within the transactions between Nur and Kaptan Demir," Remand Results at 25, thus does not unexplainedly contradict Kaptan's representation that its scrap purchases from Nur were "miniscule." Kaptan's Cmts. on Draft Remand Results at 3. Commerce did not merely state that "the limited nature of these transactions is not based on volume," which would imply (as Domestics suggest) that the scrap sales were

---

sales volume was the sole relevant limitation on the nature of an input supplier's transactions. Kaptan's Br. at 10–11.

somehow limited in a manner other than their volume.  Commerce stated, rather, that "the significance of the limited nature of these transactions is not based upon volume . . . ."  Remand Results at 25 (emphasis added).  In other words, Commerce did not conclude that Nur's shipbuilding activities cut against a finding of primary dedication simply because the amount of steel scrap that Nur sold to Kaptan was small.  As Commerce instead explained, Commerce drew this conclusion because the amount of steel scrap that Nur sold to Kaptan was insignificant as an element within the totality of Nur's complex shipbuilding operations:

> Upon a review of Nur's business activities, which consist largely of shipbuilding, we find that the production processes involved in shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies.

Remand Results at 19 (emphasis added).  While Commerce could have dwelt longer on this point, the court's role is not to enforce a standard of "ideal clarity" where Commerce's position is reasonably discernible.  Wheatland Tube, 161 F.3d at 1369–70.

Lastly, Domestics take issue with Commerce's determination that two "similarly-situated affiliates that supplied Kaptan with scrap" are cross-owned input suppliers for the purpose of subsidy attribution.[17]  Domestics' Br. at 16; 19 C.F.R. § 351.525(b)(6)(iv).  Domestics argue that "an examination of the affiliated transactions of non-Nur affiliates underscores the arbitrary nature of Commerce's treatment of Nur" and that "Commerce's failure to acknowledge, much less explain, this disparate treatment . . . supports a remand here."  Domestics' Br. at 23.

As the Government and Kaptan point out, however, this differential treatment can be explained by the fact that Kaptan did not challenge Martas and Aset's treatment as cross-owned input suppliers in the initial agency proceeding or in subsequent litigation.  Gov't Br. at 16;

---

[17] These affiliates are Martas Marmara Ereglisi Liman Tesisleri A.S. ("Martas") and Aset Madencilik A.S. ("Aset").  Domestics' Br. at 16.

Kaptan's Br. at 7. Kaptan clarifies that this is because neither Matras nor Aset received subsidies that were attributable to Kaptan. Kaptan's Br. at 7.

Thus, while "inconsistent treatment [by an agency] is inherently significant," DAK Ams. LLC v. United States, 44 CIT __, __, 456 F. Supp. 3d 1340, 1355 (2020), the type of consistency that Domestics insist upon would be practically impossible for any agency to achieve. Commerce initially determined to treat Nur, Martas, and Aset alike as cross-owned input suppliers. AR Results, 86 Fed. Reg. at 53280 n.10. Commerce broke this alignment in the Remand Results only because of Kaptan's necessarily selective challenge to Nur's status. During the remand proceeding, Commerce was unable to modify any portion of its AR Results that was not subject to challenge by a party—including Commerce's treatment of Martas and Aset. See Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT __, __, 256 F. Supp. 3d 1314, 1334 (2017) ("What Commerce was not permitted to do on remand was to reopen and re-review the settled issue of the agency's decision in its Final Determination . . . ."). This means that Commerce, upon determining not to treat Nur as a cross-owned input supplier, could not have avoided inconsistency by modifying its treatment of Martas and Aset unless authorized by law. Here, Commerce was authorized only to review its treatment of Nur. Kaptan I, 633 F. Supp. 3d at 1285.

By Domestics' reasoning, Commerce could not possibly have determined on remand that Nur was not Kaptan's cross-owned input supplier without acting arbitrarily. Such a restriction would set a virtually unattainable standard for redeterminations in cases like this one, where the original AR Results contain unchallenged determinations regarding several affiliated suppliers. It would also inhibit compliance with the court's order that Commerce "further expl[ain] and review . . . Commerce's finding that Nur was a cross-owned input supplier of input products primarily dedicated to the production of downstream products," Kaptan I, 633 F. Supp. 3d at 1285.

As to Domestics' argument that Commerce should at least be required to explain the inconsistency on further remand, the court finds that no explanation Commerce could give on this point would "enable the court to evaluate the agency's rationale at the time of decision" beyond what Commerce has already given in the Remand Results. Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990). As discussed above, Commerce has met its burden of explanation with respect to its treatment of Nur. Commerce has faced no challenge to whether it has met this burden with respect to its treatment of Martas and Aset. And as for Commerce's duty to explain any disparate treatment of the different affiliates (assuming that one exists), a sufficient reason for the disparity is already plain—Commerce could not retroactively revise its treatment of Martas and Aset.

Accordingly, the court sustains Commerce's analysis of Nur's business activity.

## CONCLUSION

In light of the above, the court sustains Commerce's Remand Results. Judgment will enter accordingly.

**SO ORDERED.**

/s/      *Gary S. Katzmann*
Judge

Dated: November 27, 2023
       New York, New York

**Web Pages Cited in the Opinion**

‹     rebar                                           ✕   🔍

Dictionary                                  Thesaurus

# rebar *noun*

re·bar   ˈrē-ˌbär 🔊

**plural** **rebar** *or* **rebars**

**:** a steel rod with ridges for use in reinforced concrete

## Recent Examples on the Web

One worker lifted a dead baby out of the shattered concrete and *rebar* of 15 homes hit in the southern city of Rafah. RISK OF WIDENING CONFLICT The conflict threatened to spread across the region.
— Compiled By Democrat Gazette Staff From Wire Reports, *Arkansas Online*, 26 Oct. 2023

After hours of nonstop strikes, some residents left their homes at daybreak to find some buildings torn in half by strikes, while others were reduced to mounds of concrete and *rebar*.
— *TIME*, 10 Oct. 2023

Much of the cobalt in Congo is mined by hand: Workers scour the surface level seams with picks, shovels, and lengths of *rebar*, sometimes tunneling by hand 60 feet or more into the earth in pursuit of a vein of ore.
— Roger Peet, *The New Republic*, 30 Aug. 2023

**See More** ⌄

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'rebar.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples

## Etymology

*re*inforcing *bar*

## First Known Use

1953, in the meaning defined above

## Time Traveler

**The first known use of *rebar* was in 1953**

**Appx39**

Case: 24-0585-GS Document 16-7 Page 93 Filed 04/02/2024 Page 2 of 14

<

| D ct onary | Thesaurus |
| --- | --- |

rebaptizer

**rebar**

rebarbative

See More Nearby Entries >



**Style**  | MLA |

"Rebar." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/rebar. Accessed 8 Nov. 2023.

⧉ Copy Citation



Facebook    Twitter

Last Updated: 4 Nov 2023 - Updated example sentences

**Love words? Need even more definitions?**

Subscr be to Amer ca s  argest d ct onary and get thousands more def n t ons and advanced search   ad free!

MERR AM-WEBSTER UNABR DGED



**Appx40**

<

D ct onary                                                    Thesaurus

**mien** 🔊

See Def n t ons and Examp es »

Get Word of the Day da y ema

You e  a  add ess        SUBSCR BE

---

# Games & Quizzes

### Quordle
Can you solve 4 words at once?

Play

### Blossom Word Game
You can make only 12 words. Pick the best ones!

Play

### Missing Letter
A crossword with a twist

### Spelling Bee Quiz
Can you outdo past winners of the National Spelli...

Dictionary | Thesaurus

**Learn a new word every day. Delivered to your inbox!**

Your email address

SUBSCRIBE

OTHER MERRIAM-WEBSTER DICTIONARIES

MERRIAM WEBSTER'S UNABRIDGED DICTIONARY

SCRABBLE® WORD FINDER

MERRIAM WEBSTER DICTIONARY API

ENGLISH SPANISH ENGLISH TRANSLATION

BRITANNICA ENGLISH ARABIC TRANSLATION

Browse the Dictionary: A B C D E F G H    K L M N O P Q R S T U V W X Y Z 0 9 BIO GEO

Home | Help | About Us | Shop | Advertising Info | Dictionary API | Contact Us | Join MWU | Videos | Word of the Year | Kids Dictionary | Law Dictionary | Medical Dictionary | Privacy Policy | Terms of Use

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary | Browse the Kids Dictionary

© 2023 Merriam Webster, Incorporated

Case Case: 24-10535-GS Document 46-7 Page 96 Filed 04/02/2024 Page 24 of 14

‹   reinforced concrete                                                          ✕    ⌕

| D ct onary | Thesaurus |

# reinforced concrete *noun*

**:** concrete in which metal (such as steel) is embedded so that the two materials act together in resisting forces

## Recent Examples on the Web

Traditionally, fortresses have relied on walls of rock, and later *reinforced concrete*, to protect those sheltering inside from archers, catapults, and eventually heavy siege guns.
— Ky e M zokam , *Popular Mechanics*, 2  une 2023

An Israeli Air Force official, who briefed reporters on Monday on the condition of anonymity, in line with military rules, said that *reinforced concrete* tunnels ran for hundreds of miles inside Gaza.
— *New York Times*, 17 May 2021

One culvert is *reinforced concrete* pipe, while the culvert with sandstone walls has a concrete base and top.
— Bob Sandr ck, *cleveland*, 17  an. 2023

**See More** ⌄

These examp es are programmat ca y comp ed from var ous on ne sources to  ustrate current usage of the word 're nforced concrete ' Any op n ons expressed n the examp es do not represent those of Merr am Webster or  ts ed tors  Send us feedbac  about these examp es

## First Known Use

1891, in the meaning defined above

## Time Traveler

**The first known use of *reinforced concrete* was in 1891**

See more words from the same year

reinforced bow

**reinforced concrete**

Case: 24-01535-GSS Document 16-7 Page 97-1 Filed 04/02/2024 Page 2 of 14

‹

| D ct onary | Thesaurus |
|---|---|

**Style**  `MLA`

"Reinforced concrete." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/rein forced%20concrete. Accessed 8 Nov. 2023.

📋 Copy Citation



**Facebook**  **Twitter**

Britannica.com: Encyclopedia article about *reinforced concrete*

---

### Love words? Need even more definitions?

Subscr be to Amer ca s  argest d ct onary and get thousands more def n t ons and advanced search   ad free!

MERR AM-WEBSTER UNABR DGED

---



Can you solve 4 words at once?

**Play**



**Appx44**

D ct onary                                                    Thesaurus

Get Word of the Day da y ema

You e a add ess          SUBSCR BE

## Games & Quizzes



### Quordle
Can you solve 4 words at once?

Play



### Blossom Word Game
You can make only 12 words. Pick the best ones!

Play



### Missing Letter
A crossword with a twist

Play



### Spelling Bee Quiz
Can you outdo past winners of the National Spelli...

Take the quiz

‹

| D ct onary | Thesaurus |

**OTHER MERR AM-WEBSTER D CT ONAR ES**

MERR AM WEBSTER S UNABR DGED D CT ONARY

SCRABBLE® WORD F NDER

MERR AM WEBSTER D CT ONARY AP

NGL SH   SPAN SH ENGL SH TRANSLAT ON

BR TANN CA ENGL SH   ARAB C TRANSLAT ON

Browse the D ct onary:   A  B  C  D  E  F  G  H      K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z  0 9  B O  GEO

Home  |  He p  |  About Us  |  Shop  |  Advert s ng nfo  |  D ct onary AP  |  Contact Us  |  o n MWU  |  V deos  |  Word of the Year  |
K d s D ct onary  |  Law D ct onary  |  Med ca  D ct onary  |  Pr vacy Po cy  |  Terms of Use

Browse the Thesaurus  |  Browse the Med ca  D ct onary  |  Browse the Lega  D ct onary  |  Browse the K d s D ct onary

© 2023 Merr am Webster,  ncorporated

←     downstream       ✕    🔍

| D ct onary | Thesaurus |
| --- | --- |

# **downstream** adverb or adjective

down·stream    ˈdau̇n-ˈstrēm 🔊

**1**   **:** in the direction of or nearer to the mouth of a stream

floating *downstream*

located two miles *downstream*

**2**   **:** in or toward the latter stages of a usually industrial process or the stages (such as marketing) after manufacture

improving profits *downstream*

*downstream* products

**3**   **biochemistry**   **:** toward the end of a series of cellular processes **:** following a linked molecular event occurring in a sequence

But by looking *downstream* of the tumor suppressors  genes] at the proteins they influence, drug developers hope to find good targets.

— Marc a Bar naga

## Recent Examples on the Web

River commerce could be flowing more naturally by the middle or end of next week as the Corps works to clean out high spots *downstream* from Montgomery Point, said Marty Shell, port terminal operator for Five Rivers Distribution and Arkansas Waterways Commission member.

— Cr st na Larue, *Arkansas Online*, 20 Oct. 2023

That is an average of 33 events every year where a lake drains its contents, sending a pulse of water *downstream* and creating potentially hazardous conditions.

— Br anna R ck, *The Conversation*, 9 Oct. 2023

As the water is drained, crews working on boats will also spray fire hoses to wash away muddy silt and send it *downstream*.

— an  ames, *Los Angeles Times*, 5 Oct. 2023

**See More** ⌄

These examp es are programmat ca y comp ed from var ous on ne sources to  ustrate current usage of the word 'downstream ' Any op n ons expressed n the examp es do not represent those of Merr am Webster or ts ed tors Send us feedbac about these examp es

## First Known Use

**Appx47**



The first known use of *downstream* was in 1591

See more words from the same year

downstate
**downstream**
downstreet

See More Nearby Entries >

**Style**  MLA

"Downstream." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/downstream. Accessed 8 Nov. 2023.

📋 Copy Citation


Facebook


Twitter

# downstream *adverb or adjective*

down·stream   ˈdau̇n-ˈstrēm 🔊

**:** in the direction a stream is flowing

# downstream *adverb or adjective*

down·stream   ˌdau̇n-ˈstrēm 🔊

**1**   **:** in the same direction along a molecule of DNA or RNA as that in which transcription and translation take place and toward the end having a hydroxyl group attached to the position labeled 3 in the terminal nucleotide

<

| D ct onary | Thesaurus |

**2** : toward the end of a series of cellular processes **:** following a linked molecular event occurring in a sequence

But by looking *downstream* of the tumor suppressors  genes] at the proteins they influence, drug developers hope to find good targets.

— Marc a Bar naga, *Science*

The tyrosine kinase activity of phosphorylated EGFR  epidermal growth factor receptor] in cancer cells results in the phosphorylation of *downstream* proteins that incite cell proliferation, invasion, metastasis, and inhibition of apoptosis.

— onathan E. Dowe  and  ohn D. M nna, *The New England Journal of Medicine*

Nglish: Translation of *downstream* for Spanish Speakers

Last Updated: 28 Oct 2023 - Updated example sentences

## Love words? Need even more definitions?

Subscr be to Amer ca s  argest d ct onary and get thousands more def n t ons and advanced search   ad free!

MERR AM-WEBSTER UNABR DGED



Can you solve 4 words at once?

Play



WORD OF THE DAY

**mien** 🔊

See Def n t ons and Examp es »

Get Word of the Day da  y ema

You  e  a  add ess

<

D ct onary                                                        Thesaurus

**Quordle**

Can you solve 4 words at once?

Play

**Blossom Word Game**

You can make only 12 words. Pick the best ones!

Play

**Missing Letter**

A crossword with a twist

Play

**Spelling Bee Quiz**

Can you outdo past winners of the National Spelli...

Take the quiz

Learn a new word every day.
Delivered to your inbox!

Your email address

SUBSCR BE

OTHER MERR AM-WEBSTER D CT ONAR ES

Dictionary         Thesaurus

ENGLISH - SPANISH ENGLISH TRANSLATION

BRITANNICA ENGLISH - ARABIC TRANSLATION

Browse the Dictionary:  A  B  C  D  E  F  G  H      K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z  0-9  BIO  GEO

Home | Help | About Us | Shop | Advertising Info | Dictionary API | Contact Us | Join MWU | Videos | Word of the Year |
Kids Dictionary | Law Dictionary | Medical Dictionary | Privacy Policy | Terms of Use

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary | Browse the Kids Dictionary

© 2023 Merriam-Webster, Incorporated

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KAPTAN DEMIR ÇELIK ENDUSTRISI VE TICARET A.Ş.,** | |
| **Plaintiff,** | |
| **and** | |
| **ÇOLAKOĞLU DIŞ TICARET A.Ş. and ÇOLAKOĞLU METALURJI A.Ş.,** | |
| **Plaintiff-Intervenors,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 21-00565** |
| **Defendant,** | |
| **and** | |
| **REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, and STEEL DYNAMICS, INC.,** | |
| **Defendant-Intervenors.** | |

## JUDGMENT

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now, in conformity with that opinion, it is hereby

**ORDERED** that the U.S. Department of Commerce's <u>Final Results of Redetermination Pursuant to Court Remand</u> (Dep't Com. July 24, 2023), ECF No. 66, is sustained; and it is further

**ORDERED** that judgment is entered for Defendant the United States.

/s/  *Gary S. Katzmann*
Judge

Dated: <u>November 27, 2023</u>
  New York, New York

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2024-1431

**Short Case Caption:** Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,532 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/02/2024

Signature: /s/ John R. Shane

Name: John R. Shane

Save for Filing