No. 2024-1431

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., COLAKOGLU
DIS TICARET A.S., COLAKOGLU METALURJI A.S.,
Plaintiffs-Appellees,

v.

UNITED STATES,
Defendant-Appellee,

REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC.,
COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC.,
NUCOR CORPORATION, STEEL DYNAMICS, INC.,
Defendants-Appellants.

Appeal from the United States Court of International Trade in
Case No. 21-00565, Judge Gary S. Katzmann

RESPONSE BRIEF FOR DEFENDANT-APPELLEE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

Of Counsel:                                SOSUN BAE
                                           Senior Trial Counsel
W. MITCH PURDY                             U.S. Department of Justice
Senior Attorney                            Civil Division
U.S. Department of Commerce                Commercial Litigation Branch
Office of the Chief Counsel for Trade      P.O. Box 480
    Enforcement and Compliance             Ben Franklin Station
1401 Constitution Avenue, NW               Washington, D.C. 20044
Washington, D.C. 20230                     Tel: (202) 305-7568
                                           Email: Sosun.Bae@usdoj.gov

June 11, 2024                              Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ...................................................vi

STATEMENT OF THE ISSUE...........................................................1

STATEMENT OF THE CASE.............................................................1

I.     Nature Of The Case ................................................................1

II.    Relevant Background For Countervailing Duty Proceedings ........................2

      A.    Commerce Imposes Countervailing Duties To Counteract Foreign Subsidies ....................................................2

      B.    Commerce's Attribution Of Subsidies ...................................3

III.   Statement Of Facts And Course Of Proceedings Below ................................5

      A.    Commerce's Administrative Proceedings............................5

      B.    Trial Court Proceedings ...............................................6

             1.    The Trial Court Remands Commerce's Final Results..............6

             2.    Commerce, On Remand, Determines That Nur Was Not A Cross-Owned Input Supplier............................7

             3.    The Trial Court Sustains Commerce's Remand Results ..........10

SUMMARY OF THE ARGUMENT ....................................................12

ARGUMENT ..............................................................................14

I.     Standard Of Review...............................................................14

II.    Framework For Cross-Owned Input Supplier Analysis ...............................15

III.    Commerce Reasonably Determined That Nur's Production Of
        Steel Scrap Was Not Primarily Dedicated To Kaptan's Production
        Of The Downstream Product .........................................................................18

        A.    Commerce's Determination That Steel Scrap Is Not Merely
              A Link In The Overall Production Chain Is Supported By
              Substantial Evidence .........................................................................20

              1.    As The Trial Court Explained, Commerce Supported Its
                    Determination That Steel Scrap Is A Common Input ..............21

              2.    Commerce Reasonably Relied On The Unprocessed
                    Nature Of Kaptan's Steel Scrap In Finding It A Common
                    Input .........................................................................................22

              3.    Commerce's Treatment Of Martas And Aset Is Irrelevant ......24

        B.    Commerce Lawfully Considered Nur's Business Activities,
              And Its Conclusion Is Supported By Substantial Evidence ................25

              1.    Commerce Can Consider An Input Supplier's Business
                    Activities In Its Analysis .........................................................25

              2.    Commerce's Analysis Of Nur's Business Activities Is
                    Supported By Substantial Evidence ........................................28

        C.    RTAC's Remaining Arguments Fail .....................................................31

CONCLUSION .......................................................................................................34

# TABLE OF AUTHORITIES

<u>Cases</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015) .............................................................14

*Anderson v. City of Boston*,
  375 F.3d 71 (1st Cir. 2004) .....................................................................26

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) .............................................................15

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ................................................................................14

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................15

*Fine Furniture (Shanghai) Ltd. v. United States*,
  865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012) .........................................19

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) ........................................................ 16, 26

*Goodluck India v. United States*,
  11 F.4th 1335 (Fed. Cir. 2021) ..............................................................19

*Gujarat Fluorochemicals Ltd. v. United States*,
  617 F. Supp. 3d 1328 ..............................................................................34

*JBF RAK LLC v. United States*,
  790 F.3d. 1358 (Fed. Cir. 2015) ..................................................... 15, 26

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
  633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023) .........................................21

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
  666 F. Supp. 3d 1334 (Ct. Int'l Trade 2023) ...........................................1

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) .............................................................15

*Nippon Steel v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ..............................................................14

*Novosteel SA v. United States*,
    284 F.3d 1261 (Fed. Cir. 2002) ..............................................................26

*Nucor Corp. v. United States*,
    653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023) ................................. passim

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ..............................................................26

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ..............................................................14

*United States Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ..........................................................2, 15

*United States v. Great Am. Ins. Co. of N.Y.*,
    738 F.3d 1320 (Fed. Cir. 2013) ..............................................................26

*Wolff Shoe Co. v. United States*,
    141 F.3d 1116 (Fed. Cir. 1998) ................................................................2

*Zhaoqing Tifo New Fibre Co. v. United States*,
    256 F. Supp. 3d 1314 (Ct. Int'l Trade 2017) .......................................25

Statutes

19 U.S.C. § 1671(a) ...................................................................................3, 16

19 U.S.C. § 1675(a)(1) ...................................................................................3

19 U.S.C. § 1677 .......................................................................................3, 16

Regulations

19 C.F.R. § 351.525 ............................................................................. passim

Other Authorities

*Countervailing Duties; Final Rule*,
    63 Fed. Reg. 65,348, 65,401 (Dep't of Commerce Nov. 25, 1998)............. passim

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) ....................................5

*Certain Glass Containers from the People's Republic of China*,
   85 Fed. Reg. 31,141 (Dep't of Commerce May 22, 2020) ................................. 32

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
   85 Fed. Reg. 38,361 (Dep't of Commerce June 26, 2020) ................................. 18

*Forged Steel Fluid End Blocks from the Federal Republic of Germany,*
   85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020) ..................................18

*Cut-to Length Plate from the Republic of Korea*,
   86 Fed. Reg. 15,184 (Dep't of Commerce Mar. 22, 2021) ................................. 18

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021)...................................1

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Defendant-appellee's counsel is aware of two cases pending in the United States Court of International Trade that may directly affect or be affected by the Court's decision in this appeal: *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, No. 22-00149 (Ct. Int'l Trade), and *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, No. 24-00096 (Ct. Int'l Trade).

## STATEMENT OF THE ISSUE

Whether the Department of Commerce's (Commerce) determination—made on remand—that plaintiff-appellee Kaptan Demir Celik Endustrisi ve Ticaret A.S.'s (Kaptan) affiliate, Nur Gemicilk ve Tic. A.S. (Nur) was not a cross-owned input supplier is supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE

### I.    Nature Of The Case

This appeal concerns Commerce's 2018 administrative review of the countervailing duty order covering steel concrete reinforcing bar (rebar) from Turkey. *See Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021) (final results), and accompanying Issues and Decision Memorandum (P.R. 283) (IDM), *as amended by Final Results of Redetermination Pursuant to Court Remand*, No. 21-00565 (Ct. Int'l Trade). Appx1808-1848, Appx2223-2255.

Defendants-appellants Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dyanmics, Inc. (collectively, RTAC) appeal the final judgment of the United States Court of International Trade (trial court) in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 666 F. Supp. 3d 1334 (Ct. Int'l Trade 2023). Appx11-37. The trial court sustained Commerce's

determination—made on remand—that Kaptan's affiliate Nur was not a cross-owned input supplier with respect to steel scrap. Specifically, the trial court held that Commerce's finding that Nur's steel scrap input was not merely a link in the overall production chain was supported by substantial evidence and in accordance with law, and that Commerce could lawfully consider an affiliate's overall business activities in undertaking its analysis of whether Nur's steel scrap was primarily dedicated to Kaptan's production of downstream product. Appx21-37.

## II.     Relevant Background For Countervailing Duty Proceedings

### A.     Commerce Imposes Countervailing Duties To Counteract Foreign Subsidies

Congress has promulgated countervailing duty laws to impose "additional duties on imported products which are subsidized by the country of export or manufacture." *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (citing 19 U.S.C. § 1671). "These additional duties are called 'countervailing' duties." *Id.* "They are levied on subsidized imports to offset the unfair competitive advantage created by foreign subsidies." *Id.* (citing *United States Steel Grp. v. United States*, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996) (explaining the difference between countervailing and antidumping duties)).

By statute, Commerce must impose countervailing duties on subsidized imports if it determines that the subject imports are in fact being subsidized, and the International Trade Commission determines that "an industry in the United

2

States—(i) is materially injured, or (ii) is threatened with material injury . . . by reason of the [subsidized] imports." *See* 19 U.S.C. § 1671(a). The quantum of the countervailing duties imposed upon such merchandise is equal to the amount of the net subsidy. 19 U.S.C. § 1671(a); *see also id*. § 1677(5), (6) (defining "subsidy" and "net countervailable subsidy"). After the initial determination, Commerce must perform annual reviews of outstanding countervailing duty orders to determine the amount of any net subsidy. *See* 19 U.S.C. § 1675(a)(1).

B.    Commerce's Attribution Of Subsidies

Commerce's practice is to "attribute a subsidy to the products produced by the corporation that received the subsidy." 19 C.F.R. § 351.525(b)(6)(i). In weighing attribution, Commerce considers the potential for a company's receipt of a subsidy through cross-ownership. *Id*. § 351.525(b)(g)(ii). Accordingly, Commerce examines whether producers or exporters of the subject merchandise are cross-owned with one another, a parent or holding company, or with their input suppliers. *Id*. § 351.525(b)(6)(ii)-(v). "Cross-ownership exists . . . where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets." *Id*. § 351.525(b)(vi).

If Commerce finds that cross-ownership exists between an input supplier and downstream producer, "and production of the input product is primarily dedicated to production of the downstream product," Commerce will attribute

subsidies received by that input supplier to the combined sales of the input and downstream products produced by both companies. 19 C.F.R. § 351.525(b)(6)(iv); *see also Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*). While neither the regulation nor its preamble define "primarily dedicated" or delineate criteria for Commerce to consider, the preamble explains that the regulation is meant to address a "situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain." *CVD Preamble*, 63 Fed. Reg. at 65,401.

The *CVD Preamble* provides examples of inputs fitting this scenario—timber stumpage primarily dedicated to lumber production and semolina primarily dedicated to pasta production. *Id.* The preamble explains that, regarding these examples, one can assume that the purpose of a subsidy to the input producer would be to benefit the production of both the input and the downstream product. *Id.* Conversely, in the example of a plastics input producer providing plastics to an affiliated company producing appliances and automobiles, the preamble explains that it would not be reasonable to assume that the purpose of a subsidy to the input producer would be to benefit the downstream product. *Id.*

4

Because the nature of input and downstream products, as well as production processes, varies significantly from case to case, Commerce's determination as to whether an affiliate is a cross-owned input supplier for the purposes of attribution is based on the specific factual circumstances of each case. Appx2230, Appx2237.

III.    Statement Of Facts And Course Of Proceedings Below

A.    Commerce's Administrative Proceedings

In 2014, Commerce issued a countervailing duty order covering steel rebar from Turkey. *See Steel Concrete Reinforcing Bar from the Republic of Turkey*, 79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014). In 2020, Commerce initiated an administrative review of 26 producers and/or exporters from Turkey (including Kaptan), covering the period of January 1, 2018, through December 31, 2018. Appx83-93. Commerce selected Kaptan as a mandatory respondent for individual review.[1] Appx103-112.

As part of its response to Commerce's initial questionnaire, Kaptan provided a list of affiliated companies; the list of affiliates included Nur, as well as Martas Marmara Erglisi Liman Tesisleri A.S. (Martas) and Aset Madencilik A.S. (Aset). Appx157. Nur's primary field of operation is in shipbuilding, but, as part of its production of ships, Nur also generates steel scrap as byproduct. Appx150,

---

[1] Commerce also selected another mandatory respondent, but its determinations with regard to that respondent are not relevant to this appeal.

Appx1833.  During the period of review, Nur sold its steel scrap byproduct to Kaptan, and Kaptan used that scrap in manufacturing the subject merchandise—steel rebar.  Appx1833.

Commerce preliminarily determined that Nur, Martas, and Aset were all cross-owned input suppliers, explaining that the three companies sold steel scrap to Kaptan and that the production of scrap was primarily dedicated to the production of the downstream product.  Appx1768.  In the final results, Commerce continued to find that Nur was a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).  Appx1832-1834.  Because no party contested Commerce's preliminary findings with regard to Martas and Aset, Commerce did not further address, in the final results, the cross-owned input supplier issue with regard to those companies.

    B.    <u>Trial Court Proceedings</u>

    1.    <u>The Trial Court Remands Commerce's Final Results</u>

Kaptan appealed Commerce's final results to the Court of International Trade.  On April 26, 2023, the trial court issued an opinion and order remanding Commerce's determination that Nur was a cross-owned input supplier.  Appx1-10. In doing so, the court held that Commerce had relied only on prior determinations that steel scrap was an input primarily dedicated to the production of downstream steel product, and had not offered a satisfactory explanation, based on the specific

facts of the underlying proceeding, as to why Nur's steel scrap was primarily dedicated to the production of downstream product. Appx8-9. The court also noted that Commerce had not adequately explained potential inconsistencies between its findings in the underlying proceeding and those made in certain other administrative determinations. Appx9-10. The court thus remanded to Commerce to further explain its determination that Nur was a cross-owned input supplier of input products primarily dedicated to the production of downstream product. Appx10.

> ### 2. Commerce, On Remand, Determines That Nur Was Not A Cross-Owned Input Supplier

On remand, Commerce initially continued its finding that Nur was a cross-owned input supplier. Appx2170-2188. However, after reviewing Kaptan's comments on the draft remand redetermination, Appx2192-2207, and further considering the record, the pertinent regulation and *CVD Preamble*, and other administrative determinations, Commerce reversed course for its final remand redetermination, finding that Nur was not a cross-owned input supplier whose steel scrap was primarily dedicated to the production of Kaptan's downstream product. Appx2230, Appx2237.

Commerce began its analysis by examining the language of the regulation, the *CVD Preamble*, and past administrative determinations, and identifying a list of factors to consider in undertaking a "primarily dedicated" analysis:

1)    Whether an input supplier produced the input;

2)    Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

3)    Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

4)    Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

5)    Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the [*CVD*] *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

Appx2234-2235. Commerce explained that the factors were not hierarchical or exhaustive, and that a "primarily dedicated" analysis is fact-specific and made on a case-by-case basis. Appx2235, Appx2237.

Commerce next applied the factors to Nur and its steel scrap. It first noted that it had no blanket rule that steel scrap should always be considered primarily dedicated, citing multiple prior administrative determinations in which it found

8

steel scrap to not be a primarily dedicated input.  Appx2237-2238.  Commerce also acknowledged that certain enumerated factors were satisfied—namely, that Nur produced the steel scrap, the scrap was used in the production of downstream product, and Kaptan was the exclusive user of Nur's scrap.  Appx2238-2239.

Commerce then considered whether the steel scrap input was merely a link in the overall production chain, finding that Nur's steel scrap was not primarily dedicated to Kaptan's downstream product such that the scrap should be considered merely a link in the overall production chain.  Appx2239.  In making this finding, Commerce explained that the scrap was not processed prior to sale, and that unprocessed steel scrap is a common input among a variety of products and industries, more akin, as an input, to plastic than stumpage or semolina.  Appx2239-2240.  Commerce also looked at Nur's business activities, concluding that its primary business of shipbuilding was not "dedicated almost exclusively to the production of a higher-value added product."  Appx2241 (citing *CVD Preamble*, 63 Fed. Reg. at 65,401).  Commerce explained that Nur's ship production was much further downstream than the downstream products produced by Kaptan, including the subject merchandise rebar, and that Nur's shipbuilding production was far removed from Kaptan's production processes, especially given the extremely limited nature of the transactions between the two companies.  *Id.*  Commerce concluded, based on a holistic examination of the enumerated factors,

that the record did not support a conclusion that the purpose of any subsidies provided to Nur—a shipbuilding company—would be to benefit the production of both Nur's input and Kaptan's downstream product. *Id.*

### 3.    The Trial Court Sustains Commerce's Remand Results

On November 27, 2023, the trial court issued an opinion sustaining Commerce's remand results, holding that Commerce's "primarily dedicated" analysis was lawful and supported by substantial evidence, and that Commerce could consider an input producer's business activity in conducting its analysis. Appx11-37.

In rendering its decision, the court rejected RTAC's argument that Commerce had failed to support its contention that steel scrap was a common input used in a variety of products and industries because it did not identify any examples of products or industries beyond those involving downstream steel products. Appx22-24. The court observed that RTAC's characterization of downstream product as encompassing ***all*** conceivable downstream steel products was so broad as to be meaningless, and would lead to a situation where Commerce would always be compelled to find an input primarily dedicated. Appx23. The court then pointed out that Commerce had listed multiple examples of products beyond steel rebar that Kaptan produced, and that Commerce had cited administrative decisions in its remand results involving various different

downstream products using steel scrap as an input.  Appx24.  The court thus held

that Commerce had supported its finding that steel scrap was a common input used

in a variety of products, such that it was not merely a link in the overall production

chain.  Appx24-25.

The trial court also disagreed with RTAC's claim that Commerce had not

explained the significance of whether Nur's steel scrap was processed or

unprocessed, stating that Commerce had indicated that the processing of steel scrap

would narrow the range of downstream applications of the scrap, making the scrap

more likely to be merely a link in the overall production chain.  Appx25.

The court then held that Commerce could lawfully consider an input

producer's overall business activity in its "primarily dedicated" analysis, and that

RTAC could not support its position that, by their silence, the regulation and *CVD*

*Preamble* prohibited Commerce from looking at an input supplier's business

activity.  Appx28.  Because RTAC's argument that Commerce's consideration of

business activity was unlawful was based on "a series of bare, conclusory

assertions," the court declined to disturb Commerce's decision to consider that

factor, noting that underdeveloped arguments are deemed waived.  Appx29.

The trial court then turned to Commerce's evaluation of Nur's business

activity, holding that Commerce had adequately explained its finding that Nur's

shipbuilding activity was far removed from Kaptan's downstream production, and

11

that no conflict existed between Commerce's position that the volume of the input
was irrelevant and its characterizations of the transactions between Nur and Kaptan
as "limited" and "miniscule." Appx32-35. The court explained that the limited
nature of transactions between the two companies indicated that Nur's shipbuilding
was "its own self-contained enterprise with little connection to Kaptan's
production of steel—except, that is, to Kaptan's purchase of Nur's byproduct scrap
as an input." Appx34.

Finally, the trial court addressed RTAC's contention that Commerce's
finding that Nur was not a cross-owned input supplier was inconsistent with its
earlier determinations that two other affiliates—Martas and Aset—*were* cross-
owned input suppliers, stating that, because no party challenged Martas's and
Aset's classification as cross-owned input suppliers during the administrative
proceeding, Commerce could not change its treatment of those affiliates during the
litigation. Appx35-36.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce's remand results are supported by substantial evidence and in
accordance with law. Commerce thoroughly explained its conclusion that Nur was
not a cross-owned input supplier because Nur's steel scrap input was not primarily
dedicated to production of the downstream product. Neither the regulation nor

*CVD Preamble* define "primarily dedicated" or outline specific criteria for Commerce to rely on in determining whether an affiliate is a cross-owned input supplier; as such, Commerce delineated a non-exhaustive list of factors to consider in its analysis, based on its experience with prior administrative determinations, the examples and explanations set forth in the *CVD Preamble*, and the purpose of the regulation.

While acknowledging that certain factors could support a finding that Nur was a cross-owned input supplier, Commerce reasonably determined, based on an overall analysis of the record facts and prior determinations, that Nur's steel scrap was not primarily dedicated to the production of Kaptan's downstream product such that the purpose of a subsidy to Nur would be to benefit both Nur's input production and Kaptan's downstream production.  In particular, Commerce found that unprocessed scrap is a common input used in a variety of products and industries, rather than merely a link in the overall production chain.  In drawing this conclusion, Commerce both explained its reasoning and supported its finding. Commerce also lawfully considered Nur's overall business activity as a shipbuilder, determining, based on record evidence, that Nur's shipbuilding business was far removed from Kaptan's production of downstream steel product, and that the nature of the transactions between Nur and Kaptan were extremely

limited.  Accordingly, Commerce concluded that Nur's business activity was not dedicated almost exclusively to the production of a higher value-added product.

RTAC's arguments against Commerce's remand redetermination mirror those lodged below, and the trial court, in a comprehensive and reasoned opinion, correctly rejected each one.  Because RTAC cannot demonstrate that Commerce's cross-owned input supplier determination is unlawful or unsupported, this Court should affirm.

## **ARGUMENT**

I.    Standard Of Review

In reviewing the trial court's judgment, this Court "reapply[ies\ the statutory standard of review that the Court of International Trade applied in reviewing the administrative record."  *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citation omitted.)  This Court will uphold Commerce's determination unless it is unsupported by substantial record evidence or otherwise unlawful.  *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  Importantly, this Court has declared that it "will not ignore the informed opinion of the [trial court]."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (cleaned up).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).  Substantial evidence may also be "less than the weight of

the evidence," and the possibility of drawing inconsistent conclusions from the

record does not render Commerce's findings unsupported by substantial evidence.

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party disputing

Commerce's determination as unsupported by substantial evidence thus "has

chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United

States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain

Commerce's determinations if they are reasonable and supported by the record as a

whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United

States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

II.    Framework For Cross-Owned Input Supplier Analysis

Commerce is afforded great deference "when a statute fails to make clear

'any Congressionally mandated procedure or methodology for assessment of the

statutory tests.'"  *JBF RAK LLC v. United States*, 790 F.3d. 1358, 1363 (Fed. Cir.

2015) (quoting *U.S. Steel*, 96 F.3d. at 1362).  In that circumstance, "Commerce

'may perform its duties in the way it believes most suitable.'"  *Id.*  Consequently,

Commerce receives "tremendous deference" that is "both greater than and distinct

from that accorded the agency in interpreting the statutes it administers" when it

exercises its technical expertise to select and apply methodologies to implement

the dictates of the trade statute. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

The relevant statute instructs Commerce to calculate countervailing duties based upon the net countervailable subsidy provided "directly or indirectly" with respect to "the manufacture, production, or export of a class or kind of merchandise imported [ ] into the United States[.]"  19 U.S.C. § 1671(a)(1). Congress has provided guidance for measuring any benefit conferred by such a subsidy, 19 U.S.C. § 1677(5)(E), but has not specified how Commerce is to calculate the subsidy rate.  Accordingly, and as described above, Commerce promulgated regulations governing the attribution of subsidy benefits.

The pertinent regulation provides that, if there is cross-ownership between an input supplier (here, Nur) and a downstream producer (here, Kaptan), and "production of the input product is primarily dedicated to production of the downstream product," Commerce will attribute subsidies received by the input producer to both the input and downstream products.  19 C.F.R. § 351.525(b)(6)(iv).  And, while neither the regulation nor its preamble define "primarily dedicated" or list specific criteria for Commerce to consider, the preamble explains that the regulation is designed to capture situations where the "purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products."  *CVD Preamble*, 63 Fed. Reg. at 65,401.

The preamble also lists examples of inputs considered to be merely links in the overall production chain, *i.e.*, inputs that are primarily dedicated to the production of a higher value-added product—timber stumpage in the lumber production chain and semolina in the pasta production chain. *Id.* Finally, the preamble provides an example of an input not primarily dedicated to the production of the downstream product and not merely a link in the overall production chain—plastics in an appliance and automobile production chain. *Id.*

Based on the above, as well as experience gleaned from prior administrative determinations, Commerce has created a list of non-exhaustive factors to consider in determining whether an affiliate is a cross-owned input supplier. These factors include, *inter alia*, whether the input is merely a link in the overall production chain (like stumpage and semolina) or is common to a wide variety of products and industries (like plastic), and whether an input supplier's business activities indicate that the purpose of a subsidy to the input supplier would be to benefit the production of both the input and downstream product. Appx2234-2235. However, as Commerce has cautioned, no single factor or piece of evidence controls; the analysis is holistic and conducted on a case-by-case basis. Appx2235, Appx2237.

Importantly, Commerce has no blanket rule that steel scrap is primarily dedicated to the production of downstream steel product. Appx2237. Rather, Commerce considers the facts of each specific case, and has determined in multiple

instances that steel scrap is ***not*** a primarily dedicated input.  Appx2238 (citing

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg.

38,361 (Dep't of Commerce June 26, 2020) (*Cold-Rolled Steel from Korea*), and

accompanying IDM; *Forged Steel Fluid End Blocks from the Federal Republic of*

*Germany* (*FEBs from Germany*), 85 Fed. Reg. 80,011 (Dep't of Commerce Dec.

11, 2020), and accompanying IDM; *Cut-to Length Plate from the Republic of*

*Korea*, 86 Fed. Reg. 15,184 (Dep't of Commerce Mar. 22, 2021) (*CTL Plate from*

*Korea*), and accompanying IDM).

III.   **Commerce Reasonably Determined That Nur's Production Of Steel Scrap Was Not Primarily Dedicated To Kaptan's Production Of The Downstream Product**

Commerce made a reasoned determination, pursuant to the factors it

enumerated in its remand results and the record in the underlying administrative

proceeding, that Nur's production of steel scrap was not primarily dedicated to the

production of Kaptan's downstream product, such that Nur should be considered a

cross-owned input supplier.  The crucial question, as described in the *CVD*

*Preamble*, is whether the purpose of a subsidy to the input producer is to benefit

the production of both the input and downstream products.  Here, given that Nur is

a shipbuilder that generates a small amount of steel scrap—a common input—as a

byproduct, one could not reasonably assume that a subsidy to Nur would be meant

to benefit Kaptan's downstream steel product.  Because Commerce's remand

redetermination was lawful and supported by substantial evidence, this Court should affirm.

As an initial matter, we note the challenges RTAC has ***not*** lodged. RTAC does not challenge the regulation itself, or the relevance of Commerce's statements in the preamble. Nor does RTAC challenge Commerce's list of factors to consider, ***except*** with regard to whether Commerce can lawfully consider an input supplier's business activities. Finally, RTAC does not appear to challenge Commerce's weighing of the various factors.[2] Rather, RTAC claims that Commerce's decision regarding the "common input" factor is inadequately explained and supported, and that Commerce cannot lawfully consider an input supplier's business activities as part of its cross-owned input supplier analysis. RTAC also asks this Court to "reinstate" Commerce's original determination with regard to Nur, but the sufficiency of Commerce's original determination is not relevant; rather, the question is whether Commerce's ***remand redetermination***, which serves as the basis for the trial court's judgment, is lawful and supported by substantial evidence.

---

[2] If RTAC did challenge Commerce's weighing of the factors, the Court could not substitute or displace Commerce's judgment regarding the weight of the evidence, so long as Commerce's determination is reasonable and supported by the record, even if some evidence detracts from Commerce's conclusion. *See Goodluck India v. United States*, 11 F.4th 1335, 1344-45 (Fed. Cir. 2021); *Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1263 (Ct. Int'l Trade 2012).

A.    Commerce's Determination That Steel Scrap Is Not Merely A Link In
The Overall Production Chain Is Supported By Substantial Evidence

Commerce found, based on examination of the record, the parties'

comments, and the *CVD Preamble*, that Nur's steel scrap is not merely a link in the

overall production chain, similar to stumpage or semolina, but is instead a common

input among a wide variety of products and industries, more akin to plastic.  RTAC

argues that Commerce failed to adequately explain and support this finding, but, as

the trial court held below and as the record demonstrates, each of RTAC's claims

to that point fails.

As an initial matter, RTAC continually refers to Commerce finding that

Nur's scrap does not form a "link in the overall production chain."  RTAC Br. at

28, 30, 33.  But the question is not whether Nur's scrap forms *a* link in the overall

production chain, and Commerce has never found that Nur's scrap failed to

constitute *a* link in the overall production chain.  Rather, as the *CVD Preamble*

guides, the relevant consideration is whether the input is "***merely*** a link in the

overall production chain."  *CVD Preamble*, 63 Fed. Reg. at 65,401 (emphasis

added).  And, based on an assessment of the record, the parties' comments, and the

*CVD Preamble*, Commerce concluded that Nur's steel scrap was not primarily

dedicated to Kaptan's downstream product such that the scrap was ***merely*** a link in

the overall production chain, like stumpage or semolina, but was instead a common

input used in a variety of products and industries.  Appx2239.

20

1.      As The Trial Court Explained, Commerce Supported Its
Determination That Steel Scrap Is A Common Input

RTAC first argues that Commerce did not support its finding that steel scrap
is a common input among a variety of products and industries by identifying any
products or industries outside of downstream steel production.  RTAC Br. at 28.
But, as the trial court pointed out, this argument is based on a "maximally broad
definition" of downstream steel products as encompassing all conceivable
downstream applications of steel scrap, and leads to a self-fulfilling prophecy in
which Commerce would be compelled to find every product that incorporates steel
scrap to be primarily dedicated.[3]  Appx22-23.  In other words, the very premise of
RTAC's argument is flawed.

As the trial court explained, Commerce was not required to identify products
or industries outside steel to deem steel scrap a common input; rather Commerce's
"task was instead to assess the range of downstream steel products that steel scrap
can be used to produce."  Appx23 (citing *Kaptan Demir Celik Endustrisi ve
Ticaret A.S. v. United States*, 633 F. Supp. 3d 1276, 1284 (Ct. Int'l Trade 2023)).
And Commerce did just that.  It both listed a variety of downstream steel products
produced by Kaptan—*e.g.,* non-subject rebar, other varieties of bars, and angle

---

[3] Indeed, RTAC's statement that "[i]t is also not obvious what industries
beyond steelmaking would use unprocessed steel scrap as a production input"
illustrates the trial court's point that RTAC assumes an unreasonably broad reading
of "downstream product."  RTAC Br. at 28.

profiles—and cited numerous administrative determinations involving steel scrap's use in a variety of other downstream steel products—*e.g.*, cut-to-length plate, cold-rolled steel, and fluid end blocks. Appx21, Appx24 & n.10. RTAC's argument that Commerce failed to identify a variety of products and/or industries in which steel scrap is used is plainly contradicted by Commerce's remand results.

     2.     Commerce Reasonably Relied On The Unprocessed Nature Of Kaptan's Steel Scrap In Finding It A Common Input

RTAC next questions Commerce's reliance on the unprocessed nature of Kaptan's steel scrap. RTAC first claims that Commerce did not explain the significance of processing scrap. RTAC Br. at 28-29. But, as the trial court correctly held, Commerce ***did*** elucidate the significance of processed versus unprocessed scrap; as the court stated, "Commerce's point was simply that any processing of steel scrap by the input supplier focuses the range of likely downstream applications of that scrap[.]" Appx25; *see also* Appx2239 ("Whether or not scrap is generated or otherwise prepared for downstream products[4] in the

---

[4] RTAC seems to assume that this statement means that Commerce believes that "scrap does not form a link in the overall production chain unless specifically generated for the purpose of feeding downstream operations[.]" RTAC Br. at 30. Taking aside the omission of the word "merely," Commerce has never, to our knowledge, made a finding that an input cannot be considered merely a link in the overall production chain unless generated for the specific purpose of feeding downstream production. Rather, as stated above, Commerce named the generation and preparation (*i.e.*, processing) of the input for downstream products as one factor to consider in its analysis.

production line is a factor to consider when determining whether an input is primarily dedicated to the production of a downstream product."). Put simply, if Nur had processed its scrap in a particular manner, the range of uses of that scrap would be narrowed, making it more likely that the processed scrap is "merely a link in the overall production chain." Here, because Nur did not process its scrap and unprocessed scrap is a common input used in a variety of products and industries, Commerce reasonably determined that the scrap is not merely a link in the overall production chain.

RTAC also attempts to undermine Commerce's reliance on *CTL Plate from Korea*, alleging that the trial court in *Nucor Corp. v. United States*, 653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023) rejected Commerce's determination regarding the processing of scrap and claiming that Commerce subsequently "abandoned" any attempt to distinguish between processed and unprocessed scrap.[5] RTAC Br. at 28-29, 33 n.5. But the court did not "reject" Commerce's ability to distinguish between processed and unprocessed scrap; it simply remanded for Commerce to

---

[5] RTAC notes that *CTL Plate from Korea* is the only other determination in which Commerce has distinguished between unprocessed and processed scrap. RTAC Br. at 29. It is unclear why RTAC believes this to be significant. There are myriad reasons why Commerce might have addressed the processing of scrap in certain determinations but not others, including the specific facts of the proceeding and the arguments raised by the parties. Moreover, Commerce is not prohibited from considering issues not previously raised in prior proceedings, particularly given that its understanding and practice regarding examining input producers has developed over time. Appx2232.

reconsider **or** further explain its scrap determination. *Nucor*, 653 F. Supp. 3d at 1309-10, 1313. And Commerce did not "abandon" its treatment of scrap; rather, on remand, it issued supplemental questionnaires and, based on its reexamination of the record, found that the input supplier and the downstream producer were not cross-owned. *Nucor Corp. v. United States*, No. 21-00182, ECF No. 93-1 at 19 (Ct. Int'l Trade). Accordingly, Commerce's primarily dedicated analysis was rendered moot. *Id.* Moreover, *Nucor* is not yet final and is not binding on this Court, and the factual circumstances in that case are distinguishable (and more complicated) than those below.[6] Finally, as the trial court observed, the fact that Nur's scrap was unprocessed was only one of multiple bases for Commerce's determination. Appx25-26 n.12.

### 3. Commerce's Treatment Of Martas And Aset Is Irrelevant

RTAC decries Commerce's treatment of Kaptan's affiliates Martas and Aset—made in the preliminary results and unaddressed since—as cross-owned input suppliers while "observing no distinctions between the scrap that they supplied to Kaptan and the scrap that Nur supplied." RTAC Br. at 31; *see also* Appx1768. According to RTAC, this differential treatment "demonstrates the

---

[6] For example, *Nucor* involved Commerce's differing treatment of two input suppliers, one of which processed its scrap and one which did not, and the court held that Commerce had not sufficiently explained that differing treatment. *Nucor*, 653 F. Supp. 3d at 1306, 1308-09.

arbitrary nature" of Commerce's determination.  RTAC Br. at 32.  But no party

"challenge[d] Martas and Aset's treatment as cross-owned input suppliers in the

initial agency proceeding or in subsequent litigation."  Appx35 (citing Appx2311).

Thus, as the trial court explained, "Commerce was unable to modify any portion of

its [final results] that was not subject to challenge by a party—including

Commerce's treatment of Martas and Aset."  Appx36 (quoting *Zhaoqing Tifo New*

*Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1334 (Ct. Int'l Trade 2017)).  In

addition, as Commerce explained on remand, "an analysis of [Kaptan's]

relationship with other affiliates, or input suppliers" is not appropriate to consider

"as a part of our analysis regarding whether Nur's production of steel scrap is

primarily dedicated to [Kaptan's] downstream production."  Appx2248.  This

Court should decline to give credence to RTAC's arguments involving Martas and

Aset.

> **B.**     **Commerce Lawfully Considered Nur's Business Activities, And Its
> Conclusion Is Supported By Substantial Evidence**
>
> > **1.**     **Commerce Can Consider An Input Supplier's Business
> > Activities In Its Analysis**

RTAC claims, as it did below, that, because neither the regulation nor the

preamble explicitly state that an input supplier's main business activity is a

relevant factor, Commerce should not be allowed to consider such business activity

in its "primarily dedicated" analysis.  RTAC Br. at 36.  First, as the trial court

noted, RTAC failed to develop this argument below, and has therefore waived it.
Appx29 ("It is well established that arguments that are not appropriately developed
in a party's briefing may be deemed waived" (quoting *United States v. Great Am.
Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013))); *see also Novosteel SA v.
United States*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) ("Novosteel, however, failed
to preserve this issue for our review, for it waived this retroactivity argument by
not presenting it in the principal summary judgment brief filed with the Court of
International Trade") (citation omitted); *SmithKline Beecham Corp. v. Apotex
Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("When a party includes no developed
argumentation on a point . . . we treat the argument as waived under our well
established rule (quoting *Anderson v. City of Boston*, 375 F.3d 71, 91 (1st Cir.
2004)).

    Even if the Court considers the argument, it should reject it.  RTAC has
provided no support for its position that "the considerations that Commerce
outlined in the [preamble] cannot be applied using terms that Commerce did not
employ verbatim in the [preamble]."  Appx28.  Nor does the preamble imply that it
"should be treated as an exhaustive compendium of all relevant factors[.]"  *Id.*
And, of course, Commerce acts well within its discretion when it develops and
applies methodologies for implementing the countervailing duty laws.  *See Fujitsu
Gen.*, 88 F.3d at 1039; *see also JBF RAK LLC*, 790 F.3d at 1363 (citation omitted)

(where Congress has not directed a specific test or methodology, Commerce "may perform its duties in the way it believes most suitable.").

Here, Commerce explained why considering an input supplier's overall business activity is not only relevant, but important, to its analysis.  As Commerce stated:

> Examining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

Appx2241 (citing *CVD Preamble*, 63 Fed. Reg. at 65,401).[7]  RTAC's position that the only salient issue is whether the input is "usable only in producing a narrow subset of goods and/or is a primary input into such goods" does not pass muster considering the language of the preamble, which states that the regulation is meant to address a "situation where a subsidy is provided to an input supplier whose production is dedicated almost exclusively to the production of a higher value added product."  *CVD Preamble*, 63 Fed. Reg. at 65,401.

---

[7]  While *Nucor* is not final, the trial court agreed with Commerce's nearly identical reasoning in that case, holding that "Commerce has offered reasoned analysis supporting its consideration of primary business activities[.]"  *See Nucor*, 653 F. Supp. 3d at 1308.

Despite RTAC's contentions to the contrary, the preamble does not cabin Commerce's analysis of an affiliate's production processes to only production of the input. And, indeed, Commerce cannot examine the production of the input—steel scrap—without examining Nur's production of ships, given that the scrap is created entirely as a result of Nur's shipbuilding process. Appx2241, Appx2309. RTAC's overly restrictive reading also ignores the crucial point from the preamble that the regulation is meant to capture a situation where "the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *CVD Preamble*, 63 Fed. Reg. at 65,401. RTAC cannot plausibly claim that an input supplier's overall business activity has no relevance to Commerce's analysis of whether the purpose of a subsidy to that input supplier is to benefit the production of the input and downstream product.

2.    Commerce's Analysis Of Nur's Business Activities Is
       Supported By Substantial Evidence

In addition to being lawful, Commerce sufficiently explained and supported its finding that Nur's business activities do not support the conclusion that Nur's production is "dedicated almost exclusively to the production of a higher value-added product" such that the purpose of a subsidy provided to Nur would be "to benefit the production of both the input and downstream products." Appx2241 (quoting *CVD Preamble*, 63 Fed. Reg. 65,401). It is undisputed that Nur's primary business is shipbuilding—a product much further downstream than rebar, or any

other downstream products produced by Kaptan.  In reviewing Nur's shipbuilding activities, Commerce found that the "production processes involved in shipbuilding are far removed from [Kaptan's] downstream production processes, especially given the extremely limited transactions between the two companies." Appx2241.

RTAC contends that Commerce did not adequately support its finding, and further alleges that Commerce's reference to the extremely limited nature of the transactions between Nur and Kaptan contradicts its position that the volume of scrap Nur sold to Kaptan is not relevant.  RTAC Br. at 40.  But, as with RTAC's other arguments, the trial court considered and correctly rejected these claims.  As the trial court explained, Commerce's statement that Nur's shipbuilding production processes involved in shipbuilding are far removed from Kaptan's downstream production processes, especially given the extremely limited nature of the transactions between the two companies, "clearly indicate[s] that the limited nature of transactions between Nur and Kaptan supported a finding that Nur's shipbuilding was its own self-contained enterprise with little connection to Kaptan's production of steel—except, that is, to Kaptan's purchase of Nur's byproduct scrap as an input." Appx34.  Put another way, Commerce did not ascribe significance to the small volume of Nur's scrap sales; rather, Nur's sales of steel scrap to Kaptan were insignificant both in the context of the total transactions

between Nur and Kaptan—which involved both transactions for the sale of scrap and transactions unrelated to the provision of scrap—and in the context of Nur's operations as a whole.  Appx35, Appx2247.

In addition, Commerce's reference to the extremely limited nature of the transactions between Nur and Kaptan came in the context of Commerce's analysis regarding Nur's overall business activities, and the question of whether Nur's business activities were dedicated almost exclusively to the downstream production of a higher value-added product.  Thus, Commerce was not relying on the volume of scrap sold when it referred to the limited nature of the transactions in the remand results.

Finally, but importantly, Commerce's examination of Nur's primary business activity as a shipbuilder, and its finding that Nur's shipbuilding production processes were far removed from Kaptan's downstream production processes, underscores the point that an input supplier's business activities shed light on whether the purpose of a subsidy to the input supplier would "benefit the production of both the input and downstream products."  Appx2241 (quoting *CVD Preamble*, 63 Fed. Reg. 65,401).  Nur is a shipbuilding company, and its overall shipbuilding processes bear little, if any, connection to Kaptan's production of its downstream products, including subject rebar.  Based on these facts, one could not reasonably conclude that the purpose of subsidy granted to Nur—a company

dedicated to shipbuilding—would be to benefit the production of the input—steel scrap byproduct—and Kaptan's downstream products.  Rather, the more reasonable conclusion is that the purpose of a subsidy granted to Nur would be to benefit its primary shipbuilding business, not its production of scrap byproduct or Kaptan's products.

C.    RTAC's Remaining Arguments Fail

RTAC claims that, on the one hand, Commerce erred in relying on prior agency determinations to find that it does not universally treat steel scrap as a primarily dedicated input, and on the other, that Commerce departed from its "repeated" earlier findings that steel scrap is primarily dedicated to the production of downstream product, including rebar.  RTAC Br. at 22, 32.  RTAC's waffling only underscores the point Commerce made in its remand results—that it "does not have a rule that steel scrap is always primarily dedicated to the production of steel in the manner of semolina to pasta or stumpage to lumber."  Appx2237.  Rather, Commerce makes determinations regarding steel scrap as an input on a case-by-case, fact-specific basis.  Appx2238.  The fact that Commerce has determined steel scrap to be primarily dedicated in previous determinations, even those involving the same respondent, is not a basis for reversal.  *See Nucor*, 653 F. Supp. 3d at 1307.  Here, Commerce considered the underlying factual circumstances, as well

as the interested parties' arguments, and reasonably concluded that Nur should not be deemed a cross-owned input supplier. Appx2246-2247.

The trial court also considered and correctly rejected RTAC's attempts to distinguish prior determinations in which Commerce did not find steel scrap to be a primarily dedicated input. Appx29-31. Addressing RTAC's claim that, in *FEBs from Germany*, Commerce primarily relied on the "quantities and types of materials" provided by the input suppliers in rendering its decision, the trial court explained that, like the remand results at issue here, Commerce did not indicate any one factor that its analysis "ultimately came down to," but instead several factors, including the nature of the input suppliers' business activities.[8] Appx30. As such, Commerce's determination in *FEBs from Germany* does not detract from, but rather supports, both Commerce's consideration of an input supplier's business activities and its determination to not find steel scrap a primarily dedicated input.

*Certain Glass Containers from the People's Republic of China*, 85 Fed. Reg. 31,141 (Dep't of Commerce May 22, 2020) (*Glass Containers from China*), and accompanying IDM, also supports Commerce's determination. In that

---

[8] Commerce examined the input suppliers' overall business activities, finding the suppliers' production not primarily dedicated to the downstream product. *FEBs from Germany* IDM at Cmt. 14. Commerce noted that the input suppliers manufactured products other than the ingots and scrap they provided the respondent, and that the amount of ingots and scrap supplied were so miniscule so as to have only a "very small" impact on production costs. *Id.*

determination, Commerce declined to find an input's supplier's provision of glass machinery a primarily dedicated input because the supplier's business involved the production of a variety of products other than glass equipment. *Glass Containers from China* IDM at Cmt. 12. RTAC contends that *Glass Containers from China* is inapposite because Commerce considered the supplier's business activities "solely in the context of determining whether to employ adverse inferences." RTAC Br. at 37. But, as the trial court explained, "[t]he entire inquiry into whether an adverse inference was appropriate hinged on Commerce's determination of whether that entity's production of the input in question was 'primarily dedicated' to the respondent's downstream production, and Commerce engaged in substantially the same type of analysis as it did here[.]" Appx30. Accordingly, the distinction RTAC relies on is one without a meaningful difference.

Finally, RTAC ascribes outsized significance to whether an input bears a "close physical relationship" with the downstream product, invoking the phrase no less than ten times throughout its brief. *See, e.g.*, RTAC Br. at 4, 13, 18, 24, 29, 38. RTAC even claims that an "input used in producing a limited group of downstream goods to which the input bears a close physical relationship (*i.e.*, to which it imparts critical characteristics) is primarily dedicated to those downstream goods within the meaning of the regulation." RTAC Br. at 13 (cleaned up). But the term "close physical relationship" does not appear in either the regulation or

preamble.  Indeed, that term appears to have been used only once, in passing and without further definition or explanation, by the trial court in *Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1337 (Ct. Int'l Trade) (stating that, in the examples set forth in the *CVD Preamble* involving semolina and stumpage, "the input was an upstream product that bore a close physical relationship to the downstream product.").  The phrase appears nowhere in the underlying administrative case briefs filed by RTAC, Commerce's analysis in the underlying administrative proceeding, the statute, Commerce's regulations, the *CVD Preamble*, or Commerce's prior administrative determinations regarding whether certain inputs are primarily dedicated to downstream product.  Given the lack of further elucidation from either Commerce or the trial court on the meaning or significance of the phrase, this Court should pay no heed to RTAC's emphasis on whether an input has a "close physical relationship" with the downstream product.

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the Court of International Trade's judgment.


Respectfully submitted,

BRIAN M. BOYNTON

34

Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/Sosun Bae
Of Counsel:                     SOSUN BAE
                                Senior Trial Counsel
W. MITCH PURDY                  U.S. Department of Justice
Senior Attorney                 Civil Division
U.S. Department of Commerce     Commercial Litigation Branch
Office of the Chief Counsel for Trade   P.O. Box 480
    Enforcement and Compliance  Ben Franklin Station
1401 Constitution Avenue, NW    Washington, D.C. 20044
Washington, D.C. 20230          Tel: (202) 305-7568
                                Email:  Sosun.Bae@usdoj.gov

June 11, 2024                   Attorneys for Defendant-Appellee

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify under penalty of perjury that the attached brief is proportionately spaced using Microsoft Word, uses a Times New Roman typeface in 14 point font size, and, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), contains 7,759 words.


<u>/s/ Sosun Bae</u>
SOSUN BAE