# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
## 2024-1431

KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., COLAKOGLU DIS TICARET A.S., COLAKOGLU METALURJI A.S.,

Plaintiffs-Appellees,

v.

UNITED STATES

Defendant,

and

REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, STEEL DYNAMICS, INC.,

Defendants-Appellants.

Appeal from the United States Court of International Trade in
Case No. 21-cv-00565, Judge Gary S. Katzmann

## NON-CONFIDENTIAL RESPONSE BRIEF OF PLAINTIFF-APPELLEE KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S

Andrew T. Schutz*
Ned H. Marshak

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000

*1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

Dated: June 11, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2024-1431

**Short Case Caption** Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States

**Filing Party/Entity** Kaptan Demir Celik Endustrisi ve Ticaret A.S.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/11/2024

Signature: /s/ Andrew T. Schutz

Name: Andrew T. Schutz

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Kaptan Demir Celik Endustrisi ve Ticaret A.S. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable      ☐    Additional pages attached

| | | |
|---|---|---|
| Kavita Mohan | | |
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable      ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................................1

KAPTAN'S RESPONSE BRIEF ........................................................................1

STATEMENT OF THE ISSUE..............................................................................2

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS .............3

    A. The Challenged Review ...........................................................................3

    B. The Trial Court's Initial Remand – *Kaptan I*..........................................6

    C. Commerce's Remand Redetermination ...................................................11

    D. The Trial Court's Sustaining Opinion – *Kaptan II* ................................17

STANDARD OF REVIEW ...................................................................................18

SUMMARY OF ARGUMENT .............................................................................19

ARGUMENT .......................................................................................................21

I.   COMMERCE'S ORIGINAL FINAL RESULTS CANNOT BE
     REINSTATED.............................................................................................21

    A. Commerce's Final Results Are Not Subject to Review by this Court........21

    B. The Trial Court Did Not Abuse its Discretion In Remanding the Final
       Results ...................................................................................................26

II.  COMMERCE'S REMAND RESULTS WERE REASONABLE,
      SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE
      WITH LAW ...............................................................................................29

    A. Commerce's Cross-Ownership Framework ...............................................29

    B. Commerce's Application Of Its Primarily Dedicated Analysis In This Case
       Was Reasonable And Supported By Substantial Evidence .......................40

      1.   Petitioners Mischaracterize the Nature of Scrap ...................................41

      2.   It Was Reasonable for Commerce to Consider Nur's Business
          Activities ...............................................................................................49

         a.   Summary of Facts and Commerce's Finding.....................................50

         b.   Commerce's Focus on Nur's Shipbuilding Was Reasonable .............51

         c.   Past Cases Do Not Render Commerce's Determination
            Unreasonable .................................................................................53

d.    Commerce's Reference to Extremely Limited Transactions Was Also Reasonable ............................................................................................55

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................58

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material deleted on pages 4 and 50.  The deleted material consists of specific confidential sales figures (quantities and values) that are unavailable in the public domain.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB, Inc. v. United States*,
  920 F.3d 811 (Fed. Cir. 2019) ...............................................................19

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004) ..........................................................24

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
  400 F.3d 1352 (Fed. Cir. 2005) ..........................................................33

*Changzhou Trina Solar Energy Co. v. United States*,
  975 F.3d 1318 (Fed. Cir. 2020) ..........................................................22

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)......................................................................24, 33

*Diamond Sawblades Mfrs. Coal. v. United States*,
  612 F.3d 1348 (Fed. Cir. 2010) ..........................................................26

*Evonik Rexim (Nanning) Pharm. Co. v. United States*,
  296 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) ......................................23

*Gerald Metals, Inc. v. United States*,
  132 F.3d 716 (Fed. Cir. 1997) ............................................................19

*Gujarat Fluorochemicals Ltd. v. United States*,
  617 F. Supp. 3d 1328 (Ct. Int'l Trade 2023) ......................................34

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
  633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023) ................................*passim*

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
  Slip Op. 23-167 (Jan. 26, 2024).....................................................*passim*

*Michaels Stores, Inc. v. United States*,
  766 F.3d 1388 (Fed. Cir. 2014) ..........................................................32

iii

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ............................................................17

*NTN Bearing Corp. of Am. v. United States*,
    295 F.3d 1263 (Fed. Cir. 2002) ............................................................24

*Nucor Corporation v. United States*, Court No. 21-00182, Slip Op.
    22-116 (CIT October 5, 2022) ....................................................9, 38, 45

*Nucor Corp. v. United States*,
    653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023)...............................39, 52, 53

*Pasta Zara SpA v. United States*,
    35 C.I.T. 620 (2011) ............................................................................30

*S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ............................................................19

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
    635 F.3d 1335 (Fed. Cir. 2011) ............................................................24

*SKF USA Inc. v. United States*,
    630 F.3d (Fed. Cir. 2011) ....................................................................33

*Thai I-Mei Frozen Foods Co. v. United States*,
    616 F.3d 1300 (Fed. Cir. 2010) ............................................................31

*Union Steel Mfg. Co. v. United States*,
    968 F. Supp. 2d 1297 (Ct. Int'l Trade 2014)..........................................31

*United States v. Eurodif S. A.*,
    555 U.S. 305 (2009)..............................................................................23

*Viraj Grp. v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007) ............................................................33

## Regulations

19 C.F.R. § 351.525 ...........................................................................*passim*

**Rules**

FRAP 28(b)(3) ................................................................................1

Federal Circuit Rule 28(b) ...........................................................1

**Statutes**

19 U.S.C. § 1516 ..........................................................................19

**Administrative Decisions**

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the
Republic of Korea: Final Results and Partial Rescission of
Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg.
15,184 (Mar. 22, 2021) ...........................................................8, 36

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea:
Final Results of Countervailing Duty Administrative Review; 2017*,
85 Fed. Reg. 38361 (June 22, 2020) ...........................................8

*Certain Glass Containers From the People's Republic of China: Final
Affirmative Countervailing Duty Determination*, 85 Fed. Reg.
31,141 (May 22, 2020) ..............................................................37

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25,
1998) .................................................................................7, 31, 32

*Forged Steel Fluid End Blocks From the Federal Republic of
Germany: Final Affirmative Countervailing Duty Determination*,
85 Fed. Reg. 80,011 (Dec. 11, 2020)...............................8, 34, 35

*Initiation of Antidumping and Countervailing Duty Administrative
Reviews*, 85 Fed. Reg. 3014, 3022 (Jan. 17, 2020)......................3

*Steel Concrete Reinforcing Bar From the Republic of Turkey:
Preliminary Results of Countervailing Duty Administrative Review
and Intent To Rescind in Part; 2018*, 86 Fed. Reg.15,921 (Mar. 25,
2021) ............................................................................................5

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 Fed. Reg. 53,279 (Sept. 27, 2021) ..............*passim*

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Plaintiff-Appellee Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") hereby makes the following statement.

1. Previously there has been no appeal before this Court or any other appellate court from the same civil action or proceeding in the Court of International Trade ("CIT" or "Trial Court").

2. Kaptan's appeal of the 2019 administrative review of the countervailing duty order on steel concrete reinforcing bar from Turkey at the CIT, styled *Kaptan Demir Celik Endustrisi ve Ticaret A.S.* v. *United States*, USCIT No. 22-149, involves the same cross-ownership issue presented here, related to the same affiliate. The outcome of this appeal will likely dictate the outcome in that case.

## KAPTAN'S RESPONSE BRIEF

Kaptan responds to the opening brief filed by Defendants-Appellants Rebar Trade Action Coalition, Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation and Steel Dynamics, Inc., (collectively "Petitioners") on April 2, 2024 (hereinafter "Pet. Br."),[1] and asks this Court to affirm the CIT's ruling *Kaptan Demir Celik Endustrisi ve Ticaret A.S.* v. *United States,* Slip Op. 23-167 (Jan. 26, 2024) ("*Kaptan II*"), (**Appx11-51**). The CIT affirmed the U.S. Department of Commerce's ("Commerce") remand redetermination, assigning Kaptan a *de minimis* countervailing duty ("CVD")

---

[1] Because it is dissatisfied with Petitioners' Statement of the Issues, Statement of the Case, and Standard of Review, Kaptan provides its own covering areas of omission and disagreement. *See* FRAP 28(b)(3); Federal Circuit Rule 28(b).

1

margin by changing its determination that Kaptan's affiliate, Nur Gemicilik ve Tic. A.S. ("Nur") is a cross-owned input supplier within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).  Final Results of Redetermination (July 24, 2023) ("Final Remand"), **Appx2223-2255**.

## STATEMENT OF THE ISSUE

(a) Whether Commerce's original decision in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 Fed. Reg. 53,279 (Sept. 27, 2021) ("Final Results"), should be reviewed by this Court under a substantial evidence/in accordance with law standard and reinstated given that: (1) Commerce issued a new final determination in this challenged review in its Final Remand that replaced the Final Results; (2) Commerce is defending that Final Remand decision before this Court and did not issue that new determination "under protest"; (3) the CIT's first opinion[2] remanding the Final Results to Commerce was not an abuse of discretion and did not direct Commerce to make a specific decision; instead, the CIT reasonably asked Commerce to further explain certain aspects of its decision and it was Commerce's own decision to reverse its Final Results?

---

[2] *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023) ("*Kaptan I*") (**Appx1-Appx10**).

(b) Was Commerce's Final Remand implementing a more robust analysis of whether Nur was a cross-owned input supplier whose scrap was primarily dedicated to Kaptan's downstream product a reasonable interpretation of the input supplier provision in 19 C.F.R. § 351.525(b)(6)(iv) and was that determination supported by substantial evidence in light of the fact that: (1) Nur's primary business activity is a shipbuilder, a much more downstream product than rebar; (2) Nur generated a minuscule amount of scrap as a by-product of shipbuilding and sold it to Kaptan; (3) this was Nur's and Kaptan's only purchase or sale between them; and (4) Kaptan uses scrap to produce subject rebar and a wide variety of other non-subject products?

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

### A.    The Challenged Review

On January 17, 2020, Commerce initiated an administrative review of the CVD order on rebar from Turkey, covering Kaptan and other Turkish producers/exporters during the period of review ("POR"), January 1, 2018, through December 31, 2018. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 3014, 3022 (Jan. 17, 2020). Having been selected by Commerce as a mandatory respondent, Kaptan filed a timely response to the Affiliation Section of Commerce's initial CVD questionnaire. In this affiliation response, as required, Kaptan identified all its affiliates including the

3

affiliates the company believed fell within the meaning of cross-owned input suppliers under 19 C.F.R. § 351.525(b)(6)(iv). **Appx140-168**. One of the affiliates identified was Nur, a shipbuilding company that sold the scrap it generated from its production to Kaptan, which Kaptan used as an input in its production of steel billet, which was then used to produce subject rebar, as well as other non-subject merchandise like angles, square bars, flat bars, and round bars.[3] The generation of scrap is an insignificant portion of Nur's business and the quantity of scrap it sold to Kaptan was miniscule compared to the scrap Kaptan purchased from other sources:

| | Total Volume Purchased by Kaptan (MT) | % |
|---|---|---|
| Other Affiliated Suppliers[4] | [     #     ] | 21.59% |
| Nur | [   #   ] | 0.003%[5] |
| Unaffiliated Suppliers | [     #     ] | 78.41% |

*Id.* at Exh. 3 (**Appx165**). Further, this sale of scrap represented only [  #  ] of Nur's sales during the POR.[6] As a result, Kaptan stated that it should not be

---

[3] *See* Kaptan Initial Response at 8 (**Appx1024**) (Kaptan also sells steel billet).

[4] For the purposes of this brief, we combined the scrap sales of the other affiliates into one category. Kaptan did not challenge the cross-owned input supplier determination with regard to other affiliates as none of them had countervailable subsidies attributed to Kaptan.

[5] Kaptan no longer claims confidential treatment of this percentage.

[6] See Kaptan SQR at Exhibit 11 (Dec. 15, 2020) (**Appx10430**) (providing Nur's overall sales which can then be used with the scrap sales figure from the Affiliation

required to report the subsidies, if any, or provide a full questionnaire response for Nur as a "cross-owned input supplier" since the company's scrap production was not "primarily dedicated to the production of the downstream product" within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).

On November 13, 2020, Commerce issued a supplemental questionnaire requesting that Kaptan provide a full questionnaire response for Nur. On December 15, 2020, Kaptan provided a full initial CVD questionnaire response for Nur, reporting that Nur possibly used certain alleged "Regional Development Subsidies." Commerce published its Preliminary Results of the administrative review on March 25, 2021. *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2018*, 86 Fed. Reg.15,921 (Mar. 25, 2021) ("Preliminary Results") (**Appx1760-1777**). Commerce preliminarily found that (1) Nur was a cross-owned input supplier of Kaptan within the meaning of 19 C.F.R. § 351.525(b)(6)(iv); (2) Nur's receipt of rent-free land represented a countervailable subsidy within the meaning of section 771(5) of the Act.; (3) Nur's non-payment of rent during the POR resulted in a subsidy benefit attributable to Kaptan at an *ad*

---

Response to arrive at the percentage). These figures are not in dispute.

*valorem* rate of 2.37 percent.  (**Appx1778-1779**).  Without this determination

regarding Nur's land, Kaptan's rate would have been *de minimis*.

On July 28, 2021, Kaptan filed its administrative case brief challenging

Commerce's determination that Nur was a cross-owned input supplier under 19

C.F.R. § 351.525(b)(6)(iv) as well as other aspects of Commerce's subsidy

analysis for Nur.

On September 27, 2021, Commerce published its Final Results assigning a

final CVD rate of 1.82% to Kaptan.  (**Appx1847-1848**).  In its decision

memorandum at Comment 5, Commerce rejected Kaptan's arguments regarding

Nur's status as an input supplier.  In rejecting Kaptan's cross-ownership argument,

Commerce concluded that "{r}egardless of the amount of steel scrap manufactured

by Nur and regardless of the fact that it was manufactured as a byproduct rather

than as Nur's primary production activity, as previously stated, steel scrap has been

found, in previous segments of this proceeding to be a product that is primarily

dedicated to the production of downstream steel products."  IDM at Cmt. 5

(**Appx1834**).

## B.    The Trial Court's Initial Remand – *Kaptan I*

Kaptan appealed Commerce's Final Results to the CIT challenging

Commerce's cross-ownership determination, as well as three aspects of

Commerce's subsidy analysis related to Nur's land rental.  While those three issues

related to Nur's land were fully briefed and argued, the Trial Court stayed its

determination on those issues while the cross-ownership issue was pending.[7]

Kaptan's cross-ownership challenge focused on Commerce's "primarily

dedicated" analysis under 19 C.F.R. § 351.525(b)(6)(iv).  The case turned on the

meaning of "primarily dedicated" in section § 351.525(b)(6)(iv), and the

*Preamble*[8], and whether the overall production and business activity of the

particular input supplier must be considered in this analysis.  Commerce's position

was that regardless of the nature of the input producer's overall business activity or

the amount of the input sold to respondent, as long as almost all of the input

producer's input are sold to the respondent, then the production is "primarily

dedicated" within the meaning of the regulation.  IDM at Cmt. 5 (**Appx1832-

Appx1334**).  Kaptan challenged this rationale as an oversimplistic which failed to

comport with the guidance and scenarios in the *Preamble*, and which ignored the

unique facts of this case.  Kaptan 56.2 Brief at 8-23 (**Appx1866-1881**).

In addition to arguing that Commerce's interpretation and application of

section 351.525 did not comport with the *Preamble*, Kaptan also outlined

numerous Commerce CVD decisions where Commerce employed a different

---

[7] *Kaptan I*, 633 F. Supp 2d at n. 4 (**Appx10**).

[8] *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998).

primarily dedicated analysis to the challenged review. *Id*. at 11-16 (**Appx1869-**

**Appx1874**); Reply Brief at 2-8 (**Appx1980-Appx1986**). These included *Forged*

*Steel Fluid End Blocks from Germany*[9] (finding a scrap supplier not provide a

primarily dedicated input) and three cases that specifically took into account the

business activities of the input supplier in determining whether the production was

"dedicated almost exclusively to the production of a higher value added product" -

*CTL Plate from Korea 2018,*[10] *Certain Cold-rolled Steel Flat Products from*

*Korea,*[11] and *Glass Containers China*[12]. In discussing these cases and

distinguishing the cases presented by the Government and Petitioners, Kaptan

demonstrated that there appeared to be a "split" within Commerce in how to

conduct the primarily dedicated analysis. *See* Kaptan Reply Brief at 8-9

(**Appx1986-1987**). Some cases applied a more holistic case-by-case analysis

---

[9] *See Forged Steel Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020), and accompanying IDM at Cmt. 14 ("*FEBs*").

[10] *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021).

[11] *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 38361 (June 22, 2020), and accompanying IDM at Cmt. 2.

[12] *Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020), and accompanying IDM at Cmt. 12.

looking at the specific facts of the case, including the business activities of the

supplier while others, like the Final Results (and the cases Commerce relied upon)

looked only at whether the input was used in production of subject merchandise.

*Id*.

At oral argument and in a notice of supplemental authority, an additional

case was discussed - *Nucor Corporation v. United States*, Court No. 21-00182.

Commerce in the Final Results of Redetermination Pursuant to Court Remand

("*Nucor Remand*") in *Nucor Corporation v. United States*, Court No. 21-00182,

Slip Op. 22-116 (CIT October 5, 2022) issued on January 31, 2023.  Kaptan Notice

of Supp. Authority at1-4 (**Appx2085-Appx2088**).  In that case, Commerce

explained that "We disagree with Nucor's assertion that an input supplier's

business operations are irrelevant in determining whether an input is a primarily

dedicated input" and that "Commerce's case history clearly demonstrates that we

have previously examined the business operations of input suppliers; in the draft

remand redetermination, we discussed *Glass Containers from China* and *FEBS*

*from Germany* as examples."  *Nucor Remand* at 63 (**Appx2086**).[13]

---

[13] That remand redetermination was later remanded again by the court (Slip Op.
23-119) and Commerce issued its redetermination on December 19, 2023.  In that
second remand redetermination, Commerce ultimately found that that the scrap
input supplier and the respondent were not cross-owned because of the lack of a
control relationship.  Similar facts are not present in this case and this does not

On April 26, 2023, the Trial Court issued its opinion in Slip Op. 23-62 ("*Kaptan I*"), remanding the case to Commerce for further explanation on its cross-ownership and primarily dedicated analysis. The Trial Court first noted that:

> In the three pages of the IDM devoted to the finding of Nur as a cross-owned input supplier, Commerce offered only one substantive reason for its decision. Commerce's position is that because it had previously found that "scrap" is an input product primarily dedicated to the production of downstream steel products, and because such finding was upheld by this court, it is a matter of routine. IDM at 25, 27. According to Commerce, as long as scrap has been sold exclusively, the issue requires no further inspection.

*Kaptan I*, 63 F. Supp. 2d at 1283 (**Appx8**). The Trial Court noted that reliance on previous segments is "misplaced" because "These determinations did not involve Nur, nor the specific factual circumstances surrounding Nur's generation of scrap and the sale of these products to Kaptan, and the use of the inputs in Kaptan's productions." *Id*. at 1284 (**Appx9**). The Trial Court then outlined the three areas where additional explanation was needed:

- First, "Commerce needs to explain further why the input product in question, i.e., scrap metal generated by Nur, is in fact primarily dedicated to the production of downstream products in this case. This is especially true considering record evidence that the scrap may have been used for the production of products other than the subject merchandise." *Id*.

---

impeach Commerce's analytical framework for assessing primarily dedicated.

10

- Second, "Commerce, however, does not adequately address or explain why in some of these prior decisions, the Department considered factors such as the byproduct nature of the scrap, and why it has declined to do so in the instant case." *Id.*

- Third, "Nor does it adequately address Kaptan's contention that although there is no de minimis standard, Commerce has previously found that ingots and scrap sold in miniscule amounts are not "primarily dedicated" to the production of the downstream product. Instead, it merely repeats its position that if scrap has been generated in any form, and if that scrap has been sold by a cross-owned entity, and subsequently used in the production of downstream products, it is primarily dedicated." *Id.*

## C.    Commerce's Remand Redetermination

On June 27, 2023, Commerce issued its Draft Results of Redetermination Pursuant to Court Remand ("Draft Remand").  **Appx2170-2188**.  In its Draft Remand, Commerce changed its methodology outlining a set of criteria it used:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

11

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

Draft Remand at 12 (**Appx2181**). Using these factors Commerce then determined that Nur continued to be a cross-owned input supplier within the meaning of the regulation. Commerce focused in particular on the fact that "(3) the steel scrap was supplied as part of a vertically integrated production chain that fed it into downstream steel production, and thus, the steel scrap was merely a link in the overall production chain of the downstream steel producer, Kaptan Demir; and (4) Kaptan Demir was the primary, and exclusive, user of the inputs produced by Nur and the steel scrap produced by Nur was dedicated exclusively to Kaptan Demir's downstream steel production." *Id*. at 18 (**Appx2187**).

On July 7, 2023, Kaptan filed comments on Commerce's Draft Remand, challenging Commerce's factual and legal determinations. **Appx2192-2208**. Specifically, while Kaptan agreed that the five criteria outlined were consistent and appropriate within the meaning of the regulation and the *Preamble*, Kaptan (1) took issue with Commerce's description of the nature of the scrap sold and (2) identified several factual and legal errors in Commerce's "vertically integrated production chain" finding. *Id*.

On July 24, 2023, Commerce issued its Final Remand. **Appx2223-2255**.

In this remand, Commerce reversed course and found that "Nur does not constitute

a cross-owned input supplier of products (i.e., steel scrap) deemed to be primarily

dedicated to downstream steel production during the period of review (POR),

January 1, 2018, through December 31, 2018." *Id*. at 1-2 (**Appx2223-2224**).  In

making this finding, Commerce analyzed the same five criteria outlined in the

Draft Remand, including a company's business activities.  *Id*. at 12-13

(**Appx2234-2235**).  Commerce noted that:

> These factors are not in hierarchical order, but rather, provide a
> general outline of our considerations in our examination of the
> record to determine whether Nur's inputs or production
> processes are primarily dedicated to the production of
> downstream product. We also note that these criteria are not
> exhaustive or exclusive, and that any analysis of whether an
> input is primarily dedicated is established by all the facts on the
> record, which in many instances, are proprietary.

*Id*. at 13 (**Appx2235**).  Commerce stressed that "When assessing these factors and

examining the record, we are still guided by our regulation and the Preamble." *Id*.

Commerce then explained that:

> In its comments on the Draft Remand, Kaptan Demir raised
> certain case-specific facts that Commerce should analyze in
> determining whether Nur's steel scrap is primarily dedicated to
> Kaptan Demir's downstream production. These factors include
> the business activities of the input supplier (*i.e.*, Nur) and
> whether Nur's relationship with Kaptan Demir constitutes a
> vertically integrated supply chain based on the extremely
> limited nature of the transactions between Nur and Kaptan

13

> Demir during the POR. Upon consideration of Kaptan Demir's arguments, and further consideration of the facts on the record of this proceeding, we find that the facts on the record do not support a finding that the steel scrap generated by Nur is primarily dedicated to Kaptan Demir's downstream production.

*Id*. at 15 (**Appx2237**).  Importantly, Commerce underscored that it "does not have a rule that steel scrap is always primarily dedicated to the production of steel in the manner of semolina to pasta or stumpage to lumber" and that it has "never" made such a finding.  *Id*. at 15-16 (**Appx2237-2238**).  Commerce then noted that its different treatment of scrap in different cases shows that "Commerce's analysis is not rigid, but, instead, is based on a consideration of all relevant facts on the record of each proceeding.  *Id*. at 16 (**Appx2238**).

In analyzing the five criteria, Commerce found three satisfied.  However, when looking at the third factor, Commerce found that Nur's scrap was not merely a link in Kaptan's production chain.  Commerce explained:

> An analysis of whether a company provides an input that is "primarily dedicated" to the production of downstream product relates generally to two primary considerations. First, the term "primarily dedicated" usually refers to the input suppliers' actual production of the input product and not the sales of the input product without production by the input supplier. Second, "primarily dedicated" normally involves an analysis of both the input supplier's entire production (*i.e.*, the nature of the supplier's operations) and input production itself and its relationship to downstream products (*i.e.*, nature of the input). These concepts are reflected in the discussed factors in our analysis relating to whether a product is "merely a link in the

14

overall production chain" and an input supplier's business
activities

*Id*. at 17 (**Appx2239**).  Commerce further found that "it is significant that there is

no evidence that the scrap provided by Nur was processed in any way prior to

selling it to Kaptan Demir" and that "Whether or not scrap is generated or

otherwise prepared for downstream products in the production line is a factor to

consider when determining whether an input is primarily dedicated to the

production of a downstream product."  *Id*. at 16 (**Appx2238**).  Commerce found

that the scrap produced by Nur was more akin to plastic – "is a common input

among a variety of products and industries and used in a variety of production

processes."  *Id*.

Finally, for the fifth factor, Commerce reconsidered Nur's business

activities.  Commerce concluded:

> Nur's primary business is shipbuilding, which involves the
> production of a product that is much further downstream than
> the downstream products produced by Kaptan Demir, most
> notably rebar. Upon a review of Nur's business activities,
> which consist largely of shipbuilding, we find that the
> production processes involved in shipbuilding are far removed
> from Kaptan Demir's downstream production processes,
> especially given the extremely limited transactions between the
> two companies. Therefore, we find that Nur's business activity
> is not "dedicated almost exclusively to the production of a
> higher value-added product" in the manner suggested by the
> *Preamble*. **Simply put, the facts on the record do not support
> the premise that subsidies given to a shipbuilder would be**

15

> **given to "benefit the production of both the input and downstream products."**

*Id*. at 19 (**Appx2241**) (emphasis added).

Commerce then addressed Kaptan's and Petitioners' specific comments on the Draft Remand. Commerce acknowledged that its original view in the Draft Remand that "Nur is not involved in a broad range of activities unrelated to steelmaking" was "an overly narrow interpretation of how we review a company's business activity in our primarily dedicated analysis." *Id*. at 29 (**Appx2251**). Commerce noted that "the facts on the record indicate that Nur's production of ships is sufficiently removed from Kaptan Demir's production of downstream products, including rebar, such that it cannot be considered "dedicated almost exclusively to the production of a higher value-added product." *Id*. at 27 (**Appx2249**).

Finally, in addressing the by-product question raised by the Trial Court, Commerce explained that:

> whether an input is a by-product must be considered in relation to the business activity of the input supplier and the nature of the input in question as that input relates to the downstream producer's production process.

*Id*. at 32 (**Appx2254**).

16

As a result of this change in treatment of Nur, Commerce removed Nur's subsidies from Kaptan's CVD rate and recalculated Kaptan's rate to be *de minimis*. **Appx2255.**

### D.    The Trial Court's Sustaining Opinion – *Kaptan II*

On November 27, 2023, the Trial Court issued Slip Op. 23-167 sustaining Commerce's Final Remand and concluding that "this redetermination is both adequately explained and supported by substantial evidence on the record." *Kaptan II*, Slip Op. 23-167 at 1 (**Appx12**).  The Trial Court summarized the regulatory framework for attribution and Commerce's primarily dedicated analysis. The Trial Court specifically noted that Commerce had in the past used different analyses in different cases but correctly recognized that "This court will uphold such differing modes of 'primarily dedicated' analysis—and indeed differing conclusions with respect to the same input product in different cases, see *Nucor I*, 46 CIT at __,600 F. Supp. 3d at 1238—so long as Commerce's conclusion in each case rests on substantial evidence and Commerce reasonably explains the basis for its decision."  *Id*. at 5 (**Appx15**), citing *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)).

The Trial Court then demonstrated that each of Petitioners' challenges were unavailing.  In addressing Petitioners' argument that Commerce "did not identify

17

products/industries using {steel} scrap beyond downstream steel products," the court first noted that "This argument merely fulfills a self-fulfilling prophecy: after first constructing a category of 'downstream steel products' that by its terms sweeps in all conceivable downstream applications of steel scrap, Domestics then insist that Commerce failed in its Remand Results to enumerate examples of downstream applications of steel scrap that fall outside this maximally broad definition." *Id*. at 13 (**Appx23**). The court then demonstrated that Commerce had in fact identified the variety of different steel products that Kaptan itself produces using steel scrap. *Id*. at 14 (**Appx24**).

Next, in addressing Petitioners' contention regarding processed vs unprocessed scrap, the Trial Court explained that "Commerce did not invoke scrap processing as a determining factor, in its 'primarily dedicated' analysis; it merely raised the possibility that processing could limit an input's downstream uses and noted that that was not the case here." *Id*. at 15-16 (**Appx25-26**).

And finally, the Trial Court concluded that Commerce's consideration of Nur's business activity in its primarily dedicated analysis was lawful. *Id*. at 18-26 (**Appx28-36**).

## STANDARD OF REVIEW

When reviewing Commerce determinations, this Court "applies anew the standard of review applied by the {CIT} in its review of the administrative record.

18

. . . In doing so, {this Court will} uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a (b)(1)(B)(i) (1994)." *F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000). The applicable "substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the . . . determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.' . . . Rather, 'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Gerald Metals, Inc. v. United States,* 132 F.3d 716, 720 (Fed. Cir. 1997) (citations omitted).

Notwithstanding the fact that this Court reviews CIT determinations *de novo*, this Court "give{s} great weight to the informed opinion of the Court of International Trade and it is nearly always the starting point of . . . {this Court's} . . . analysis." *ABB, Inc. v. United States*, 920 F.3d 811, 820 (Fed. Cir. 2019).

## <u>SUMMARY OF ARGUMENT</u>

The CIT's decision was correct, and this Court should sustain Commerce's Final Remand. First, the Trial Court did not abuse its discretion in remanding the Final Results to Commerce for further explanation, and this Court should reject Petitioners' argument that it should review the original Final Results under the substantial evidence standard.

19

Second, Commerce's Final Remand was reasonable, supported by substantial evidence and otherwise in accordance with law. Commerce is afforded substantial deference in interpreting the "primarily dedicated" language in the 19 C.F.R. § 351.525 and that interpretation should be affirmed provided that it is reasonable and consistent with the *Preamble*. Commerce's Final Remand easily meets that standard. Commerce established a clear and reasonable five factor test and linked each of those factors to the guidelines in the *Preamble*. In evaluating whether Nur's input production was dedicated to the downstream product, Commerce reasonably considered Nur's shipbuilding (production process that resulted in the scrap) and that shipbuilding, a high-value add, downstream production process, not scrap generation, was the company's primary business activity. Commerce also reasonably considered the fact that the quantity of scrap sales by Nur to Kaptan were miniscule (0.003% of Kaptan's scrap purchases) indicating an extremely limited volume of interactions between the companies. In light of these facts, Commerce reasonably concluded that Nur was not merely a link in Kaptan's overall production of a more higher value product. Given the unique facts of this case, Commerce's conclusion was not inconsistent with its precedent, and was in line with the general analyses Commerce used in the past.

20

## **ARGUMENT**

### I.    COMMERCE'S ORIGINAL FINAL RESULTS CANNOT BE REINSTATED

Petitioners' brief primarily focuses on Commerce's Final Results, rather than the Final Remand.  Pet. Br. at 13-25.  Petitioners claim that the Final Results should be reinstated because "Commerce acted reasonably in rejecting Kaptan's arguments and continuing to cross-attribute subsidies."  *Id*. at 19.  They argue that Commerce's interpretation of its regulation was reasonable, was supported by the *Preamble*, and was consistent with judicial and administrative precedent.  *Id*. at 20-23.  They then claim that the lower court erred by finding that the decision was not "appropriately explained and supported."  *Id*. at 24.  Contrary to Petitioners' argument, this Court should not in this Appeal evaluate whether Commerce's initial determination was supported by substantial evidence and in accordance with law.  Rather, this Court's review is limited to whether the Trial Court's initial decision to remand the Final Results to Commerce was correct under the more deferential abuse of discretion standard of review.

#### A.    Commerce's Final Results Are Not Subject to Review by this Court

In its initial remand decision, the Trial Court did not reach the merits of Commerce's initial decision.  It did not definitively accept or reject that decision; rather, it merely concluded that "Commerce has not provided adequate explanation

in the Final Results regarding its determination that Nur was a "cross-owned input

supplier" of primarily dedicated inputs under 19 C.F.R. § 351.525(b)(6)(iv)," and

accordingly, remanded "the Final Results for further review and explanation."

Kaptan I, 633 F. Supp 2d at 1278 (**Appx3**); *see also id*. at 1285 (**Appx10**) (The

"court finds that Commerce has offered insufficient explanation as to how the

specific factual situations in this case support the conclusion that Nur was a cross-

owned input supplier.").

On remand, Commerce did not undertake its analysis under "respectful

protest." *See Changzhou Trina Solar Energy Co. v. United States,* 975 F.3d 1318,

1327 (Fed. Cir. 2020) ("On remand, Commerce, "under respectful protest,

increased Trina's {export} price{ } by the amount countervailed" as a result of the

Ex-Im Bank Buyer's Credit Program.").  Rather, it followed the Trial Court's

instructions, re-examined the law and facts and provided an adequate explanation

as to its decision-making process.  This comprehensive analysis led Commerce to

reverse its initial decision: "Upon further consideration of the facts contained on

the record of this proceeding, the regulations, and the *Preamble*, . . .{Commerce

found} . . .  that Nur does not constitute a cross-owned input supplier whose

production is primarily dedicated to the production of downstream product

pursuant to 19 CFR 351.525(b)(6)(iv)."  Final Remand at 8 (**Appx2230**).

22

Thus, whether Commerce's initial decision was supported by substantial

evidence and in accordance with law is not the subject of this appeal.  Commerce

had the right to reconsider an initial determination during the course of the

litigation, and had the right, if it so desired, to reach a contrary conclusion, which

the Court will then examine under the substantial evidence standard of review.  In

*United States v. Eurodif S. A*., 555 U.S. 305, 316 (2009), the Supreme Court

discussed this standard as follows:

> {W}hen the Department exercises this authority in the course of
> adjudication, its interpretation governs in the absence of
> unambiguous statutory language to the contrary or unreasonable
> resolution of language that is ambiguous.[6] . . .This is so even
> after a change in regulatory treatment, which "is not a basis for
> declining to analyze the agency's interpretation under the
> *Chevron* framework." . . . ." '{T}he whole point of *Chevron* is
> to leave the discretion provided by the ambiguities of a statute
> with the implementing agency.' "

In *Evonik Rexim (Nanning) Pharm. Co. v. United States*, 296 F. Supp. 3d

1364, 1367–68 (Ct. Int'l Trade 2018), the CIT followed this principle:

> GEO argues that Commerce reversed its position on remand
> despite the fact that "the record evidence on the liquid ammonia
> surrogate value issue did not change; all that changed was
> Commerce's reinstatement of the original briefs filed by
> Baoding and GEO providing legal arguments addressing this
> issue." Id. at 9. The presence of additional briefing at the
> administrative level was significant, however, because the
> Department had more information and arguments to consider in
> making its decision. The Department is allowed to "change its
> conclusions from one review to the next based on new

information and arguments, as long as it does not act arbitrarily
and it articulates a reasonable basis for the change."

*See also Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1342

(Fed. Cir. 2011) ("The fact that Commerce changed its policy is irrelevant, as

Commerce is entitled to change its views, and a new administrative policy based

on a reasonable statutory interpretation is nonetheless entitled to *Chevron*

deference.") *NTN Bearing Corp. of Am. v. United States*, 295 F.3d 1263, 1269

(Fed. Cir. 2002) ("Commerce, however, may alter its methodology if the change is

supported by a reasonable basis, because a reasonable interpretation of the statute

will be given deference. . . . .Such deference extends to its limits when Commerce

interprets the antidumping laws').

Finally, in *Altx, Inc. v. United States*, 370 F.3d 1108, 1117 (Fed. Cir. 2004),

this Court discussed the appropriate standard for reviewing a Trial Court's remand

of an agency decision for further explanation or clarification:

> The parties disagree, however, as to the appropriate standard for
> any review of the Court of International Trade's *ALTX I* and *II*
> remand orders. Altx contends that the "substantial evidence"
> standard should apply uniformly to both the interlocutory
> remand orders and the final decisions of the court. The Japanese
> producers and Commission contend that a more deferential
> "abuse of discretion" standard is required when a Court of
> International Trade order does not reach the sufficiency of the
> evidence supporting the Commission's determination, but
> instead remands only for further explanation or clarification of
> the Commission's position. *See Taiwan Semiconductor,* 266

24

F.3d at 1344.

In *Taiwan Semiconductor,* the Court of International Trade
neither affirmed nor reversed an affirmative injury
determination by the Commission, but merely remanded the
matter for additional "explanation" that would clarify the
Commission's findings. *Id.* Because the court did not squarely
address the sufficiency of the evidence supporting the
Commission's determination, we applied an "abuse of
discretion" standard in our review:

In the present case, the Court of International Trade did not find
that the Commission's first determination was not supported by
substantial evidence or that the Commission did not make its
determination in accordance with law. In other words, the trial
court performed no substantial evidence review at all for this
court to review. The Court of International Trade also did not
request the Commission to perform any further investigation.
Rather, the court remanded the Commission's determination for
further explanation.
...
The Supreme Court has explained: "If the reviewing court
simply cannot evaluate the challenged agency action on the
basis of the record before it, the proper course ... is to remand to
the agency for additional investigation or explanation." A
court's judgment as to whether the record before it needs further
explanation in order for the court to understand and properly
evaluate the agency's action is a determination that lies within
the discretion of the court. Thus this court reviews the Court of
International Trade's decision to remand for a further
explanation from the Commission for abuse of discretion. *Id.*
(citations omitted).

Our reasoning in *Taiwan Semiconductor* controls our review of
*ALTX I* and *II.* Here, as in *Taiwan Semiconductor,* neither of the
Court of International Trade's remand decisions required
additional investigation by the Commission, nor did either of
the remand decisions alter a Commission determination in any

25

substantive regard. On the contrary, the remand decisions only instructed the Commission to (1) further consider the relevant arguments made by the parties, (2) explain in greater detail its decision and reasoning, or (3) reinterpret the evidence in some limited manner. As in *Taiwan Semiconductor,* the court simply "request{ed} ... further explanation of agency action," *id.,* and did not evaluate the substantiality of the Commission's evidence. Therefore, any review of *ALTX I* and *II* in this case is under an abuse of discretion standard.

*See also Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1356 (Fed. Cir. 2010) ("We review decisions of the Court of International Trade that remand decisions of the Commission for further explanation (based on an inability to evaluate on the basis of the record before the court) with the more deferential abuse-of-discretion standard.").

In short, this Court's mandate on appeal is to decide whether Commerce's Final Remand is supported by substantial evidence and in accordance with law, and not whether Commerce's initial Final Results – which Commerce re-examined and reversed – met this standard. This Court's analysis of the initial Commerce decision is limited to deciding whether the Trial Court abused its discretion in requiring that Commerce provide a better analysis of its rationale.

## B.    The Trial Court Did Not Abuse its Discretion In Remanding the Final Results

The Trial Court clearly did not abuse its discretion by remanding Commerce's Final Results for further explanation. There were no errors of fact or

law in the Trial Court's remanding determination.  Instead, the Trial Court

reasonably identified certain areas of Commerce's Final Results that required

additional explanation.  Specifically, Commerce's Final Results made the

following determination:

> Regardless of the amount of steel scrap manufactured by Nur
> and regardless of the fact that it was manufactured as a
> byproduct rather than as Nur's primary production activity, as
> previously stated, steel scrap has been found, in previous
> segments of this proceeding to be a product that is primarily
> dedicated to the production of downstream steel products.
> Nothing Kaptan argues changes that fact.

IDM at Cmt 5 (**Appx1834**).  The Trial Court reasonably found that "Commerce's

reliance on determinations in prior segments, and this court's opinion in *Icdas*, is

misplaced" because "These determinations did not involve Nur, nor the specific

factual circumstances surrounding Nur's generation of scrap and the sale of these

products to Kaptan, and the use of the inputs in Kaptan's productions."  *Kaptan I*,

633 F. Supp. 2d at 1284 (**Appx9**).  The Trial Court then explained that:

> Commerce needs to explain further why the input product in
> question, i.e., scrap metal generated by Nur, is in fact primarily
> dedicated to the production of downstream products in this
> case. This is especially true considering record evidence that the
> scrap may have been used for the production of products other
> than the subject merchandise.

*Id*.

The Trial Court similarly took issue with Commerce's attempt to distinguish past cases that contained similar facts:

> The IDM also attempts to distinguish prior Commerce decisions cited by Kaptan. IDM at 26. Commerce, however, does not adequately address or explain why in some of these prior decisions, the department considered factors such as the byproduct nature of the scrap, and why it has declined to do so in the instant case. Id. Nor does it adequately address Kaptan's contention that although there is no de minimis standard, Commerce has previously found that ingots and scrap sold in miniscule amounts are not "primarily dedicated" to the production of the downstream product. Instead, it merely repeats its position that if scrap has been generated in any form, and if that scrap has been sold by a cross-owned entity, and subsequently used in the production of downstream products, it is primarily dedicated. Id.

*Id*.

This determination was not an abuse of discretion. There were legitimate and unique factual circumstances presented in this case that were unlike those in the previous cases upon which Commerce relied. These differences went unaddressed in Commerce's original Final Results. Moreover, Commerce used different analyses and criteria in different cases when assessing whether an input was primarily dedicated. The Trial Court reasonably sought additional explanation on why Commerce's analysis in the Final Results was inconsistent with the analysis in those cases. For these reasons, the Trial Court's decision to remand the Final Results was not an abuse of discretion.

28

## II.    COMMERCE'S REMAND RESULTS WERE REASONABLE, SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.    Commerce's Cross-Ownership Framework

When a producer/exporter is selected as a mandatory respondent in a CVD case, Commerce's CVD questionnaire requires, in accordance with the Regulations, the respondent to identify any "cross-owned" affiliates.  The regulations outline four different categories of companies that potentially fall within the regulatory definition of "cross-ownership."  19 C.F.R. § 351.525(b)(6):

(1)    Corporations producing the same product;

(2)    Holding or parent companies;

(3)    Input suppliers; and

(4)    Transfer of subsidy between corporations with cross-ownership producing different products.

*Id*. at § 351.525(b)(6)(ii)-(v).  If a company falls within one of these categories and falls within the definition of cross-ownership,[14] then the affiliate must report whether it used any of the alleged subsidies in the case.  If subsidies are received by these affiliates, then the benefits from those subsidies are attributed to the

---

[14] Cross-ownership is defined as "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporation."  19 C.F.R. § 351.525(b)(6)(vi).

producer of subject merchandise (*i.e.*, the mandatory respondent).  *Id*. at §

351.525(b)(6)(i).  That is, subsidy rates calculated for the affiliate are combined

with the rates calculated for the respondent.

The central dispute in this case is whether Kaptan's affiliate, Nur, a

shipbuilder, falls within the "input supplier" provision of 351.525(b)(6)(iv).  The

regulations make clear that not all input suppliers that fall within the definition of

cross-ownership under section 351.525(b)(6)(vi) are required to report subsidies.

The requirement is limited to input suppliers where the production of the input is

"primarily dedicated to the production of the downstream product":

> If there is cross-ownership between an input supplier and a
> downstream producer, and **production of the input product is**
> **primarily dedicated to production of the downstream**
> **product**, the Secretary will attribute subsidies received by the
> input producer to the combined sales of the input and
> downstream products produced by both corporations (excluding
> the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).  The regulation does not provide a

definition of "primarily dedicated" or identify the criteria that Commerce is to

consider in making this analysis.  How Commerce is to evaluate whether the

production of an input product is "primarily dedicated to the production of the

downstream product" can instead be found in the *Preamble*.

The court has recognized the *Preamble* as "the Department's own

interpretation of its regulation."  *Pasta Zara SpA v. United States*, 35 C.I.T. 620,

30

624 (2011). Further, the court has explained that where the plain language of the regulation is susceptible to multiple interpretations, it is appropriate to look to the *Preamble* as the "Department's stated intent at the time it promulgated the regulation." *Union Steel Mfg. Co. v. United States*, 968 F. Supp. 2d 1297, 1321 (Ct. Int'l Trade 2014). Thus, any interpretation and analysis of its regulations that Commerce undertakes must be "consistent with the stated interpretation in the Preamble." *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1308 (Fed. Cir. 2010).

In addressing the regulation's limitation to suppliers whose input is primarily dedicated to the production of the downstream product, the *Preamble* explains that "The main concern we have tried to address is the situation where a subsidy is provided to an input producer whose production is **dedicated almost exclusively to the production of a higher value** added product—the type of input product that is **merely a link** in the overall production chain. *Preamble*, 63 Fed. Reg. at 65,401 (emphases added). The *Preamble* then sets forth several examples of scenarios where it is reasonable to conclude that the input is primarily dedicated to the downstream production. These include "stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production." *Id*. In those instances, the *Preamble* notes that it

31

was clear that "the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Id.*

In contrast, the *Preamble* explains that:

> Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles.

*Id.* With these contrasting examples, the *Preamble* establishes the book-ends of scenarios that Commerce could encounter when addressing this issue. These examples plus the unequivocal expression of the purpose of the regulation – that the production "be merely a link in the overall production chain" should serve as the guideposts for Commerce's interpretation of primarily dedicated language in the regulation.

By not providing an express set of criteria for Commerce to evaluate, the *Preamble* permits Commerce to establish a methodology through its administrative practice. This court will uphold that methodology so long as it is reasonable and consistent with the *Preamble*. This Court accords "substantial deference" to Commerce's "interpretations of its own regulations." *Michaels Stores, Inc. v. United States,* 766 F.3d 1388, 1391 (Fed. Cir. 2014). "{D}eference to an agency's

32

interpretation of its own regulations is broader than deference to the agency's
construction of a statute, because in the latter case the agency is addressing
Congress's intentions, while in the former it is addressing its own." *Viraj Grp. v.
United States,* 476 F.3d 1349, 1355 (Fed. Cir. 2007).  "{A}s the Supreme Court
has explained, the agency's construction of its own regulations is "of controlling
weight unless it is plainly erroneous or inconsistent with the regulation."
*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363–64 (Fed.
Cir. 2005).  Commerce's interpretation of "primarily dedicated" need not be "the
only one it permissibly could have adopted" in order for Commerce's
determination to be reasonable.  *Chevron, U.S.A., Inc. v. Natural Resources
Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  Commerce therefore has
flexibility in establishing criteria for determining whether the primarily dedicated
language has been met in a particular case and can change its practice used in
different cases so long as that change is explained and is reasonable.  *See SKF USA
Inc. v. United States*, 630 F.3d, 1365, 1373 (Fed. Cir. 2011) ("When an agency
changes its practice, it is obligated to provide an adequate explanation for the
change."); *see also* Final Remand at 10 ("As we previously stated, neither the
Preamble nor the statute and regulations offer an explicit definition of 'primarily
dedicated'; the determination may, therefore, be reasonably made based on the

facts of each proceeding.").

Over the years, Commerce has used different approaches in analyzing input supplier scenarios. In some cases, Commerce effectively ignored the type of input used (i.e., plastics vs. semolina) and found the primarily dedicated language met where the input supplier sold all (or most) of its produced input to the producer and the input was used in the production of subject merchandise. *See Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1338 (Ct. Int'l Trade 2023) ("Because electricity could not have been found on this record to be "dedicated to the production" of any downstream product in the way the regulation contemplates"). Petitioners outline other cases with such a limited analyses in their brief at pages 15-16, 20. These cases, Petitioners proclaim, support the type of limited analysis they advocate for in this case.

In other cases, however, Commerce performed a more comprehensive analysis. A prime example of this more comprehensive agency practice is Commerce's determination in *FEBs* IDM at Cmt. 14. In that case, two cross-owned affiliates of the FEB producer-respondent produced and sold ingot and scrap to the FEB producer. The FEB producer used scrap to produce subject merchandise. Commerce in *FEBs* reviewed the "nature of input and downstream products and production processes" and specifically "examined BGH Freital's and

34

BGH Lippendorf's business activities on the record." *Id*. Commerce considered the fact that "BGH Freital and BGH Lippendorf manufacture non-subject merchandise including semi-finished steel products, round and flat bar, and wire" and only provided small quantities of inputs to the respondent. *Id*. Commerce then concluded:

> the record demonstrates that BGH Freital and BGH Lippendorf supplied very small quantities of ingots and scrap to BGH Siegen. Analogous to the plastic as an input to an automobile example in the *CVD Preamble*, one cannot reasonably conclude that these inputs are dedicated almost exclusively to the production of downstream products or that these are the type of input products that are merely a link in the overall production chain.

*Id*. In making this determination, Commerce distinguished the case from others where the nature of the input (*e.g.*, pulp logs and pulp), "have one purpose, which is to be used as an input dedicated exclusively to the production of a higher value added product (*i.e.*, the downstream product including subject merchandise)." *Id*. That is, Commerce concluded in FEBs that scrap is not a "one purpose" input for a specific steel product.[15]

---

[15] Fluid end blocks are a forged piece of metal into a specific shape. *See Fluid End Blocks*, ELLWOOD CITY FORGE GROUP, https://www.ellwoodcityforge.com/fluid-end-blocks

In *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ("*CTL Plate from Korea 2018*"), the issue was whether Plantec, a cross-owned affiliate of POSCO, the respondent, was an input supplier and Commerce explained that: "Record evidence shows that Plantec provided various materials to POSCO.  One of the inputs was scrap generated from Plantec's production process as a by-product and sold to another POSCO input supplier, PDC, prior to being resold to POSCO."  *Id*. at IDM Cmt. 2.  In analyzing whether the input provided was primarily dedicated, Commerce evaluated "Plantec's business activities as reflected in information on the record of this review" and "concluded that Plantec's production is not "dedicated almost exclusively to the production of a higher value product".  Commerce noted that "the record shows that Plantec's primary function is the "construction of industrial plant{s}."  *Id*.; *see also Certain Cold-Rolled Steel Flat Products from the Republic of Korea* IDM at Cmt. 2 ("If the record shows the sole purpose of POSCO Plantec's production activities is to provide inputs to POSCO's steel production, one might reasonably conclude that the purpose of a subsidy to POSCO Plantec is to benefit POSCO's steel production. However, on the contrary, the record shows that POSCO Plantec's productions include construction of a

36

refinery, a cargo terminal in Taiwan, a storage tank in an LNG terminal in Korea, and a luggage processing facility in Korea, etc.").

In *Glass Containers China*, Commerce found that a particular cross-owned affiliate ("Company A") had not been required to submit a Section III questionnaire response because its business activities were not "primarily dedicated" to the production of the input:

> Company A's business license details a variety of production activities *other than glass equipment manufacturing*. Thus, record evidence in the instant case *does not indicate that Company A's production is "dedicated almost exclusively to the production of a higher value added product*" in the manner suggested by the Preamble or that the purpose of any subsidy provided to Company A would be "to benefit the production of both the input and downstream products." Therefore, Commerce did not specifically request or require a complete Section III questionnaire response from Company A.[16]

These cases demonstrate that Commerce has used different methodologies in past cases that include evaluating the nature of the input itself as well as the nature of the input supplier's production, i.e., its "business activities." Recognizing the inconsistency in its past cases, Commerce in its Final Remand set forth five clear criteria that it evaluates in assessing whether an input is primarily dedicated to the

---

[16] *Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (May 22, 2020), and accompanying IDM at Cmt. 12.

downstream product:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

Final Remand at 12-13 (**Appx2234-2235**).[17]  "These factors are not in hierarchical

---

[17] These were the same criteria Commerce outlined in its Final Results of Redetermination Pursuant to Court Remand in *Nucor Corporation v. United States*, Court No. 21-00182, Slip Op. 22-116 (CIT October 5, 2022).

order" and "are not exhaustive or exclusive." *Id*. at 13 (**Appx2235**).  Commerce's

analysis often rests on extremely case specific factors "which in many instances,

are proprietary." *Id*.

These same factors have been upheld by the by the CIT.  In *Nucor Corp. v.*

*United States*, 653 F. Supp. 3d 1295, 1307 (Ct. Int'l Trade 2023), the court

reviewed remand results where Commerce outlined the very same five factor test

used here.  The court found that:

> Commerce is correct that neither the statute nor the agency's
> regulations define "primarily dedicated." Remand Results at 22.
> The court "recognizes that decisions regarding attribution are
> fact specific and Commerce may reach different conclusions in
> different cases in relation to the same input." *Nucor I*, 600 F.
> Supp. 3d at 1238. Nucor offers no substantive arguments
> against Commerce's consideration of various factors beyond
> noting that Commerce has reached different decisions in certain
> other proceedings involving scrap supplied to POSCO. *See* Pl.'s
> Opp'n Cmts. at 18–19. That alone is not a basis for remand.
> Commerce explained its methodological approach by way of
> reference to the *CVD Preamble* and prior agency
> determinations. Remand Results at 24–25. Except to the extent
> discussed further in, the chosen factors appear at least facially
> relevant to determining whether "the purpose of a subsidy
> provided to the input producer is to benefit the production of
> both the input and downstream products." *CVD Preamble*, 63
> Fed. Reg. at 65,401.

*Id*.

**B.    Commerce's Application Of Its Primarily Dedicated Analysis In This Case Was Reasonable And Supported By Substantial Evidence**

In its Final Remand, Commerce explained that its "interpretation of what is considered "primarily dedicated" is necessarily complex because of the vast variety of companies, inputs, types of subject merchandise, production processes, and circumstances surrounding all the aforementioned that Commerce must examine on a record-specific basis."  Final Remand at 15 (**Appx2236**).  Commerce further noted that "We have repeatedly emphasized such determinations are record-specific and involve an analysis of all relevant facts on each individual record to determine whether an input producer's production processes or involvement in the production of subject merchandise indicates that a subsidy a government provided to that input producer was intended to support the production of downstream product."  *Id.*

Refusing to recognize these legitimate constraints, Petitioners raise two challenges to Commerce's Final Remand.  First, they argue that Commerce's determination that "'unprocessed' steel scrap of the kind that Nur sold to Kaptan is a 'common input among a variety of products and industries and used in a variety of production processes'" is "neither supported by the record nor adequately explained.  Pet. Br. at 26-27.  Second, they argue that "Commerce inappropriately focused on Nur's generalized 'business activity' over record evidence regarding

40

Nur's production of steel scrap", failing to "adequately address prior cases in which it found steel scrap to be primarily dedicated to downstream production of rebar." Id. at 27. These arguments are without merit. Each of these arguments was addressed and correctly rejected by Commerce and the Trial Court below.

### 1.    Petitioners Mischaracterize the Nature of Scrap

Petitioners make fundamental errors in addressing Commerce's treatment of Nur's steel scrap. Throughout their argument Petitioners challenge Commerce's determination that scrap is "common input among a variety of products and industries." Pet. Br. at 27. They argue that since steel scrap is only used for "steelmaking" that "there is no indication that unprocessed steel scrap is an input of 'universal application." *Id*. Petitioners conclude that since "scrap is always primarily dedicated to "steel production" that "steel scrap—again, regardless of processing level—has the sort of direct, physical relationship with rebar that timber has with lumber, and semolina has with pasta." *Id*. at 29-30.

This simplicity – that because steel scrap is used for steel products it is "merely a link in production"– was rightly rejected by both Commerce in its remand and by the Trial Court. As Commerce reasoned in the Final Remand, the examples in the *Preamble* do not support this simplified approach. Final Remand at 9-10, 15-16, 24-25 (**Appx2231-2232, Appx2237-2238, Appx2246-2247**).

Semolina is virtually *only* used in pasta, and lumber can only be made from timber. In contrast, while scrap is used for "steel products", the term "steel products" represents a countless number of singular end products, not just rebar. As the record demonstrates, among other steel products, Kaptan uses scrap to produce "steel billets, reinforcing bars, angles, square bars, flat bars, and round bars" and other non-subject rebar. Initial Response at 8-9 (**Appx1024-Appx1025**). Thus, the scenario before the court is more akin to whether stumpage is primarily dedicated to wood furniture or semolina is primarily dedicated to meat lasagna. This is a much more complicated inquiry than the examples identified in the *Preamble.*

Moreover, neither "steel products" nor rebar itself are always made from scrap (unlike lumber from stumpage). Rebar is made from billet which can be made from either melted scrap steel or first time steel. Thus, on the spectrum of inputs, scrap is closer to an input of general use, like plastic, than it is to limited use inputs like semolina or stumpage. Just like plastic sometimes can and sometimes cannot be a primarily dedicated input based on the totality of the circumstances and the specifics of a given case, a similar totality of the circumstances analysis is necessary to evaluate the scrap in this case.

The Trial Court squarely and reasonably addressed Petitioners' argument as

follows:

> By {Domestics'} reasoning, it would appear that even in the
> archetypical case of plastics, automobiles, and appliances,
> Commerce would be required to offer examples of downstream
> uses for plastics other than "downstream plastic products" in
> order to show that plastics production is not primarily dedicated
> to automobile production. And because every product that
> incorporates plastics as an input is arguably a "downstream
> plastics product," as Domestics suggest is the case with
> "downstream steel products," Domestics' Br. at 18, Domestics'
> proposed standard would seemingly compel a primary
> dedication finding in the very hypothetical case that Commerce
> invoked to demonstrate a lack of primary dedication—and,
> indeed, in every case. This standard wants for a limiting
> principle, and the court declines to adopt it.
>
> Contrary to Domestics' suggestion, Commerce's task in
> establishing steel scrap's closer similarity to plastics than to
> semolina was not to "identify products/industries using {steel}
> scrap beyond downstream steel products." Domestics' Br. at 18.
> Commerce's task was instead to assess the range of
> downstream steel products that steel scrap can be used to
> produce. *Kaptan I*, 633 F. Supp. 3d at 1284. . .
>
> That is precisely what Commerce did on remand. Explaining
> that "unprocessed scrap is a common input among a wide
> variety of products and industries," Remand Results at 18,
> Commerce (elsewhere in its redetermination) listed "non-
> subject rebar, other types of bars, and angle profiles" as
> examples of products besides the subject rebar that Kaptan uses
> steel scrap to produce. Id. at 26–27. The remand record on
> which Commerce based these assertions contains Kaptan's
> representations that "Kaptan Demir manufactures steel billets,
> reinforcing bars, angles, square bars, flat bars, and round bars in
> its meltshop and two rolling mills" and that at one of these

43

mills, "hot billets are . . . rolled into various products, including deformed reinforcing bars ranging from 8 mm to 40 mm and other products." Letter from Kaptan to W. Ross, Sec'y of Com., re: Kaptan Initial Questionnaire Response at 8–9 (July 6, 2020), P.R.R. 88 ("Kaptan Questionnaire Response"). As the Government notes, Commerce cited cases in its Remand Results that involved additional downstream products for which steel scrap can be an input. Even Domestics acknowledge that "{t}he record here indicates that Kaptan used Nur's scrap to produce downstream steel products, including rebar."

This variety of downstream outputs constitutes substantial evidence in support of Commerce's determination that rebar is one of many products that can be manufactured from steel scrap, and that the relationship of Nur's steel scrap to Kaptan's rebar is thus unlike the more direct input-to-output relationship of semolina to pasta. Commerce, furthermore, has adequately explained the link between this evidence and its findings in the Remand Results

*Kaptan II* at 13-15 (**Appx23-Appx25**).

Petitioners go on to challenge Commerce's discussion of processed versus unprocessed and a more dedicated generation of scrap. Pet. Br. at 30-33. These comments are directly related to the nature of scrap as a by-product. Given this nature, as required by the *Preamble*, Commerce must determine whether the scrap is "merely a link" in the downstream production. The word "merely" is critical in this requirement and necessitates the totality of circumstances approach Commerce espouses. It is not sufficient, as Petitioners argue, that the input is just a link. If simply being a link in the production chain were sufficient, every input would be

"primarily dedicated." But the *Preamble* is clear with the plastics example that something more is required – hence Commerce reasonably looked at both the nature of the input and the nature of the input production.

This is precisely why Commerce states in the Final Remand that:

> Neither Commerce's regulations nor the *Preamble* states that scrap is always primarily dedicated to the production of downstream product. Thus, Commerce makes a determination regarding steel scrap as an input on a case-by-case, fact-specific basis. Commerce has never made a finding that steel scrap is always primarily dedicated to the production of steel.

Final Remand at 16 (**Appx2238**). Commerce then explained that "This is evident by not only this case, but *Cold-Rolled Steel from Korea*, *FEBs from Germany*, *CTL Plate from Korea*, and Commerce's Final Results of redetermination Pursuant to Court Remand (Nucor Remand) in *Nucor Corporation v. United States*, Court No. 21-00182, Slip Op. 22-116 (CIT October 5, 2022) issued on January 31, 2023, in which Commerce did not treat steel scrap as a primarily dedicated input." *Id*.

This case law and Commerce's Final Remand makes clear that additional factors must be present beyond scrap being used for subject merchandise to render it "primarily dedicated." This additional factor could be further processing of scrap (e.g., slitting, cutting, etc) and in other instances this factor could be a more dedicated production (e.g., producing other comparable level steel products like angles, bar, etc.). Commerce explained:

45

Where we examined the by-product nature of steel scrap, we have done so in the context of determining whether steel scrap is merely a link in the overall production chain. For example, in *CTL Plate from Korea* and the *Nucor Remand*, we considered a range of case-specific factors, including an analysis of the by-product nature of the steel scrap as it relates to an input supplier's overall production process, the fact it was sold through an intermediary, the scope of business of the steel scrap input supplier, and the nature of other services provided by the input supplier in determining whether the materials and inputs provided were primarily dedicated to downstream production.117 Based on the totality of the circumstances, we then determined that the steel scrap was not primarily dedicated to downstream products. .  Instead, whether an input is a by-product must be considered in relation to the business activity of the input supplier and the nature of the input in question as that input relates to the downstream producer's production process.

Final Remand at 31 (**Appx2235**).  Commerce then distinguished *OCTG from Turkey*, which Petitioners rely on in their brief[18]:

a closer analysis of the primary business activity of the input supplier in *OCTG from Turkey*, wherein we found that an input supplier provided steel scrap to the mandatory respondent to produce intermediate products, also shows the significance of a company's business activity as it relates to our primarily dedicated analysis. While we did not reference primary business activity in our decision from *OCTG from Turkey*, we find it significant for the purposes of the arguments raised by the parties to this proceeding that the primary business activity of the input supplier at issue in that case, Tosyali Demir, involved the production of steel angles and profiles.115 While we found the steel scrap in *OCTG from Turkey* to be primarily dedicated to downstream production, our finding in *OCTG from*

---

[18] Pet. Br. at 16, 30.

> *Turkey* does not necessitate that we likewise must find the steel
> scrap generated by Nur, which Nur produced as a part of a
> much further removed production process in shipbuilding, is
> primarily dedicated to Kaptan Demir's downstream production.
> Likewise, as explained above, while it is true that Nur's
> production of steel scrap is exclusively provided to Kaptan
> Demir, as was the case in *OCTG from Turkey*, this alone does
> not support a finding that Nur's provision of steel scrap is
> primarily dedicated to Kaptan Demir's downstream production
> given other facts on the record.

*Id*. 30-31 (**Appx2234-2235**).  Thus, Petitioners' arguments fail to take into

consideration the fact that Commerce's decision is based on a totality of

circumstances approach. Commerce's decision did not turn solely on the fact that

the scrap was or was not processed; nor did Commerce find that unprocessed scrap

can never be a primarily dedicated input.  Instead, Commerce reasonably used that

fact as one of the factors in its decision.  As the Trial Court explained:

> Commerce made these statements in conjunction with its
> analysis (discussed in greater detail above) of whether an input
> is "not merely a link in the overall production chain." Remand
> Results at 17. Commerce's point was simply that any
> processing of steel scrap by the input supplier focuses the range
> of likely downstream applications of that scrap, analogizing the
> relationship of input scrap to downstream rebar to the
> relationships of semolina to pasta and of stumpage to lumber.11
> Id. According to Commerce, the presence on the record of any
> evidence of such processing would support a finding that the
> input scrap's relationship to Kaptan's rebar was marginally
> closer. Id. Commerce did not invoke scrap processing as a
> determining factor in its "primarily dedicated" analysis; it
> merely raised the possibility that processing could limit an

input's downstream uses and noted that that was not the case here.

Domestics contest the relevance of Commerce's distinction between processed and unprocessed steel. Domestics' Br. at 18. They fail, however, to explain how this purported irrelevance—which Commerce cites as one factor among many—would affect the completeness of Commerce's explanation for its negative primary dedication finding, or the question of whether that finding is supported by substantial evidence.

*Kaptan II* at 15-16 (**Appx25-26**).

Put another way, Commerce weighed the evidence on the record in this case, outlined the factors it reviewed, linking them to the *Preamble*, compared its analysis to decisions in other cases, and came to a reasonable conclusion that the segment specific facts in this case do not support a finding that Nur is a cross-owned input supplier under the regulations.

Finally, Petitioners argue that Commerce's failure to distinguish its decision on Nur from its treatment of Kaptan's other scrap suppliers, Martas Marmara Ereglisi Liman Tesisleri A.S. and Aset Madencilik A.S. renders Commerce's decision arbitrary. Pet. Br. at 31. At no point, either in the challenged review, at court, or in the remand proceeding, did Kaptan challenge Commerce's determination as to these two affiliates. The reason there was no challenge, and hence no discussion by Commerce, was because neither of these companies had subsidies attributable to Kaptan. Thus, the treatment of these companies as cross-

48

owned input suppliers was, and remains, irrelevant. As the Trial Court correctly

explained:

> During the remand proceeding, Commerce was unable to
> modify any portion of its AR Results that was not subject to
> challenge by a party—including Commerce's treatment of
> Martas and Aset. See Zhaoqing Tifo New Fibre Co. v. United
> States, 41 CIT __, __, 256 F. Supp. 3d 1314, 1334 (2017)
> ("What Commerce was not permitted to do on remand was to
> reopen and re-review the settled issue of the agency's decision
> in its Final Determination . . . ."). This means that Commerce,
> upon determining not to treat Nur as a cross-owned input
> supplier, could not have avoided inconsistency by modifying its
> treatment of Martas and Aset unless authorized by law. Here,
> Commerce was authorized only to review its treatment of Nur.

*Kaptan II* at 26 (**Appx36**).

### 2.    It Was Reasonable for Commerce to Consider Nur's Business Activities

Petitioners challenge Commerce's consideration of Nur's business activities

in three ways. First, they argue that the analysis was inconsistent with the

regulations and Preamble because it took into consideration Nur's main business

activities rather than only its "input production." Pet. Br. at 35. Second, they

argue that that the analysis was inconsistent with previous cases. *Id*. And third

they argue that Commerce's reliance on the "extremely limited transactions"

between Nur and Kaptan was flawed. *Id*. All of these arguments should be

rejected.

CONFIDENTIAL INFORMATION DELETED

### a.     Summary of Facts and Commerce's Finding

Nur "produces and sells fishing vessels and other ships".  Kaptan SQR at 6 (**Appx10010**).  This industry is distinct from, and has no connection to, subject merchandise or steel production in general.  Indeed, it is an industry much farther downstream than rebar.  Evidence on the record demonstrates that steel scrap is a very miniscule by-product to Nur's production and that this scrap purchase from Nur was a very miniscule component of Kaptan's production of scrap purchased.  Further, Nur's production of ships, of which steel scrap is the by-product, is the production of a much higher-value product than rebar.  In addition,

(1) the sale of scrap represented [   #   ] of Nur's sales of all products during the period of review ("POR") by value– confirming that the generation of scrap is a minuscule portion of the Nur's production.  Kaptan SQR at Exhibit 11 (**Appx10430**).

(2) Nur's financial statement shows that this small sale of scrap, amounting to $13,675.37[19], is the only sale or purchase of goods between Nur and Kaptan.  *Id*. at Exh. 9 (**Appx10414-Appx10415**); Draft Comments at 9-10 (**Appx2200-2201**).

(3) Nur does not supply Kaptan with scrap on a regular basis.  The company has been in business since 2005.  Kaptan SQR at 6 (**Appx10010**).  Kaptan had been involved in three CVD reviews prior to the challenged review and this is the first review in which Nur sold scrap to Kaptan.  The transient and sporadic nature of Nur's scrap sales (i.e., that they had none in previous PORs) constitutes substantial evidence that Nur is not merely a link in the production process.

---

[19] Kaptan no longer claims confidential treatment of this figure.  This is a conversion of the Turkish Lira figure in the financial of 64,547.75 TL,

(4) Nur sold 0.0031% of the scrap Kaptan purchased during the POR. This miniscule amount of scrap was used for both subject and non-subject merchandise. Affiliation Response at Exh. 3 (**Appx165**).

Under these facts, there is no basis to conclude that the purpose of a subsidy to Nur was to benefit Kaptan's production. As a result, Commerce correctly explained that "Nur's primary business is shipbuilding, which involves the production of a product that is much further downstream than the downstream products produced by Kaptan Demir, most notably rebar". Commerce then concluded:

> Upon a review of Nur's business activities, which consist largely of shipbuilding, we find that the production processes involved in shipbuilding are far removed from Kaptan Demir's downstream production processes, especially given the extremely limited transactions between the two companies. Therefore, we find that Nur's business activity is not "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble*. Simply put, the facts on the record do not support the premise that subsidies given to a shipbuilder would be given to "benefit the production of both the input and downstream products."

Final Remand at 19 (**Appx2241**).

> **b.** Commerce's Focus on Nur's Shipbuilding Was Reasonable

Petitioners first argue that Commerce's focus on Nur's primary business activity was inconsistent with the *Preamble* and that Commerce instead should have focused solely on Nur's "input production." Pet. Br. at 36. Petitioners further note that the phrase "business activities" is not in the *Preamble*.

Petitioners' argument fails. Commerce fully explained the purpose of its business activities analysis and how it satisfied the requirements of the *Preamble*:

> "primarily dedicated" normally involves an analysis of both the input supplier's entire production (*i.e.*, the nature of the supplier's operations) and input production itself and its relationship to downstream products (*i.e.*, nature of the input). These concepts are reflected in the discussed factors in our analysis relating to whether a product is "merely a link in the overall production chain" and an input supplier's business activities.

Final Remand at 18 (**Appx2240**). Because scrap is a by-product, it is not possible to review only Nur's input production. Instead, the only way to analyze scrap production is to look at the nature of the production that results in the scrap, i.e., the shipbuilding. As the Trial Court found:

> Domestics again do not explain why the considerations that Commerce outlined in the Preamble cannot be applied using terms that Commerce did not employ verbatim in the Preamble. Nor do Domestics explain their position on the issue of where the focus of the word "production" in § 351.525(b)(6)(iv) and the Preamble lies. It is further unclear why an analysis of Nur's shipbuilding activities is irrelevant to "production of the 'input,' and whether the input feeds a higher value-added product." Id. at 20. Nur produces steel scrap, after all, by building ships. Remand Results at 5.

*Kaptan II* at 18 (**Appx28**).

Commerce's focus on Nur's primary business activities was a reasonable interpretation of the *Preamble*. This interpretation has been used by Commerce in various cases and has been upheld by the CIT. As explained in *Nucor*,

Commerce concluded that Plantec's primary business activity, "the construction of industrial plants," along with its "diverse" business functions, is insufficiently tied to "steelmaking or constructing steel-making plants." . . .

Commerce has offered reasoned analysis supporting its consideration of primary business activities, noting that such consideration helps the agency to determine "whether an input supplier's production is 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be 'to benefit the production of both the input and downstream products.' " Remand Results at 30 & n.83 (quoting *CVD Preamble*, 63 Fed. Reg. at 65,401). In other circumstances, Commerce may examine subsidies in the context of the upstream subsidy statutory provision. *See CVD Preamble*, 63 Fed. Reg. at 65,401 ("Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.").

*Nucor Corp.,* 653 F. Supp. 3d at 1308

<u>c.</u>    <u>Past Cases Do Not Render Commerce's Determination Unreasonable</u>

Petitioners next contend that past Commerce cases do not support

Commerce's business activities analysis in its Final Remand. Pet. Br. at 37-39.

Petitioners refuse to recognize that Commerce's primarily dedicated analysis is

highly case specific and that Commerce in this case did not rely solely on Nur's

primary business activities. This was one of several factors considered. Each of

the cases Petitioners discuss, *Fluid End Blocks*, *Glass Containers, CTL Plate* and

*OCTG from Turkey* stand for the general premise that Commerce does in fact

consider business activities in its primarily dedicated analysis.  Thus, Petitioners

complaint can only be as to how Commerce considered the business activities in

those cases as compared to this one.

      As the Trial Court concluded, Petitioners have not identified any real error in

Commerce's analysis by referencing these cases.  *Kaptan II* at 20-21 (**Appx30-**

**Appx31**).  In each of these cases, Commerce considered the business activities of

the supplier as one of several factors in its analysis.  None of these cases have a

factual premise that would *require* Commerce to make a specific determination in

this case regarding Nur's activities.  The Trial Court addressed this squarely:

> As with *Fluid End Blocks*, however, Commerce merely invoked
> *CTL Plate* in the Remand Results as an example of a
> determination where Commerce considered a respondent's
> business activities as one factor—not, as Domestics appear to
> suggest, as the only factor. . . *CTL Plate* and *Fluid End Blocks*
> are thus indistinguishable from these Remand Results in that
> they exemplify Commerce's consideration of an input
> supplier's business activity alongside other factors in its
> "primarily dedicated" analysis. Together with *Glass*
> *Containers*, they constitute analogous precedents that do not
> identifiably "underscore the problems" with Commerce's
> analytical approach in this case.

*Kaptan II* at 20 (**Appx30**).

54

> d.    Commerce's Reference to Extremely Limited
>        Transactions Was Also Reasonable

Petitioners argue that Commerce "has not adequately supported its finding

that Kaptan and Nur's extremely limited intercompany transactions justify its

decision not to cross-attribute subsidies received by Nur."  Pet. Br. at 42.

Petitioners' complaint is that Commerce's relied on "limited" transactions to make

its decision when Commerce simultaneously found that the amount of scrap sold

by Nur to Kaptan was an irrelevant factor.  *Id*. at 40-41.  Commerce's

consideration on the level of interaction between Nur and Kaptan is not

unreasonable.

In Commerce's Draft Redetermination, Commerce focused on the amount

of transactions between Nur and Kaptan, not just scrap sales.  Draft Remand at 16,

citing to Kaptan's financial statements (**Appx2185**).  Commerce explained in that

draft determination that Nur's financials did not show what exactly the

transactions were but that the large amount of transactions showed that the

companies were highly integrated.  *Id*.  In its comments on the Draft Remand,

however, Kaptan pointed out a significant factual error in this analysis – the very

next page of the financial detailed the exact nature of the transactions.  Kaptan

explained:

> This shows that a vast majority of the transactions are service
> and financial related, with no purchases of goods from any

55

other affiliates and only a small sale of goods to an affiliate.
The provision of services generally do not rise to the level an
"input supplier" under the cross ownership regulations
(leasing and financing definitely do not) and thus these
affiliated transactions do not support a vertically integrated
production process between Nur and other member
companies of the Cebi Family. Indeed, it shows the opposite;
all the services are financial, leasing or port services and
unrelated to production altogether. These affiliated
transactions only show a small amount . . . of commercial
goods. This matches the exact amount Kaptan reported for its
purchases of scrap from Nur. *See* Kaptan Affiliation
Response at Exhibit 2. Thus, the reference to the affiliated
transactions section of Nur's tax return (financial statement)
in fact shows an extremely limited amount of commercial
good transactions between the affiliates, all of which are
accounted for by this minuscule amount of scrap sold to
Kaptan.

Draft Remand Comments at 10 (**Appx2201**).  In response to this argument,

Commerce correctly changed its position in its Final Remand:

In its comments on the Draft Remand, Kaptan Demir raised
certain case-specific facts that Commerce should analyze in
determining whether Nur's steel scrap is primarily dedicated to
Kaptan Demir's downstream production. These factors include
the business activities of the input supplier (*i.e.*, Nur), whether
Nur's relationship with Kaptan Demir constitutes a vertically
integrated supply chain, and the extremely limited nature of the
transactions between Nur and Kaptan Demir during the
POR.105 It is important to note that the significance of the
limited nature of these transactions is not based upon volume,
as Kaptan Demir argues, but instead, an analysis of the totality
of the facts contained within the transactions between Nur and
Kaptan Demir. Upon consideration of Kaptan Demir's
arguments, we find that facts on the record do not support a

> finding that the steel scrap generated by Nur is primarily
> dedicated to Kaptan Demir's downstream production.

Final Remand at 25 (**Appx2247**).  Petitioners protest that Commerce created the

very "miniscule" standard it disavowed is overly simplistic.  The reality is that

Commerce clearly explained that it is not setting such a standard but instead

merely considers the volume or amount of interactions between the input supplier

and producer as one factor in its analysis.  The difference between a factor to

consider and a hard-lined standard is significant.  Commerce's approach

reasonably permits Commerce to have flexibility to apply its primarily dedicated

criteria to a variety of different fact patterns in a consistent manner.

The Trial Court addressed Petitioners' argument on this issue as follows:

> Commerce clearly indicated that the limited nature of
> transactions between Nur and Kaptan supported a finding that
> Nur's shipbuilding was its own selfcontained enterprise with
> little connection to Kaptan's production of steel—except, that
> is, to Kaptan's purchase of Nur's byproduct scrap as an input. .
> . . Commerce did not merely state that "the limited nature of
> these transactions is not based on volume," which would imply
> (as Domestics suggest) that the scrap sales were somehow
> limited in a manner other than their volume. Commerce stated,
> rather, that "the significance of the limited nature of these
> transactions is not based upon volume . . . ." Remand Results at
> 25 (emphasis added). In other words, Commerce did not
> conclude that Nur's shipbuilding activities cut against a finding
> of primary dedication simply because the amount of steel scrap
> that Nur sold to Kaptan was small. As Commerce instead
> explained, Commerce drew this conclusion because the amount
> of steel scrap that Nur sold to Kaptan was insignificant as an

element within the totality of Nur's complex shipbuilding operations

*Kaptan II* at 25 (**Appx35**).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons discussed above, Kaptan respectfully requests that this Court affirm the decision of the Court of International Trade.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz*
Ned H. Marshak

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000

*1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

Dated: June 11, 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28.1(e)(2) and 32(a)(7)(B).

This brief contains 13,697 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally spaced type face using Word 2010 in Times New Roman 14 point font.

*/s/ Andrew T. Schutz*___
Andrew T. Schutz
*Counsel for Plaintiff-Appellee Kaptan*