## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., COLAKOGLU DIS TICARET A.S., COLAKOGLU METALURJI A.S.,

*Plaintiffs – Appellees*

v.

UNITED STATES,

*Defendant – Appellee*

v.

REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, STEEL DYNAMICS, INC.,

*Defendants – Appellants*

Appeal from the United States Court of International Trade in
Case No. 1:21-cv-00565, Judge Gary S. Katzmann

**REPLY BRIEF OF DEFENDANTS-APPELLANTS
REBAR TRADE ACTION COALITION AND ITS INDIVIDUAL
MEMBERS**

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action
Coalition and its individual members*

Dated: July 12, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## **CERTIFICATE OF INTEREST**

| **Case Number** | 2024-1431 |
|---|---|
| **Short Case Caption** | Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States |
| **Filing Party/Entity** | Rebar Trade Action Coalition and its individual members - Defendant-Appellants |

> **Instructions:**
>
> 1. Complete each section of the form and select none or N/A if appropriate.
>
> 2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
>
> 3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
>
> 4. Please do not duplicate entries within Section 5.
>
> 5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/16/2024

Signature: /s/ Alan H. Price

Name: Alan H. Price

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Rebar Trade Action Coalition | | |
| Nucor Corporation | | |
| Commercial Metals Company | | |
| Gerdau Ameristeel US Inc. | | |
| Steel Dynamics, Inc. | | |
| Byer Steel Group, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................1

II.    BACKGROUND .........................................................................1

III.   ARGUMENT................................................................................4

    A.     This Court May Reinstate Commerce's Original Determination ...............................................................5

    B.     The Regulation and Preamble Support Cross-Attribution ....................6

    C.     Commerce's Determination that Nur's Scrap Was Not "Primarily Dedicated" to Kaptan's Steel Production is Inadequately Supported and Explained................................10

    D.     Commerce's Analysis of Nur's Business Activities Was in Error.......................................................................20

IV.    CONCLUSION..........................................................................27

i

## STATEMENT OF CONFIDENTIAL MATERIALS OMITTED

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1 )(B), this brief contains confidential material that has been omitted. The material omitted from page 25 describes certain transactions between affiliated parties.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Silicon Techs. v. United States*,
    334 F.3d 1033 (Fed. Cir. 2003) ................................................................5

*Gujarat Fluorochemicals Ltd. v. United States*,
    617 F. Supp. 3d 1328 (Ct. Int'l Trade 2023) ................................7, 13

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .......................................21

*Nucor Corp. v. United States*,
    653 F. Supp. 3d 1295 (Ct. Int'l Trade 2023) .......................................21

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) .........................................................17

**Regulations**

19 C.F.R. § 351.525(b)(1) ......................................................................6

19 C.F.R. § 351.525(b)(5)(ii) ..................................................................6

19 C.F.R. § 351.525(b)(6)(i) ...................................................................2

19 C.F.R. § 351.525(b)(6)(iv) ................................................2, 6, 10, 20

19 C.F.R. § 351.525(b)(6)(vi) ..................................................................2

**Administrative Materials**

*Certain Glass Containers from the People's Republic of China*,
    85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) ....................21

*Certain Softwood Lumber Products from Canada*,
    57 Fed. Reg. 22,570 (Dep't Commerce May 28, 1992) .......................7

*Concrete Reinforcing Bar from Mexico and Turkey*,
    Inv. Nos. 701-TA-502 and 731-TA-1227, USITC Pub. 5122 (Oct.
    2020) (Review) ..................................................................................15

*Countervailing Duties*,
   63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)............................*passim*

*Cut-to-Length Carbon -Quality Steel Plate from India, Indonesia, and South Korea*, Inv. Nos. 701-TA-388, 389, and 391 and 731-TA-817, 818, and 821, USITC Pub. 5455 (Aug. 2023) (Fourth Review)
   ...................................................................................................................14

*Fluid End Blocks from China, Germany, India, and Italy*,
   Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468, USITC Pub. 5152 (Jan. 2021) (Final) ..............................................15

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) .....................................20

*Steel Concrete Reinforcing Bar from the Republic of Turkiye*,
   89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) .......................................11

**Other Authorities**

Compl., *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
   Ct. No. 24-00096 (Ct. Int'l Trade June 27, 2024), ECF No. 9 ...........................11

## I.    INTRODUCTION

The Rebar Trade Action Coalition and its individual members (collectively "RTAC"), Defendants-Appellants in this proceeding, hereby reply to the response briefs filed by Defendant-Appellee the United States and Plaintiff-Appellee Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"). *See* Resp. Br. for Def.-Appellee the United States (June 11, 2024), ECF No. 21 ("Government's Br."); Corrected Resp. Br. of Pl.-Appellee Kaptan Demir Celik Endustrisi ve Ticaret A.S. (June 26, 2024), ECF No. 31 ("Kaptan's Br.").

## II.    BACKGROUND

This appeal concerns certain steel scrap that Kaptan, a Turkish producer of steel concrete reinforcing bar ("rebar"), purchased from a cross-owned affiliate and used in its production. In its original determination in the review covering Kaptan's U.S. sales of rebar during calendar year 2018, the U.S. Department of Commerce ("Commerce") determined, on the basis of Kaptan's purchase of this input, to attribute subsidies received by the affiliate to the combined value of sales of that input and Kaptan's downstream production. Appx1829-1834. After a remand from the U.S. Court of International Trade ("CIT"), Commerce reversed its original finding, and determined not to attribute the subsidies. Appx2223-2255.

In countervailing duty proceedings involving companies that are cross-owned to the degree that one company can use or direct the other's assets as if they were its own, Commerce normally attributes subsidies to sales of the products produced by

1

the company receiving the subsidy. 19 C.F.R. §§ 351.525(b)(6)(i) & (vi). However, where the company receiving the subsidy provides an input to a cross-owned downstream producer, Commerce will attribute the subsidy to the combined sales of the input and downstream product, so long as "production of the input product is primarily dedicated to production of the downstream product." *Id.* § 351.525(b)(6)(iv). This prevents companies from avoiding countervailing duty exposure by separately incorporating divisions that produce inputs used "almost exclusively" in manufacturing a higher-value downstream good. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) (final rule) ("Preamble").

During the 2018 review period, steel scrap was Kaptan's only significant production input. Appx164-165, Appx1022-1023, Appx1026, Appx1064-1065. Kaptan purchased some of this scrap from cross-owned affiliates, including Nur Gemicilik ve Tic. A.S. ("Nur"), which generated the scrap as a byproduct of shipbuilding activities. Appx148-150, Appx1668, Appx1772-1773. Commerce found that this scrap was primarily dedicated to Kaptan's downstream production, notwithstanding Kaptan's arguments that Kaptan purchased a *de minimis* amount of scrap from Nur, and that Nur's business focus was shipbuilding, not scrap generation. Appx1832-1834.

Kaptan appealed and the CIT remanded for further consideration. Appx1-10. Commerce reversed course in the final remand results. It noted five factors that it has considered in past cases, three of which it viewed as supporting cross-attribution:

(1) Nur's generation of scrap as a byproduct of shipbuilding qualified as "production of the input product" within the meaning of 19 C.F.R. § 351.525(b)(6)(iv);

(2) Nur's scrap was usable in Kaptan's downstream production and was in fact so used;

(3) Nur had no customers for scrap other than Kaptan.

Appx2238-2239; Appx2247.[1] However, the agency found two factors weighed against cross-attribution. Specifically, it found that Nur's scrap was not primarily dedicated to Kaptan's downstream steel production within the meaning of 19 C.F.R. § 351.525(b)(6)(iv). Appx2237-2240. Commerce also found that Nur's business focus on shipbuilding supported non-attribution of Nur's subsidies, particularly "given the extremely limited transactions" between Kaptan and Nur. Appx2241. After the CIT affirmed the remand results, RTAC appealed to this Court.

---

[1] The agency also rejected Kaptan's assertion that the quantity of scrap traded between the companies was relevant to its analysis. Appx2235-2236.

## III.  **ARGUMENT**

Commerce's original treatment of the steel scrap that Kaptan purchased from Nur was consistent with the agency's regulations, the Preamble, and judicial and agency precedent. By contrast, its remand results are inadequately explained and supported. This Court should therefore reinstate the original determination or, in the alternative, send the remand results back to Commerce for further consideration.

Appellees argue that the original determination is not before the Court, making its conformity with the standard of review irrelevant. Government's Br. at 19; Kaptan's Br. at 21-26. As to Commerce's remand redetermination, the Government argues that Commerce reasonably determined that Nur's scrap was not primarily dedicated to Kaptan's downstream production. Government's Br. at 20-25; *see also id.* at 31-34. The Government then claims that Commerce's analysis of Nur's business activities was lawful and supported by substantial record evidence. *Id.* at 25-31. Kaptan's arguments with respect to the remand redetermination track those of the Government. Kaptan's Br. at 29-58.

As detailed below, Appellees' arguments are not compelling. First, they do not persuade that Commerce's original determination is outside the Court's purview. Nor do they demonstrate that the remand results comport with the standard of review. Rather, Commerce's remand results are inconsistent with the purpose and the language of its regulation and the Preamble. Further, Commerce's remand analysis

of whether the scrap steel at issue was "primarily dedicated" to downstream production is inadequately supported and explained. Likewise, the weight that Commerce accorded to Nur's "business focus" is at odds with the regulation/Preamble, and inadequately supported and explained. Accordingly, this Court should either reinstate the agency's original determination or send the remand results back to Commerce for further consideration.

### A.  This Court May Reinstate Commerce's Original Determination

Appellees argue that this Court cannot reinstate the agency's original determination. Government's Br. at 19; Kaptan's Br. at 21-26. Appellees are incorrect. The entire record of an appealed proceeding is before the Court when it conducts its review. *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036-37 (Fed. Cir. 2003). The entire record includes, naturally, the agency's original determination, regardless of how the lower court treated that original determination. Further, the agency's remand determination is clearly subject to this Court's *de novo* review for conformity with 19 U.S.C. § 1516a(b)(1)(B)(i). *See, e.g., id.* at 1036.

As explained in RTAC's opening brief, the agency's treatment on remand of Nur's scrap is not in conformity with the statute's requirements, while the original treatment of that scrap was. The Court thus has two options. It can vacate the unexplained and unsupported remand determination and reinstate the agency's

original treatment of Nur's scrap brief. Alternatively, it can send the remand determination back to the agency for further consideration.

## B.     The Regulation and Preamble Support Cross-Attribution

Commerce's regulations specify the conditions under which the agency will attribute subsidies to one or more products. 19 C.F.R. § 351.525(b)(1). Where a single company produces both an input and downstream goods using that input, Commerce will attribute subsidies related to the input to the company's combined sales of both the input and the downstream goods. *Id.* § 351.525(b)(5)(ii); *see also* Preamble, 63 Fed. Reg. at 65,400. Commerce originally intended, in drafting its regulations, not to attribute to downstream production any subsidies received by a producer's cross-owned input suppliers. Preamble, 63 Fed. Reg. at 65,400-01. But commenters pointed out that a loophole would result, whereby companies might escape countervailing duty liability by separately incorporating their input-producing operations. *Id.* Commerce therefore adopted final regulations requiring attribution of a cross-owned input supplier's subsidies to the combined sales of the input and the downstream products that the input benefits, where the "production of the input product" is "primarily dedicated" to the "downstream product." *Id.*; 19 C.F.R. §§ 351.525(b)(5)(ii) and (b)(6)(iv).

In promulgating Section 351.525(b)(6)(iv), Commerce explained that a "primarily dedicated" input is one used "almost exclusively" to produce a "higher

value added product," thereby forming "merely a link in the overall production chain" for the value added product. Preamble, 63 Fed. Reg. at 65,401. It provided two examples of inputs/products meeting this definition: (1) stumpage, *i.e.*, timber, used to produce lumber,[2] and (2) semolina, which is used to produce products like pasta. *Id.* Both examples involve downstream goods that have few, if any, inputs beside the inputs named in the examples, and consequently rely heavily on the named inputs for their overall characteristics. *Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1337 (Ct. Int'l Trade 2023) (describing these examples as involving inputs with a "close physical relationship" to the downstream product). Moreover, there appear to be few products other than the named downstream goods — pasta, lumber — into which the named inputs could be directly used.[3]

Commerce also provided the contrasting example of plastics, as used in the production of automobiles or appliances. Preamble, 63 Fed. Reg. at 65,401. As the example implies, plastics may be used in both types of downstream product, but plastics are unlikely to be the primary input in their production, or to drive their

---

[2]    Stumpage is also used to produce pulp, as well as saleable byproducts such as chips and sawdust. *Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,577-78 (Dep't Commerce May 28, 1992) (final affirmative countervailing duty deter.).

[3]    *See* note 2, *supra*, regarding products manufactured from stumpage. Semolina, being a type of flour, would appear directly usable in bread, cakes, and similar goods.

overall characteristics. And while plastics may be commonly used to produce higher value-added products, there are many products in which plastics may form a direct input beyond automobiles or appliances. Because of the attenuated relationship between plastics as an input and automobiles/appliances as downstream goods, "it is not reasonable to assume that the purpose of a subsidy to {a plastics producer} is to benefit the {production of automobiles or appliances}." *Id.* The logical corollary of this observation, of course, is that where there is a close and direct relationship between the input and the downstream good — as with timber/lumber and semolina/pasta — it is reasonable to make that assumption. *See id.*

The foregoing illustrates several key points underlying this appeal. First, 19 C.F.R. § 351.525(b)(6)(iv) was meant to harmonize (1) the agency's treatment of subsidies tied to production of an input by a company that is cross-owned with a downstream producer that uses that input with (2) the agency's treatment of subsidies benefitting production of an input by a company that also makes a downstream product with that input. Second, the regulation is focused on the relationship between "the input product" and the "downstream product." Third, the Preamble, by focusing its discussion of the regulation on examples that concern that directness or attenuation of the relationship between the input and downstream product, confirms that the regulation is primarily concerned with that relationship, rather than other factors — such as the input supplier's business focus.

In its response brief, the Government notes that RTAC does not challenge either the regulation or the Preamble, implying that this is a flaw or error in RTAC's challenge. Government's Br. at 19. But there is no reason for RTAC to challenge legal sources that support its position that Commerce is meant to focus on the relationship between the input and output products. Likewise, while the Government argues that RTAC has ascribed "outsized significance" to the physical relationship between scrap and rebar, *id.* at 33-34, it is the regulation and Preamble that ascribe particular importance to this relationship.

The Government frames the "crucial question" underpinning 19 C.F.R. § 351.525(b)(6)(iv) as that of whether it is reasonable to conclude that the purpose of an input subsidy is to benefit both input and downstream products. Government's Br. at 16, 18. But this question can be properly answered only in the context of the reasons for which Commerce adopted the regulation (harmonization of treatment of subsidies tied to input products) and the analytical methodology outlined in the Preamble. As further detailed below, Commerce's analysis of the record facts here regarding the relationship between Nur's scrap and Kaptan's downstream production is at odds with both the reasons behind the regulation and the Preamble's methodology. That analysis is therefore inadequately explained and unsupported. Likewise, the heavy weight that the agency gave to Nur's business focus is at odds

with the regulation and Preamble, and its overall treatment of Nur's business activities are inadequately supported and explained.

### C. Commerce's Determination that Nur's Scrap Was Not "Primarily Dedicated" to Kaptan's Steel Production is Inadequately Supported and Explained

The agency's regulations and Preamble confirm that, in determining whether to attribute subsidies received by a cross-owned input supplier to the sales of the downstream product, the agency must focus on the relationship between the input product — or the "production of the input product" and the downstream good. 19 C.F.R. § 351.525(b)(6)(iv); Preamble, 63 Fed. Reg. at 65,400-01. The goal of the analysis is to determine whether the input is of a type that is "merely a link in the overall production chain" for "a higher value added product," such that it makes sense to find that the subsidy was meant to benefit both the input and the downstream product. Preamble, 63 Fed. Reg. at 65,401.

As explained in RTAC's opening brief, rebar is typically produced by melting steel scrap, forming the melted scrap into billet (a semi-finished good), and then further processing the billet into rebar. *See* Opening Br. of Def.-Appellants RTAC and its Individual Members (Apr. 2, 2024), ECF 16 at 6 ("RTAC's Opening Br."). Kaptan reported here that it produced rebar using the typical process, identifying steel scrap as the only raw material used in its production. Appx165-166, Appx1022-1023, Appx1026, Appx1064-1065. Further, steel scrap lacks any obvious

commercial use except in the production of downstream steel mill products like rebar, through remelting. In other words, steel scrap, in its relation to steel mill products like rebar, is exactly the sort of good that the Preamble indicates is a "primarily dedicated" input. Unsurprisingly, Commerce has repeatedly found that steel scrap is "primarily dedicated" to the production of downstream steel mill products including rebar. *See* RTAC's Opening Br. at 15-17 (collecting cases).[4]

In its response brief, the Government attempts to show that Commerce's contrary assessment of the relationship between scrap and rebar on remand was appropriately explained and supported. Government's Br. at 17-25, 31-32. It argues that the agency is not obligated by any blanket rule or precedent to treat steel scrap as primarily dedicated to downstream steel production. *Id.* at 17-22, 31-32. It claims that Commerce's assessment of the relationship between scrap and rebar was adequately explained and supported in the record, inclusive of the agency's reliance on the "unprocessed" nature of the scrap that Nur sold to Kaptan. *Id.* at 22-24. It

---

[4]     As noted in RTAC's opening brief, Commerce found Nur's scrap primarily dedicated to Kaptan's downstream rebar production in the final results of the 2019 and 2020 reviews of the countervailing duty order on Turkish rebar. RTAC's Opening Br. at 15-16 n.4. Since the opening brief was filed, Commerce has also found Nur's scrap to be primarily dedicated to Kaptan's downstream rebar production in the final results of the 2021 administrative review. Kaptan has not appealed this treatment. *See* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkiye*, 89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) (final results of countervailing duty administrative review; 2021) at 8-9; *see also* Compl., *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Ct. No. 24-00096 (Ct. Int'l Trade June 27, 2024), ECF No. 9.

avers that Commerce's disparate treatment of Nur and other cross-owned companies that supplied scrap to Kaptan is of no moment. *Id.* at 24-25. Finally, it argues that Commerce's determination that Nur's scrap was not primarily dedicated to Kaptan's production comports with the overall purpose of 19 C.F.R. § 351.525(b)(6)(iv). *Id.* at 16, 18. These arguments are not persuasive.

The Government begins by arguing that there is no blanket rule that Commerce must find steel scrap to be primarily dedicated to downstream steel goods. *Id.* at 17-18, 31-32. Further to this claim, the Government argues that Commerce appropriately found that steel scrap is not "merely a link" into rebar production, but is instead a link of some other stripe. *Id.* at 20-21.

But RTAC has not argued that any blanket rule regarding scrap and downstream steel goods exists. Rather, RTAC argues that Commerce's analysis of the relationship between inputs and downstream goods must be consistent with the regulation and guided by the Preamble.[5] Relevantly, the regulation and Preamble indicate that the distinction between a "link" and a "mere{} link" rests on how closely and directly the output product depends on the input product for its characteristics, and the degree to which the input is used across a wide variety of

---

[5] That said, the very few cases in which Commerce has found scrap not to be primarily dedicated to downstream production of a steel-intensive good are factually distinguishable. *See* discussion *infra* at 21-22; *see also* RTAC's Opening Br. at 22-24, 32-33, 37-39.

industries and processes. *See* Preamble, 63 Fed. Reg. at 65,401; *see also Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1337. As discussed above, steel scrap, in its relation to rebar and similar steel mill products, is just the sort of good that the regulation and Preamble indicate is a "primarily dedicated" input.

Nonetheless, the Government claims that there are many downstream products across industries that incorporate steel scrap in some way. Government's Br. at 21. But as the Preamble's examples indicate, the question is not how many downstream products could eventually incorporate the relevant input in some indirect fashion. After all, stumpage/timber is an indirect input into many types of products that incorporate wood. The fact that stumpage/timber may have the same kind of attenuated relationship to these finished goods that plastics have to automobiles or appliances means nothing for the relationship between stumpage/timber and the limited number of goods in which stumpage/timber is used directly — lumber, pulp, chips, and sawdust. Too, there are a limited number of processes by which stumpage/timber become lumber, pulp, chips, and sawdust — essentially, sawing or chipping. As such, there are neither a wide variety of industries nor a wide variety of processes that use stumpage/timber in direct production operations.

The Government argues that Commerce properly considered steel scrap to be a common input among a variety of products and industries, because it is used to

produce products beyond rebar, including steel plate and non-subject steel bars. *Id.* at 21-22. But this is like saying that semolina is used to produce pasta of different shapes. These steel products all use steel scrap as a primary production input that provides crucial characteristics.[6] Further, the scrap is incorporated into these goods through remelting, rather than through a wide variety of distinct processes. Too, the agency has previously rejected the notion that the "value added downstream product" must be the subject merchandise uniquely. RTAC's Opening Br. at 20 (glossing cases). As such, rather than demonstrate the reasonableness of Commerce's approach, the Government calls it into question. At the very least, the Government underscores a lack of necessary explanation on Commerce's part.

The Government also notes that scrap can be used in the production of forged steel fluid end blocks ("FEBs"). Government's Br. at 18, 22. But scrap appears to be a more indirect input into these products, which are produced primarily through the forging of ingots, than it is into rebar. *Compare Concrete Reinforcing Bar from*

---

[6] Kaptan points out that it is possible to make these products without using scrap, or with relatively little scrap, using "first time steel," *i.e.*, steel newly produced through blast furnace operations. Kaptan's Br. at 42; *see also Cut-to-Length Carbon -Quality Steel Plate from India, Indonesia, and South Korea*, Inv. Nos. 701-TA-388, 389, and 391 and 731-TA-817, 818, and 821, USITC Pub. 5455 (Aug. 2023) (Fourth Review) at I-19 (discussing blast furnace and electric arc furnace steelmaking), *available at* https://www.usitc.gov/publications/701_731/pub5455.pdf. But Kaptan did not produce rebar or any other products using blast furnace operations, and it reported scrap as its only production input. Appx165-166, Appx1022-1023, Appx1026, Appx1064-1065.

*Mexico and Turkey*, Inv. Nos. 701-TA-502 and 731-TA-1227, USITC Pub. 5122 (Oct. 2020) (Review) at I-26, *available at* https://www.usitc.gov/publications/701_731/pub5122.pdf, *with Fluid End Blocks from China, Germany, India, and Italy*, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468, USITC Pub. 5152 (Jan. 2021) (Final) at I-18 – I-21, *available at* https://www.usitc.gov/publications/701_731/pub5152.pdf. The fact that Commerce did not find scrap primarily dedicated to downstream FEBs production in its investigation into German FEBs is thus of no clear relevance here. The case is also distinguishable for other reasons, as explained in RTAC's opening brief. RTAC's Opening Br. at 32.

The Government next attempts to rehabilitate Commerce's ill-explained reliance on the "unprocessed" nature of the scrap that Kaptan obtained from Nur, going well beyond anything that Commerce articulated. Government's Br. at 22-24. For example, the Government enlarges on Commerce's bare observation that Nur did not specially process the scrap that Kaptan used in its production operations. *Id.* at 22-23. Specifically, the Government explains that had Nur processed the scrap prior to selling it to Kaptan, the uses of that scrap would potentially have been narrowed to the point that the scrap would be "merely a link" in Kaptan's production chain for higher value-added products. *Id.* But not only must Commerce's remand determination stand or fall on its own merits, the Government's *post-hoc* explanation

is unconvincing.[7] Kaptan used Nur's scrap as-is in producing rebar; further processing would appear unnecessary to fit it to those operations and would not appreciably alter the close relationship between that scrap and Kaptan's downstream production. *See* RTAC's Opening Br. at 28-30.

Equally unconvincing— is the Government's contention that the remand proceedings in the litigation concerning the 2018 administrative review of the order on South Korean cut-to-length plate are irrelevant. Government's Br. at 23-24. But Commerce relied on the first remand results in that litigation as support for its conclusions here. Appx2240, Appx2250. Those results appear to be the only instance beside the proceeding at bar in which Commerce has attempted to distinguish between processed and unprocessed steel scrap; they were rejected by the lower court and have since been superseded by results that do not make this distinction. *See, e.g.*, RTAC's Opening Br. at 28-29.

Similarly misplaced is the Government's response to RTAC's observation that Commerce's treatment of Nur's scrap on remand is inconsistent with the agency's treatment of scrap supplied by other cross-owned Kaptan affiliates. Government's Br. at 24-25. The Government implies that RTAC is advocating for Commerce to

---

[7] The Government's explanation follows the reasoning laid out by the lower court. RTAC respectfully submits that the lower court erred in articulating bases and explanations for the agency's action that the agency did not put forth itself. *See* Government's Br. at 22-23; *see also* Kaptan's Br. at 43-44; Appx25.

cease treating these other affiliates' scrap as primarily dedicated to Kaptan's production. *Id.* at 25. But this is an argument that RTAC has never made nor had reason to make. Rather, RTAC has pointed out that by finding Nur's scrap not primarily dedicated to Kaptan's downstream production, Commerce treated apparently indistinguishable scrap supplied by similarly situated cross-owned affiliates distinctly. RTAC's Opening Br. at 31-32. Distinct treatment of similar situations is a hallmark of arbitrary action. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (stating that it is "well-established that an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently" (internal quotation and citation omitted)).

Finally, the Government claims that Commerce's determination that Nur's scrap was not "primarily dedicated" to Kaptan's downstream production comports with the overall purpose of 19 C.F.R. § 351.525(b)(6)(iv). Government's Br. at 16, 18. As noted above, the Government frames the "crucial question" in this regard as whether it is reasonable to conclude that the purpose of subsidies to Nur is to benefit both input and downstream products. *Id.* But this question can meaningfully be answered only in the context of the reasons for which Commerce adopted the regulation (harmonization of treatment of subsidies tied to input products) and the analytical methodology outlined in the Preamble. Commerce's analysis of the record here regarding the relationship between Nur's scrap and Kaptan's downstream

production is at odds with both and is therefore inadequately explained and unsupported.

The analysis also stands to create an unworkable precedent with respect to steel scrap. Steel scrap is generated in the production of steel-intensive goods, *i.e.*, is a byproduct rather than a good produced intentionally in its own right. But it is also the crucial input in the most typical process for producing rebar and similar downstream goods. Allowing steel mills like Kaptan to avoid countervailing duties by separately incorporating their steel-intensive, scrap-generating production operations recreates the loophole that Commerce intended to close through 19 C.F.R. § 351.525(b)(6)(iv).

And as noted above, the Preamble confirms that where the input is one with the type of close physical relationship to the downstream product that is exemplified by timber/lumber or semolina/pasta, it is reasonable to assume that the subsidy benefits both the input and the output. It is reasonable precisely because the input has limited direct use in goods other than steel mill products, and the input is the main, if not sole, input for rebar to which the input provides crucial characteristics. Here, by providing Nur with free land that it used in scrap-generating operations, the GOT subsidized Nur's generation of steel scrap, which Nur then sold exclusively to Kaptan for use in producing downstream, value-added goods including rebar — a product that was made entirely from scrap and to which the scrap imparted crucial

characteristics. Commerce's conclusion that Nur's scrap was nonetheless not "primarily dedicated" to Kaptan's downstream steel production is out of step with the Preamble, underscoring the inadequacy of the agency's explanation and support.

Kaptan's brief in support of Commerce, largely tracks the Government's arguments, while its few points of departure either contribute little or actively undermine the Government's claims. Kaptan's Br. at 29-49. For example, Kaptan argues that steel scrap can be used directly in the production of multiple steel products, whereas semolina — one of the inputs identified in the Preamble — is used almost exclusively in pasta. *Id.* at 42. Putting aside for the moment the fact that the Preamble also identifies stumpage — which is used to produce multiple goods directly, Kaptan fails to grapple with the logic of the agency's example of the relationship between plastics and automotive/automobile production. That example underscores the need to work backward from the finished downstream good to properly understand the relationship between that product and a relevant input. Working backward from an automobile to plastic, one understands that plastic is at best a minor input into an automobile and one that does not necessarily impart core physical or commercial characteristics.

As for Kaptan's contention that the relationship between semolina and a lasagna is attenuated in the way of the relationship between plastics and an automobile, *id.*, RTAC agrees. Working backwards from the finished product of a

lasagna, semolina is not even a direct input, and the finished good incorporates many other ingredients besides those produced using semolina. But the relationship between Kaptan's rebar and input scrap such as that supplied by Nur is not so attenuated. Rather, Kaptan produced rebar using one material input — scrap. For similar reasons, Kaptan's observation that rebar doesn't have to be made using scrap, but could be produced with "fresh steel," fails. *Id.*; *see also* note 6, *supra*.

### D. Commerce's Analysis of Nur's Business Activities Was in Error

In analyzing whether production of an input is primarily dedicated to a higher, value added good, forming "merely a link" in that good's production chain, the regulations and Preamble direct the agency to focus on the relationship between the input product and the downstream product. 19 C.F.R. § 351.525(b)(6)(iv); Preamble, 63 Fed. Reg. at 65,400-01. This is not to say that Commerce has never considered other issues, such as an input supplier's overall business activities, in determining whether to cross-attribute an input supplier's subsidies. But the agency has found that an input supplier's overall business activities are irrelevant in most cases, and "matter{} little" where the input that it supplied is used in the respondent's downstream production, as here. Appx1833; *see also* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) (final results of countervailing duty admin. rev. and rescission, in part; 2019) at 10-11; *Icdas Celik*

*Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

Indeed, in past cases in which the agency has alluded to a supplier's overall business activities as support for a decision against cross-attribution, the issue has been a makeweight, with the real focus being — properly — on the relationship between the input supplied and the downstream product. *See* RTAC's Opening Br. at 32 (regarding investigation into German FEBs); Issues and Decision Memorandum accompanying *Certain Glass Containers from the People's Republic of China*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) (final affirm. countervailing duty deter.) at 68-70 (involving "inputs" that were not incorporated into the downstream product at all, but took the form of production equipment). And while the lower court affirmed Commerce's right to consider business activities in litigation arising from the 2018 administrative review of the order on South Korean cut-to-length plate, it nonetheless remanded due to continuing concerns over the agency's finding that the scrap at issue in that case was not "primarily dedicated" to the respondent's downstream steel production. *See Nucor Corp. v. United States*, 653 F. Supp. 3d 1295, 1308-10 (Ct. Int'l Trade 2023); *see also* RTAC's Opening Br. at 38-39 (discussing factual distinctions between the business activities of the input supplier there and Nur). This decision thus underscores the lesser weight rightfully accorded to "business activities" in the overall analysis.

On remand, Commerce accorded a weight to Nur's business activities that is at odds with the regulation and Preamble and its past practice. It also justified that weight based on the "extremely limited transactions" between Nur and Kaptan, without adequately explaining why those transactions were limited in a relevant way. *See* RTAC's Opening Br. at 35-42. Appellees nonetheless defend the weight agency accorded to Nur's business focus/activities, as well as the support and explanation for the agency's conclusions regarding the transactions between Nur/Kaptan. The Government first argues that any argument that Commerce is prohibited from considering business activities in its analysis has been waived, and is in any event untenable. Government's Br. at 25-28. The Government also argues that Commerce adequately explained and supported its conclusion that the "extremely limited" transactions between Nur and Kaptan supported the weight accorded to Nur's business focus. *Id.* at 28-31. Kaptan's claims again largely track those of the Government. Kaptan's Br. at 49-58.

The Government begins by arguing that RTAC has waived any claim that Commerce is prohibited from considering an input supplier's overall business activities or business focus in determining whether to cross-attribute subsidies, while also arguing that any such claim would be untenable. Government's Br. at 25-28. RTAC has never made that argument, rendering the Government's contention moot.

But neither the Government nor, more pertinently, Commerce, can avoid the arguments that RTAC *has* made by pointing at arguments that RTAC has *not* made.

RTAC's point is not based on a simple claim that Commerce is prohibited from considering an input supplier's business activities when determining whether to cross-attribute subsidies. Rather, RTAC's argument is that the regulations and Preamble indicate that the *focus* of the cross-attribution analysis is to be on the relationship between the input product and the downstream product. *See* discussion *supra* at 6-10; RTAC's Opening Br. at 20-21, 36-37; Appx2278-2279.

Beyond the regulation and Preamble, Commerce's own statements support this view, including its continued findings regarding the relevance, or lack thereof, of the quantities of primarily-dedicated inputs supplied between cross-owned companies. Appx1832-1834; Appx2181-2182, Appx2237, Appx2247. Absent the particular language of the regulation and Preamble, one might reasonably ask whether a foreign government, in subsidizing production of an input provided in limited quantities to a cross-owned downstream producer, intended to benefit the cross-owned downstream production. But Commerce has repeatedly found the quantity irrelevant to answering this "crucial question"— a finding that makes sense given the way that the regulation and Preamble indicate that the agency is to evaluate the foreign government's intent, *i.e.*, with special weight accorded to the relationship

between the input and output products. *See, e.g.*, Appx2181-2182; Appx2247; Appx1832-1834; Government's Br. at 18.

While the Government/Commerce assert that consideration of business activities assists the agency in assessing whether a foreign government intended to benefit downstream production when it offered subsidies to an input supplier, Government's Br. at 27-28; Appx2241, such assertions neither explain nor justify the particular weight that Commerce accorded to Nur's business activities here. Commerce attempted to explain and justify that weight by virtue of the "extremely limited transactions" between Nur and Kaptan. Appx2237, Appx2241, Appx2247. But as RTAC has explained, even if Nur/Kaptan's transactions with each other might be fairly characterized as "extremely limited," their limited nature necessarily reflects the volume of scrap at issue in the transactions — an issue that Commerce itself has found irrelevant to its analysis. RTAC's Opening Br. at 40-41.

In defending Commerce, the Government argues that the agency did not rely on the volume of scrap traded between Nur and Kaptan, but on the insignificance of scrap-related transactions in the context of total transactions between them. Government's Br. at 29-30. But Commerce merely alluded to "the totality of the facts contained within the transactions between Nur and Kaptan," without explaining which "facts" it found particularly relevant as to those transactions, or on what basis it concluded that their "totality" supported a decision against cross-attribution.

Appx2247. Further, while Kaptan argued that the transactions between the two companies did not support cross-attribution, it did so — as Commerce acknowledged — on the basis that these transactions reflected a minimal quantity of scrap. *Id.*; *see also* Appx2199-2201. Kaptan's arguments to Commerce thus shed no light on the agency's thinking here, and the Government cannot properly bridge the gap through *post-hoc* reasoning.

For that matter, the Government's attempted explanation makes little sense. To the extent that Kaptan and Nur had substantial intercompany transactions relative to the amount of scrap traded between them, the most natural conclusion would be that the two companies' operations are integrated in a way that would support cross-attribution. At least, the existence of such transactions provides no obvious support for finding against cross-attribution, particularly given that Nur not only sold scrap to Kaptan that Kaptan used to make rebar; Nur [ description of transactions ]. Appx156-157. And as RTAC has pointed out, Commerce's treatment of Nur is inconsistent with its treatment of other scrap-supplying affiliates. RTAC's Opening Br. at 41.

Given the lack of explanation or support that Commerce provided for its conclusion regarding the "extremely limited transactions" between Nur and Kaptan, the agency's analysis of Nur's business activities (and the Government's defense of that analysis) comes down to the fact that Nur is a shipbuilding company. *See*

Government's Br. at 30-31; Appx2250-2252. The Government avers that it would not be reasonable for the agency to conclude that subsidies offered to a shipbuilding company were intended to benefit downstream production using inputs generated by shipbuilding activities. Government's Br. at 30-31. But again, the Preamble and regulations indicate that the focus of the analysis is to be the relationship between the input product and downstream good, and that it is this relationship that figures primarily in assessing the intention behind the subsidy to the input supplier. Due attention must also be given to the reason that Commerce promulgated the cross-attribution regulation in the first place: to harmonize the treatment of companies that separately incorporate input production and downstream production with the treatment of companies that handle both operations within a single corporate entity. The weight that the agency has placed on Nur's status as a shipbuilder is inadequately explained and supported in light of the regulations and Preamble.

Kaptan's arguments with respect to Commerce's consideration of Nur's business activities largely track the Government's claims. Kaptan's Br. at 49-58. However, Kaptan also argues that the by-product nature of Nur's scrap means that it is not possible to resolve the question of whether that scrap was primarily dedicated to Kaptan's downstream production without consideration of Nur's business focus. *Id.* at 52. But Commerce explicitly found that the generation of scrap as a byproduct qualified as "production of the input product" within the meaning of 19 C.F.R.

§ 351.525(b)(6)(iv). Appx2238-2239. And as noted above, treating steel scrap as not primarily dedicated to downstream production in which it is used as the only input, on the basis that it is a byproduct, stands to recreate the loophole that the regulation was meant to close, given the realities of global steel — and particularly rebar — production. *See* discussion at 18, *supra*. Too, the regulation and Preamble demonstrate that the focus of the analysis is on the relationship between the finished downstream good — Kaptan's rebar and similar products — and the input material (scrap steel). The weight accorded to Nur's business focus remains inadequately explained, and the agency's conclusions regarding the nature of the transactions between the companies both inadequately explained and supported.

## IV.   **CONCLUSION**

As explained above and in RTAC's opening brief, Commerce's original determination to cross-attribute subsidies received by Kaptan's cross-owned input supplier Nur was lawful and reasonable. By contrast, Commerce failed to appropriately explain or support the remand results in which it ceased to cross-attribute the subsidies that Nur received. Commerce's original determination should therefore be reinstated. Failing that, the remand determination should be remanded for further consideration.

Respectfully submitted:

*/s/ John R. Shane*

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition and its individual members*

Dated: July 12, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1431

**Short Case Caption:** Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,218 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/12/2024

Signature: /s/ John R. Shane

Name: John R. Shane